UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
GPIF-I EQUITY CO., LTD. and                                          : Case No. 13-547
GPIF-I FINANCE CO., LTD.,                                            :
                                                                     :
                                Plaintiffs, :
                                                                     :
                       -against-                                :
                                                                     :
HDG MANSUR INVESTMENT SERVICES, INC.,                                :
HDGM ADVISORY SERVICES, LLC, and                                     :
HAROLD D. GARRISON                                                   :
                                                                     :
                               Defendants. :
                                                                     :
-------------------------------------------------------------------X

## GPIF-I EQUITY CO., LTD. AND GPIF-I FINANCE CO., LTD.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

WILMER CUTLER PICKERING
 HALE AND DORR LLP
Charles C. Platt
Jeremy S. Winer
7 World Trade Center
250 Greenwich Street
New York, New York 10007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND......................................................................................................1

    A.    The HDG Entities Agree to Serve as Fund Manager to the Funds.........................1

    B.    The HDG Entities Pay Themselves Excessive Financing Fees Out of Fund Assets. ......................................................................................................................2

    C.    The Funds Learn That the HDG Entities Had Misappropriated Fund Assets Over the Course of 2012 and Had Engaged in Improper Accounting Practices. ....5

ARGUMENT................................................................................................................................5

    A.    An Injunction Is Appropriate Here to Return to the Status Quo..............................5

    B.    The Funds Are Likely to Prevail on Their Claims...................................................6

    C.    The Funds Face Irreparable Harm That Cannot Be Remedied At Law And Requires Injunctive Relief. .......................................................................................9

    D.    The Balance of Harms Tips in the Funds' Favor....................................................10

CONCLUSION..........................................................................................................................11

# TABLE OF AUTHORITIES

## CASES

*Asa v. Pictometry Int'l Corp.*,
   757 F. Supp. 2d 238 (W.D.N.Y. 2010) ................................................................................. 7

*N.Y. Marine & General Insurance Co. v. Lafarge North America, Inc.*,
   599 F.3d 102 (2d Cir. 2010)) ................................................................................................. 7

*Reuters Ltd. v. United Press Int'l, Inc.*,
   903 F.2d 904 (2d Cir. 1990) ................................................................................................. 6

*S.E.C. v. Moran*,
   922 F. Supp. 867 (S.D.N.Y. 1996) ....................................................................................... 6

*Simonds v. Simonds*,
   45 N.Y.2d 2d 233, 408 N.Y.S. 2d 359 (1978) ..................................................................... 7

*Sokoloff v. Harriman Estates Development Corp.*,
   96 N.Y.2d 409 (2001) ........................................................................................................... 6

*Vector Capital Corp. v. Ness Technologies, Inc.*,
   No. 11 Civ. 6259, 2012 WL 913245 (S.D.N.Y. Mar. 19, 2012) ......................................... 8

## OTHER AUTHORITIES

Restatement (Second) of Trusts § 199(c) (1965) ...................................................................... 7

## PRELIMINARY STATEMENT

This is an action by two investment funds to recover at least $5,818,682 that was misappropriated by their fund manager from the funds' assets.

The fund manager owed fiduciary and contractual duties to protect fund assets and to put the interests of the funds and fund shareholders ahead of its own interests. The fund manager breached that trust by using its authority over fund assets to pay itself fees to which it was not entitled without notice to or the approval of the funds, by engaging in fraudulent accounting practices to hide its misappropriation of fund assets, and, when confronted, by claiming that the money at issue was owed to the fund manager as payment for previously "underbilled" fees.

To redress this flagrant breach of trust and self-dealing, the funds demanded that the monies in dispute be returned to the funds or, failing that, that such monies be placed in escrow pending resolution of the parties' dispute. The fund manager refused to comply with these demands, and the funds believe that the fund manager is in financial distress.

The funds therefore request that the Court enter a preliminary injunction order in the form of a constructive trust that directs the fund manager to deposit $5,818,682 into an escrow account with an independent bank, and not to take any other action with respect to that money.

