UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

GPIF-I EQUITY CO., LTD. and
GPIF-I FINANCE CO., LTD.,

                                 Plaintiffs, :

                  -against-

HDG MANSUR INVESTMENT SERVICES, INC.,
HDGM ADVISORY SERVICES, LLC, and
HAROLD D. GARRISON

                        Defendants. :

-------------------------------------------------------------X

Case No. __13-547_____

**DECLARATION OF
DEBORAH HAZELL**

I, Deborah Hazell, hereby declare as follows:

1.      I am a member of the board of directors of each of GPIF-I Equity Co., Ltd. and GPIF-I Finance Co., Ltd. (the "Funds"). I have been a director of the Funds since July 19, 2011. I submit this declaration in support of the Funds' request for a preliminary injunction.

**The HDG Entities Were Engaged to Provide Fund Management Services to the Funds.**

2.      In September 2002, each of the Funds entered into a fund management agreement (together, the "Agreements") with HDG Investment Services, Inc. ("HDG Investment"). True and correct copies of the Agreements and their amendments, are attached as Exhibit A (GPIF-I Equity) and Exhibit B (GPIF-I Finance). I have also attached as Exhibit C a true and correct copy of Schedule X ("Definitions; Rules of Usage and Interpretation") to the Agreements.

3.      On or around March 30, 2012, HDG Investment assigned all of its rights, duties and obligations under the Agreements to HDGM Advisory Services, LLC ("HDG Advisory" and, together with HDG Investment, the "HDG Entities"). Attached hereto as Exhibit D is the Assignment and Assumption Agreement.

4.      The Agreements describe various fees, costs and expenses that the Funds were to pay to the HDG Entities for their services to the Funds.  Among the fees described in the Agreements are Investment Financing Fees ("Financing Fees").

**The Funds Learned That the HDG Entities Had Misappropriated Fund Assets.**

5.      On or around December 17, 2012, it came to the Funds' attention that the HDG Entities may have paid themselves millions of dollars out of the Funds' assets, without prior notice or approval from the Funds.  The Funds requested in writing that the HDG Entities explain the basis for the payments.

6.      On December 20, 2012, the HDG Entities' CEO, Harold D. Garrison, advised the Funds that HDG Advisory had taken $5,818,682 in additional Financing Fees from the Funds' assets because (he claimed) Financing Fees allegedly had been "underbilled" since the inception of the Fund in 2002.

7.      The HDG Entities had previously received Financing Fees based on their calculation that they were entitled to 1% of the amount of the financing relating to each real estate investment made by the Funds.  The HDG Entities used this "1% of the amount of financing" calculation in more than 60 transactions since 2002, and received fees from the Funds based on their common understanding of the appropriate calculation under the Agreements.

8.      The HDG Entities claim to have taken the $5,818,682 in additional Financing Fees based on an entirely new calculation that was never used before by the parties, and that was based on an entirely different interpretation of the Agreements not shared by the Funds.  As Mr. Garrison explained, the HDG Entities re-calculated their additional Financing Fees as 1% of the total amount of each real estate investment(including the Funds' own equity in these investments), *not* just the financing related to the investment.

INTERNAL - 2

9. The HDG Entities had already received, under the Agreements, Investment Acquisition Fees that totaled "1% of the aggregate gross acquisition price" of each property investment made by the Funds. As a result, the HDG Entities had already received a fee based on the total amount of each real estate investment.

10. The HDG Entities paid themselves these additional Financing Fees by taking money from various fund accounts without regard to whether and how those accounts were correlated to the real estate investments or financing for those investments that purportedly justified the fees.

11. During a December 27, 2012 meeting of the Boards of Directors of the Funds, Mr. Garrison said that the HDG Entities had taken these additional Financing Fees because he was concerned that the HDG Entities would be terminated as fund manager and he thought it would be easier to extract the Fees while the HDG Entities still had control over the Funds' assets rather than through a dispute resolution process with the Funds after the HDG Entities were terminated.

12. The Funds demanded that the HDG Entities return the disputed fees or at least place the disputed fees in escrow pending resolution of the dispute. The HDG Entities, through Mr. Garrison, refused that request. On December 27, 2012, the Funds terminated the HDG Entities as fund manager, effective on January 2, 2013.

**The Funds Learned That the HDG Entities Had Engaged in Improper Accounting Practices to Hide from the Funds' Boards That They Had Taken Fund Assets.**

13. On January 16, 2013, the Funds learned that the HDG Entities had engaged in improper accounting practices during the previous year. Specifically, on at least 29 occasions during 2012, the HDG Entities paid themselves fees for transactions that they apparently expected to occur later in the year, but that in most cases never occurred. The HDG Entities paid

themselves these fees—which totaled over $5.8 million—even though they had not yet earned

that money (and in most cases never earned the money).  During the course of the year, the HDG

Entities accounted for those payments as prepaid fees and created offsetting asset entries to avoid

expensing the payments and drawing the attention of the Funds' Boards.  The payments ranged

from just under $30,000 to over $500,000.

**Absent Injunctive Relief, the Funds Will Suffer Irreparable Harm**

14.    Mr. Garrison has from time to time stated to various board members of the Funds

that, given the reduction in asset-based fees resulting from declines in the net asset value of the

Funds, the HDG Entities were experiencing difficulty meeting overhead expenses.  The Funds

believe that there is a significant possibility that without the revenue provided by the Funds, the

HDG Entities will be unable to continue operating.

15.    The discovery of the HDG Entities' improper accounting practices has

heightened the Funds' concerns about the HDG Entities' financial condition and the risk of

further misappropriation of the Funds' assets.

16.    The $5,818,682 at issue represents approximately one third of the Funds'

available cash.  It also represents approximately 6.6% of the Funds' current Net Asset Value.

17.    Without assurance that the money will not be dissipated, the Funds cannot (i)

ensure accuracy of their net asset value or (ii) report to shareholders as to the value of their

holdings in the Funds, which shareholders often need for tax purposes or other financial planning

purposes.

18.    Additionally, the Funds need this money to maintain their property investments

and service their loans.  If the monies are dissipated, the impact of this loss will be magnified as

INTERNAL - 4

the Funds' investment strategy may be impacted, thus potentially negatively impacting the

shareholders' ultimate investment return.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York

      January 24, 2013

                                   Deborah Hazell