```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
GPIF-I EQUITY CO., LTD and
GPIF-I FINANCE CO., LTD,
                                Plaintiffs,        Index No.: 1:13-cv-00547-
                                                   CM
        v.

HDG MANSUR INVESTMENT SERVICES, INC.,
HDGM ADVISORY SERVICES, LLC, and                   DECLARATION OF
HAROLD D. GARRISON,                                HAROLD D. GARRISON

                                Defendants.
-------------------------------------------------------------------------X
```

I, Harold D. Garrison, being duly sworn, hereby state as follows:

1.      I am the Chairman and Chief Executive Officer of both HDG Mansur Investment Services, Inc. ("HDG Investment"), and HDGM Advisory Services, LLC, ("HDGM Advisory," together the "HDG Entities," and together with me, the "Defendants") and have been since the inception of each entity. I make this declaration based upon the knowledge and information I have personally with respect to the matters contained herein.

**The Parties**

2.      In 1982, I co-founded Mansur Development Corporation. I co-founded The Mansur Group, Inc. in 1987 and HDG Investment in 1994, to develop new property investment products for high net-worth investors and international institutions. The Mansur Group has provided $5.3 billion in capital advisory services in North America, Europe and Asia.

3.      HDG Investment is a leading international advisory firm which has advised, developed, and managed international real estate ranging from single tenant assets to complex international portfolios. Amongst the services it provides are real estate fund management,

1

customized asset and portfolio management, acquisition and disposal mandates, real estate investment structuring, and specialist consulting projects.

4. In the late 1990's, HDG Investment began exploring the idea of a real estate investment vehicle which would appeal to religious Muslim investors by accommodating the requirements and restrictions of *Shari'ah*, Muslim religious law. Among other distinctions from common investments, all transactions would be structured to follow the prohibition against the payment of interest, and the tenants of buildings owned by the fund would be vetted for suitability. For example, tenants would be vetted to ensure they have no involvement with pornography, alcohol, banking, or insurance.

5. On or about September 20, 2002, HDG Investment entered into fund management agreements with GPIF-I Equity Co., Ltd. and GPIF-I Finance Co., Ltd (together "Plaintiffs" or the "Funds"). The Fund Management Agreements (collectively, the "FMA") are identical in all pertinent parts. The Fund Management Agreement between GPIF-1 Equity Co., Ltd. and HDG Investment is attached as Exhibit A to the Declaration of Deborah Hazell in Support of Plaintiffs' Motion for a Preliminary Injunction ("Hazell Dec."). The Fund Management Agreement between HDG Investment and GPIF-I Finance Co., Ltd is attached as Exhibit B to the Hazell Dec.

6. HDGM Advisory was created in 2012 as a member of the Mansur Group and a corporate relative to HDG Investment. Shortly after its inception, HDGM Advisory became an assignee of HDG Investment's agreements with the Plaintiffs.

7. On or about March 30, 2012, HDGM Advisory received an assignment of all of HDG Investment's rights and obligations pursuant to the FMA. The Assignment and Assumption Agreement was attached as Exhibit D to the Hazell Dec.

**Terms of the Fund Management Agreements**

8. Pursuant to Section 4.2 of the FMA, the HDG Entities were required to:

> identify, consider, select, investigate, acquire, manage, operate and maintain the real estate and real estate related investment opportunities . . . [,] perform customary financial market, credit, legal, physical and other appropriate due diligence investigations and activities with respect to each prospective investment and determine the need for, or advisability of, financing. In addition, [HDG Investment must] prepare, negotiate and execute, on the Fund's behalf, all agreements, documents and instruments necessary or advisable for the development, acquisition, management operation and maintenance of the Property Investments.

9. Pursuant to Section 4.1 of the FMA, the HDG Entities were required to perform their "duties and services" in accordance with the principles of Islamic *Shari'ah*, including the "structuring, acquisition and financing of investments."

10. Accordingly, the HDG Entities investigated properties as potential acquisitions, both for their prospects as investments and for their suitability under this fund's special requirements for compliance with *Shari'ah*. Once an attractive property was identified, HDG Entities negotiated the purchase and then presented the property to the Fund Managers' Investment Committee for approval. The HDG Entities then obtained suitable financing (again, in accordance with *Shari'ah* requirements and prohibitions). Property managers and leasing agents would also be contracted for each property by HDG Entities. HDG Entities also provided quarterly reporting to the Funds' Boards, which required a valuation of the Funds' assets each quarter, including the determination of the fair market value of each property in the Fund's portfolios. The net asset value provided the support for defining a quarterly share price which

3

was provided to the Board and also, when approved, provided to the invertors on a quarterly basis.