## FACTUAL BACKGROUND

### A.   The HDG Entities Agree to Serve as Fund Manager to the Funds.

Around September 2002, defendant HDG Mansur Investment Services, Inc. ("HDG Investment") entered into a Fund Management Agreement with plaintiff GPIF-Equity Co., Ltd. ("Equity Co.") and a substantially identical Fund Management Agreement with plaintiff GPIF-I Finance Co., Ltd. ("Finance Co." and, together with Equity Co., the "Funds"). (Declaration of Deborah Hazell ("Hazell Decl.") ¶ 2 & Exs. A-C.) The Fund Management Agreements are referred to herein collectively as the "Agreements." On or around March 30, 2012, HDG

1

Investment assigned all of its rights, duties and obligations under the Agreements to defendant HDGM Advisory Services, LLC ("HDG Advisory" and, together with HDG Investment, the "HDG Entities"). (Hazell Decl. ¶ 3 & Ex. D.)

The Agreements provided that the HDG Entities would act as the fund manager and agent to the Funds, and would have authority and control over the Funds' assets. Among the duties that the HDG Entities agreed to undertake were to furnish the Funds with investment evaluation services, advice and investment services with respect to the investment and reinvestment of Fund assets and services relating to the financing and disposition of the Funds' properties. (*See, e.g.*, Hazell Decl. Ex. A § 4.1.) The HDG Entities also assumed in practice broad authority to manage the Funds' assets and exercised that broad authority. The Funds reposed trust and confidence in the HDG Entities, and entrusted the HDG Entities to protect and manage the Funds' assets in the best interests of the Funds and their shareholders.

The Agreements set forth the various fees, costs and expenses that the Funds were to pay to the HDG Entities for their services to the Funds. Among the fees described in the Agreements are "Investment Financing Fees" ("Financing Fees"), which are defined as "financing fee[s] payable to the Fund Manager [*i.e.*, the HDG Entities] . . . in connection with the acquisition by the Fund" of a real estate investment "which financing fee[s] shall be an amount equal to 1% of the aggregate amount of financing with respect to such" investment. (Hazell Decl. ¶ 4 & Ex. C pg. 9.)

    **B.**    **The HDG Entities Pay Themselves Excessive Financing Fees Out of Fund Assets.**

On or around December 17, 2012, it came to the Funds' attention that the HDG Entities had paid themselves millions of dollars out of the Funds' assets, without prior notice or approval

from the Funds. The Funds requested in writing that the HDG Entities explain the basis for the payments. (Hazell Decl. ¶ 5.)

On December 20, 2012, the HDG Entities, through their Chief Executive Officer, defendant Harold D. Garrison, advised the Funds that the HDG Entities had "received"—*i.e.*, taken—$5,818,682 in additional Financing Fees from the Funds' assets because (he claimed) Financing Fees allegedly had been "underbilled" since the inception of the Funds in 2002. (Hazell Decl. ¶ 6.)

The HDG Entities had previously received Financing Fees based on their calculation that they were entitled to 1% of the amount of the financing relating to each real estate investment made by the Funds. The HDG Entities used this "1% of the amount of financing" calculation in more than 60 transactions since 2002, and received fees from the Funds based on that common understanding of the appropriate calculation under the Agreements. (Hazell Decl. ¶ 7.)

According to Mr. Garrison, the HDG Entities took the $5,818,682 in "additional" Financing Fees based on an entirely new calculation—one that was never used before by the parties, and that was based on an entirely different interpretation of the Agreements not shared by the Funds. As Mr. Garrison explained, the HDG Entities re-calculated the additional Financing Fees as 1% of the total amount of each real estate investment (including the Funds' own equity in these investments), *not* just the financing related to the investment. Put another way, the HDG Entities said that they helped themselves to additional Financing Fees, long after the original payments were made, based on their unilateral determination that they were somehow entitled to the Fees based on the entire amount invested, rather than on just the financing arranged in connection with that investment. (Hazell Decl. ¶ 8.)

3

In paying itself these additional Financing Fees, the HDG Entities raided the cash holdings of various accounts in the Funds' investment properties without regard to whether and how those accounts were correlated to the real estate investments or related financing that purportedly justified the fees. It appears that the HDG Entities grabbed cash for themselves wherever it was available. (Hazell Decl. ¶ 10.)

The payment of these additional Financing Fees essentially resulted in the HDG Entities getting paid twice for their services. The HDG Entities had already received, under the Agreements, Investment Acquisition Fees that totaled "1% of the aggregate gross acquisition price" of each property investment made by the Funds. (Hazell Decl. ¶ 9 & Ex. C at pg. 8.) The HDG Entities' new interpretation of the Agreements thus results in a classic case of "double-dipping."