11. Pursuant to the FMA, the HDG Entities were paid several types of fees. All fees, other than leasing fees, were shared with HSBC, the Funds' sponsor. Among those were:

A. **Fund Manager Compensation**- pursuant to section 5.1 of the FMA and Attachment A thereto, the HDG Entities were entitled to "a quarterly administration fee . . . in a net amount equal to 1.08% of the estimated Average Daily Total Assets of the Fund Companies on an annualized basis as of the last day of the relevant calendar quarter" as compensation for its work managing the fund and the properties, maintaining compliance with *Shari'ah* requirements and prohibitions, and reporting quarterly to investors. See Exhibit A to FMA.

B. **Reimbursement of Expenses-** pursuant to § 5.2 of the FMA, the HDG Entities were entitled to reimbursement of certain fees, costs, and expenses incurred in the process of executing their duties and responsibilities pursuant to the FMA. A budget for such expenses would be approved by the Investment Committee, and no further permissions would be needed to get reimbursement for amounts within the approved budget.

C. **Transactional Fees-** pursuant to §§ 5.4-5.6 of the FMA, the HDG Entities were entitled to (1) Acquisition Fees, (2) Financing Fees, and (3) Disposition Fees, each in exchange for providing the Funds with different services, since

> "the Fund Manager . . . has the capability of providing such services rather than having a third party provide such services."

12. Pursuant to Section 5.4 of the FMA, for the HDG Entities' work in identifying and negotiating acquisitions, the HDG Entities were paid a fee of 1% of the acquisition price of a Property Investment[1/] made by the Funds in accordance with the precepts of Islamic *Shari'ah*.

13. The HDG Entities were also entitled to fees for their services provided in obtaining *Shari'ah*-compliant financing for Property Investments made by the Funds (the "Financing Fee"). *See* §5.5 of the FMA. The Financing Fee was 1% of all financing used to acquire Property Investments, "including equity, debt, debt-equivalent and Islamic financing elements." *Id.*

14. Additionally, the HGD Entities received a fee on the disposition of all Fund Property Investments. This fee was 1% of aggregate gross proceeds from the disposition. *See* Section 5.6 of the FMA.

15. Each of the above fees was designed to compensate the HDG Entities for a distinct service they provided to the Funds. The HDG Entities only received these fees when they provided the associated services.

16. Pursuant to Section 3 of the FMA, the HDG Entities were authorized to withdraw funds to pay themselves without seeking approval from Plaintiffs or the Board of Directors.

> The Fund Manager is authorized to execute all day-to-day transactions on behalf of Equity Co. and the Fund. The Fund Manager is authorized to pay out of the funds of Equity Co. and

---

[1/] A Property Investment is "a real estate investment made directly or indirectly by any or all of the Fund Companies . . . in accordance with the precepts of Islamic Shariah . . . ." *See* Schedule X, which was attached as Exhibit C to the Hazell Dec.

> the Fund all of the fees, costs and expenses payable by Equity Co.
> or the Fund pursuant to any Transaction Document [including, but
> not limited to, the FMA] to or on behalf of the Fund Manager.

The HDG Entities did so repeatedly throughout the life of the FMA with no complaint by the Funds until 2012.

17. I understand that the Funds have claimed that it was inappropriate for the HDG Entities to pay themselves Financing Fees before a deal closed. This is simply incorrect. The FMA specifically provided the HDG Entities with the right to be paid Financing Fees "prior to the time of the completion of the relevant financing." FMA §5.5. The FMA was structured this way because of the unusually complicated and time-consuming finance and tax structures employed to insure the investments were *Shari'ah*-compliant. Accordingly, over the ten years they were Fund Manager, the HDG Entities periodically paid themselves Financing Fees before a transaction closed. I only recall one instance in which the HDG Entities received financing fees when the transaction did not ultimately close. In any such instance, the fees were credited back to the Funds to account for such a payment.

**Realization of Underpayment**

18. Between 2002 and 2012, the HDG Entities were paid Financing Fees based solely on the debt portion of acquisitions. In late 2011 or early 2012, discussions began between the Board and the HDG Entities concerning the Boards' desire for a "review of procedures" pursuant to the FMA and other governing documents. In preparation for the review, the HDG Entities began an internal review of fees they had been paid. The HDG Entities then became aware that an error had been made in how their fees had been calculated, that the fees should have been based not only on debt financing, but on "equity, debt, debt-equivalent, and Islamic financing elements," as per Section 5.5 of the FMA.

19.     KPMG was engaged to perform an "Agreed Upon Procedure" review of the Funds for the period from 2009 through 2011.  While KPMG's review was ongoing, the HDG Entities informed the Boards of Directors of the Funds about the underpayments, broadly estimating that they were owed in the area of $5 million.

20.     In fact, in April of 2012, I again raised the issue that the HDG Entities had been underpaid throughout the term of the FMA and were owed substantial monies.

21.     The final report from KPMG, attached hereto as Exhibit 1, highlighted the definition for the calculation of the HDG Entities' Finance Fee, noted that the Financing Fee should be "equal to **1% of the aggregate amount of financing**" which includes "equity, debt, debt-equivalent, and Islamic financing elements" used to acquire a Property Investment.  *KPMG Report*, p. 71 (emphasis in original).  KPMG's report is consistent with the HDG Entities' interpretation of the FMA.