During a December 27, 2012 meeting of the Funds' boards of directors, Mr. Garrison told the boards that the HDG Entities had taken these additional Financing Fees because he was concerned that the HDG Entities would be terminated as fund manager, and he thought it would be easier to extract the Fees while the HDG Entities still had control over the Funds' assets rather than through a dispute resolution process with the Funds after the HDG Entities were terminated. (Hazell Decl. ¶ 11.)

The Funds demanded that the HDG Entities return the disputed fees or at least place the disputed fees in escrow pending resolution of the dispute. The HDG Entities, through Mr. Garrison, refused that request. On December 27, 2012, the Funds terminated the HDG Entities as fund manager, effective January 2, 2013. (Hazell Decl. ¶ 12.)

### C. The Funds Learn That the HDG Entities Had Misappropriated Fund Assets Over the Course of 2012 and Had Engaged in Improper Accounting Practices.

On January 16, 2013, the Funds learned that the HDG Entities had engaged in improper accounting practices during the previous year. Specifically, on at least 29 occasions during 2012, the HDG Entities paid themselves fees for transactions that they apparently expected to occur later in the year, but that in most cases never occurred. The HDG Entities paid themselves these fees—which totaled over $5.8 million—even though they had not yet earned that money (and in most cases never earned the money). During the course of the year, the HDG Entities accounted for those payments as prepaid fees and created offsetting asset entries to avoid expensing the payments and to keep the payments hidden from the Funds' boards. The payments ranged from just under $30,000 to over $500,000. (Hazell Decl. ¶ 13.)

In December 2012, after (i) realizing that the transactions would not in fact occur and that they would not earn the money they had taken, and (ii) facing inquiries from the Funds' boards, the HDG Entities re-characterized these improper payments as the additional Financing Fees described above, apparently in an effort to cover up the unearned payments that they had been making to themselves throughout the year, and that were never disclosed to the Funds or their auditors. (Hazell Decl. ¶¶ 5-6.)

The HDG Entities' misleading accounting practices confirm that they had no basis whatsoever to have misappropriated the Funds' assets, and that their claim to have taken "additional Financing Fees" is another misrepresentation in their unraveling fraudulent scheme.

### ARGUMENT

### A. An Injunction Is Appropriate Here to Return to the Status Quo.

A preliminary injunction may be entered where the moving party establishes: (1) that it will likely suffer irreparable harm if an injunction is not entered; and (2) that it is likely to

5

succeed on the merits of its claims or, in the alternative, that it has demonstrated sufficiently serious questions regarding the merits of the claims to warrant litigation, and that the balance of hardships tips decidedly in its favor. *See Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990). As described more fully below, the Funds meet each of these requirements.

### B. The Funds Are Likely to Prevail on Their Claims.

The HDG Entities owed fiduciary duties to protect the Funds' assets and to put the interests of the Funds and the Funds' shareholders ahead of the HDG Entities' own interests. As manager and agent of the Funds that exercised control over the Funds' assets, the HDG Entities were in a position of trust and obligated by law to act loyally and in the best interests of the Funds. *See Sokoloff v. Harriman Estates Dev. Corp.*, 96 N.Y.2d 409, 429-30 (2001). The Investment Advisers Act, which governs the HDG Entities' provision of services to the Funds, also "establishes a statutory fiduciary duty" that required the HDG Entities to "act for the benefit of their clients"—*i.e.*, the Funds. *S.E.C. v. Moran*, 922 F. Supp. 867, 895-96 (S.D.N.Y. 1996).

The HDG Entities engaged in fraud and breached their fiduciary duties to the Funds by putting their own interests ahead of the interests of the Funds and the Funds' shareholders, by paying themselves at least $5,818,682 out of the Funds' assets to which they were not entitled, by engaging in misleading and deceptive accounting practices relating to their misappropriation of these assets, and by lying to the Funds about when and why they had taken the assets from the Funds. Mr. Garrison participated in the fraudulent conduct and aided and abetted the HDG Entities' breaches of fiduciary duty. Instead of protecting the Funds' assets, the HDG Entities and Mr. Garrison engaged in blatant self-dealing at the expense of the Funds and their shareholders, and then made misrepresentations to the Funds to cover up their misconduct.