22.     The HDG Entities then completed their audit of the past Financing Fee calculations.   This process revealed the underpayment totaling $5,818.682 to the HDG Entities.  This underpayment was reported to the Board and was also presented at the third-quarter 2012 meeting of the Board of Directors.

23.     Accordingly, the HDG Entities began the process of "truing-up" the underpaid financing fees in 2012.  The underpaid fees were taken incrementally so as not to harm the Funds or their investors.

24.     I think that it is important to note that we have been engaged with the Funds with respect to a resolution of all of these issues since December of 2012.  I do not know what has

changed in the past month that caused the Funds to make these allegations and commence this action.

**Termination of the FMA and Fees Owed to the HDG Entities**

25. On December 27, 2012, at a telephonic meeting of the Board of Directors, there was a vote to terminate the FMA. Although the termination was referenced in a letter from Ms. Hazell dated January 8, 2013, attached hereto as Exhibit 2, no formal notice of termination, as required by Section 6.2 of the FMA, was received by the Defendants until they received the letter from Paul Dawe dated January 14, 2013, attached hereto as Exhibit 3. That letter named January 2, 2013 as the termination date.

26. Pursuant to Section 6.2 of the FMA, certain monies are due to the HDG Entities at the termination of the FMA. Those sums have not been paid. Nonetheless, the HDG Entities have, in the interest of the Funds and the Funds' investors, worked with the Funds to make the transition to the new manager as smooth as possible. As recently as January 10th, Ms. Hazell wrote to thank us for our assistance with the transition to new management and our ongoing support. Ms. Hazell's January 10, 2013 e-mail is attached hereto as Exhibit 4. Since the HDG Entities are cooperating with the Funds and providing services to accomplish an orderly transfer to the new fund manager, they are entitled, pursuant to Section 6.4 of the FMA, to their fees under the FMA for 30 days after the date of termination, in addition to unpaid fees from the term of the FMA. The administrative fees and reimbursements for that period total approximately $134,010.

27. According to Sections 6.2 and 6.4 of the FMA, the Funds' unilateral election to terminate the agreement at the end of 2012 entitles the HDG Entities' to a severance payment of

$5,465,928. This severance payment was due at termination. Plaintiffs have not paid the termination fee to any of the HDG Entities.

28.  Also as per Sections 6.2 and 6.4 of the FMA, such a termination entitles the HDG Entities to a payout of HDG Entities' co-investments in the Fund, which total $1,657,300 (according to the September 2012 financials).

29.  Sections 6.2 and 6.4 of the FMA also provide that the HDG Entities are entitled to receive $503,342, representing its full fees for transactions that closed prior to their termination and for expenses incurred before that date. A breakout of those fees is as follows:

| Event | HDG Entities' Fee |
|---|---|
| Nederbipp disposition fee | 396,671 |
| Neiderbipp CAPF | 213,519 |
| Less: Niederbipp paid early on estimate | (639,571) |
| AW Plano Disposition Fee | 369,900 |
| UK Portfolio consensual sale "top-up"- Solihul | 56,227 |
| UK Portfolio consensual sale "top-up"- Hemel | 41,655 |
| SA Andover Lease Commission | 64,941 |
| **TOTAL** | **503,342** |

30.  Additionally, the HDG Entities are entitled to their fees for financing transactions on which they worked and which are scheduled to close within 180 days after their termination. *See* definition of "Termination Payment Elements" on page 12 of Schedule X- Definition Rules of Usage and Interpretation, attached as Exhibit C to the Hazell Dec. Accordingly, HDG Entities are due the following payments:

| Financing | HDG Entities' Fee |
|---|---|
| ING Senior | 1,858,500 |
| ING Mezz | 148,500 |
| HSBC Bank of Bermuda Mezz | 522,000 |
| HSBC Bank of Bermuda 5-Pack Sr & Jr | 864,000 |
| **TOTAL** | **3,393,000** |

31. Accordingly, Plaintiffs currently owe the HDG Entities at least $11,153,580.[2/]

32. I do not understand what possibly could have changed since January 10 to cause the Funds to make this application to the Court about a topic that all involved have known about and discussed since December of 2012.

33. Finally, it is also my understanding that the Funds have alleged that the HDG Entities are "in financial distress." While the end of this relationship did impact us, we continue to be a going concern with a global portfolio of investment properties, and are headquartered in Indianapolis, Indiana.

_____
Harold D. Garrison

Subscribed and sworn to before me
this 29th day of January, 2013.

_____
Notary Public   Amy Novack



AMY NOVACK
Hamilton County
My Commission Expires
July 29, 2017

---

[2/] This number does not include the fees owed to the HDG Entities for the leases it negotiated with tenants of the Funds' properties.