To compel the HDG Entities to redress this egregious breach of trust, the Funds seek a preliminary injunction in the form of a constructive trust, which would return the parties to the

status quo that existed prior to the HDG Entities' abuse of their position as the Funds' fiduciary. *See* Restatement (Second) of Trusts § 199(c) (1965); *Simonds v. Simonds*, 45 N.Y.2d 2d 233, 408 N.Y.S. 2d 359 (1978); *see generally Asa v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238, 243 (W.D.N.Y. 2010) (purpose of preliminary injunction is "as closely as possible [to] restore[] the parties to their status prior to the genesis of [their] dispute").

The HDG Entities have tried to justify their misappropriation of Fund assets by claiming that the additional Financing Fees that they paid themselves were permitted under the Agreements. The plain language of the Agreements shows that this is incorrect. The Agreements state clearly that Financing Fees payable to the HDG Entities "shall be an amount equal to *1% of the aggregate amount of financing* with respect to" each property investment made by the Funds. Hazell Decl. Ex. C at 8 (emphasis added).

Even if the plain language of the Agreements were ambiguous (and it is not), the parties' course of conduct over the past decade demonstrates that they both understood that Financing Fees were to be calculated as 1% of the financed amount of the underlying transactions. *See N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 119 (2d Cir. 2010) ("[t]here is no surer way to find out [the intent of the parties to a contract] . . . than to see what they have done") (citation omitted). Here, the HDG Entities themselves calculated the Financing Fees as 1% of the financed amount in every one of the more than 60 transactions that have been consummated during the decade in which the Agreements have been in place, never once claiming—as they do now—that Financing Fees should have been calculated under the Agreement as 1% of the total acquisition price paid for each real estate investment.

The HDG Entities' new interpretation of the Agreements is also completely contrary to the rationale for the Financing Fees, which is to compensate the HDG Entities for arranging

7

financing with respect to certain investments, not to reward the HDG Entities based on the total acquisition price of the investments. Under the new interpretation of the agreements by the HDG Entities, they would get the same amount of Financing Fees on a property investment of, say, $10 million, regardless of whether they arrange financing of $1.00 or $9 million. Such an absurd result cannot be what the parties intended. *See, e.g., Vector Capital Corp. v. Ness Techs., Inc.*, No. 11 Civ. 6259, 2012 WL 913245, at *3 (S.D.N.Y. Mar. 19, 2012) ("a court should not interpret a contract in a manner that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties'") (citations omitted).

If the parties had intended for the Funds to pay the HDG Entities 1% of the total acquisition costs, they would have used a phrase such as "total acquisition costs" rather than "amount of financing" when describing the 1% fee to which the HDG Entities are entitled. Elsewhere, in fact, the parties used that precise language in the Agreements. (Hazell Decl. Exs. A & B at A-1 to A-2) (referring to the "*total acquisition cost* of such Property Investment (net of all fees, costs and expenses incurred in connection with the acquisition, including those relating to financing in connection therewith)" (emphasis added)).

Moreover, the HDG Entities' new interpretation of the Agreements would result in their being paid twice for the same services. Pursuant to the Agreements, the HDG Entities have already been paid "Investment Acquisition Fees" that totaled "1% of the aggregate gross acquisition price" of each property investment made by the Funds. The HDG Entities' taking of Financing Fees pursuant to their new interpretation of the Agreements is thus a classic case of "double-dipping."

Finally, the HDG Entities' misleading accounting practices described above confirm that they had no basis whatsoever to have misappropriated the Funds' assets, and that their claim to

8

have taken "additional Financing Fees" is simply another misrepresentation in their unraveling fraudulent scheme.

Even if there were some conceivable basis for the HDG Entities' new interpretation of the Agreements to provide for additional Financing Fees, the HDG Entities were not permitted to simply pay themselves unilaterally out of the Funds' assets. Section 5.1 of the Agreements provides that Financing Fees are payable only "upon request." Hazell Decl. Ex. A § 5.1 ("the Fund . . . shall pay to the Fund Manager, promptly *upon request*, the following fees: . . . (ii) Investment Financing Fees . . ." (emphasis added)). The HDG Entities did not request that the Funds pay the $5,818,682 in Financing Fees that they claim to have been owed; rather, the HDG Entities simply took the money, depriving the Funds of the opportunity to evaluate a request for payment and to determine (as is the case with these Fees) that the request was without basis. This, too, was a breach by the HDG Entities of the Agreements.

### C. The Funds Face Irreparable Harm That Cannot Be Remedied At Law And Requires Injunctive Relief.

Faced with this flagrant breach of trust and self-dealing, the Funds must take action to protect the Funds' assets and shareholders. The need to redress this breach of trust is heightened by the serious and concrete risk that the HDG Entities may dissipate the $5,818,682 they have already taken because they have few (if any) additional sources of revenue other than the Funds and are currently experiencing financial distress. Mr. Garrison has from time to time stated to various board members that, given the reduction in asset-based fees resulting from declines in the net asset value of the Funds, the HDG Entities were having difficulty meeting overhead expenses. (Hazell Decl. ¶ 14.) The HDG Entities have also resorted to misleading and deceptive accounting practices and grabbing cash from accounts without regard to whether those accounts were correlated to the fees claimed to be due. (Hazell Decl. ¶¶ 10, 13.) Thus, the Funds believe

9

that out of concern over a possible future termination, and recognition of its dire revenue situation, the HDG Entities engaged in a "cash grab" so as to ensure their financial survival, and that they will dissipate all their remaining assets during the pendency of this dispute.

As a result, the Funds are seeking a preliminary injunction in the form of a constructive trust that requires the HDG Entities to place the $5,818,682 in dispute into an escrow account at an independent bank, and that prohibits the HDG Entities from taking any other action with respect to that money.

This constructive trust is not only required to protect the assets of the Funds' shareholders, who have been victimized by the HDG Entities. It is also necessary because an award of money damages cannot compensate the Funds for the disruption in Fund operations, and the attendant impairment of goodwill with the Funds' shareholders, that would result from an inability to determine whether the $5,818,682 that already has been taken will be available for return to the Funds (and not dissipated). Without assurance that the money will not be dissipated, the Funds cannot (i) ensure accuracy of their net asset value and (ii) report to shareholders as to the value of their holdings in the Funds, which they may need for, for example, tax purposes or other financial planning purposes. Additionally, if the monies are dissipated, the impact of this loss will be magnified as the Funds' investment strategy may be impacted, thus potentially negatively impacting the shareholders' ultimate investment return. (Hazell Decl. ¶¶ 16-18.)

**D.   The Balance of Harms Tips in the Funds' Favor.**

The Funds face the dissipation of millions of dollars in shareholder assets if the HDG Entities are allowed to maintain control over the disputed Financing Fees. These assets amount to approximately one third of the Funds' available cash and 6.6% of the current Net Asset Value of the Funds. (Hazell Decl. ¶ 16.)

By contrast, the HDG Entities cannot demonstrate any material harm should an injunction be granted directing them to place the $5,818,682 in escrow. The Fees at issue are Fund assets, not reimbursement for out-of-pocket expenses incurred by the HDG Entities. In the unlikely event that the HDG Entities were to prevail, the money would then be made available to the HDG Entities, with interest, placing them in the same position they are in now. To the extent they are able to claim any economic harm, it would validate the Funds' concerns as it would reinforce the notion that the HDG Entities need this money to continue operations, and if allowed to retain the money, will likely spend it and thus render the money unrecoverable.

## CONCLUSION

For the foregoing reasons, the Funds respectfully request that the Court enter a preliminary injunction pending trial in this matter ordering the HDG Entities to deposit $5,818,682 into an escrow account, and restraining and enjoining the HDG Entities from selling, transferring, assigning, encumbering, or taking any other action with respect to the funds placed into escrow.

| | |
|---|---|
| Dated: New York, New York<br>January 24, 2013 | WILMER CUTLER PICKERING<br>HALE AND DORR LLP<br><br>By: *[signature]*<br>Charles C. Platt<br>Jeremy S. Winer<br><br>7 World Trade Center<br>250 Greenwich Street<br>New York, New York 10007<br>Tel: (212) 230-8800<br>Fax: (212) 230-8888<br><br>*Attorneys for Plaintiffs GPIF-I Equity Co.,*<br>*Ltd. and GPIF-I Finance Co., Ltd.* |