UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
GPIF-I EQUITY CO., LTD. and                        :
GPIF-I FINANCE CO., LTD.,                           :
                                                              :
                      Plaintiffs,                         :
                                                              :
v.                                                            :        **Case No. 13 Civ 547 (CM)**
                                                              :
HDG MANSUR INVESTMENT SERVICES, INC.,   :
HDGM ADVISORY SERVICES, LLC, and           :
HAROLD D. GARRISON                                :
                                                              :
                      Defendants.                       :
-----------------------------------------------------------------x

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
## FOR A PRELIMINARY INJUNCTION

MINTZ LEVIN COHN FERRIS
 GLOVSKY AND POPEO, P.C.
Francis J. Earley
John S. McMahon III
Chrysler Center
666 Third Avenue, 25th Floor
New York, New York 10017
FEarley@mintz.com
TMcMahon@mintz.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS .....................................................................................................3

Defendants' Performance Under the Agreements .....................................................................3

Fees Paid to the HDG Entities ....................................................................................................5

The HDG Entities Determine They Were Being Underpaid ......................................................6

The Termination of the FMA .......................................................................................................8

ARGUMENT ..............................................................................................................................10

I.      Plaintiffs Cannot Show Irreparable Harm...................................................................11

        A.      Injunctive Relief Is Unavailable in Cases About Only Money Damages.............11

        B.      Plaintiffs' Delay Exposes the Lack of Any Real Urgency ....................................13

II.     Plaintiffs Are Unlikely to Succeed on the Merits ..........................................................14

        A.      The Agreement Between the Parties Allows Defendants to Pay
                Themselves, So There Is No Breach of Contract....................................................14

        B.      Defendants Were Entitled to the Money...............................................................14

        C.      Plaintiffs Will Not Be Able to Prevail on Any of Their Non-Contract
                Claims ...........................................................................................................15

III.    The Balance of the Equities Does Not Decidedly Tilt Towards Either Party ..................16

        A.      Plaintiffs Are Withholding Defendants' Fees Worth Significantly More
                Than the Amount in Dispute Here ........................................................................16

        B.      Defendants Have Cooperated Since Termination, In Contrast to Plaintiffs ..........17

CONCLUSION.............................................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Alitalia Linee Aeree Italiane v. Airline Tariff Publ. Co.,*
   580 F. Supp. 2d 285 (S.D.N.Y. 2008)............................................................15-16

*Citibank, N.A. v. Citytrust,*
   756 F.2d 273 (2d Cir. 1985)...........................................................................13

*Delta Air Lines, Inc. v. Tie Cargo Corp.,*
   1996 U.S. Dist. LEXIS 22755, 1996 WL 1088913 (E.D.N.Y. Oct. 17, 1996).......................12

*Emirates Int'l Inv. Co. v. ECP Mena Growth Fund, LLC,*
   2012 U.S Dist. LEXIS 83616, 2012 WL 2198436 (S.D.N.Y. June 15, 2012) .......................11

*Federal Express Corp. v. Federal Espresso, Inc.,*
   201 F.3d 168 (2d Cir. 2000)...........................................................................10

*Grupo Mexicano De Desarrollo v. Alliance Bond Fund,*
   527 U.S. 308 (1999).....................................................................................11

*ImOn, Inc. v. ImaginOn, Inc.,*
   90 F. Supp. 2d 345 (S.D.N.Y. 2000)..................................................................10

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997).....................................................................................10

*Rafter v. Liddle,*
   704 F. Supp. 2d 370 (S.D.N.Y. 2010)................................................................15

*Rodriguez v. DeBuono,*
   175 F.3d 227 (2d Cir. 1999)...........................................................................11

*S. Cherry St. LLC v. Hennessee Group LLC,*
   534 F. Supp. 2d 405 (S.D.N.Y. 2007)................................................................16

*Tang Capital Partners, LP v. Cell Therapeutics, Inc.,*
   591 F. Supp. 2d 666 (S.D.N.Y. 2008) (McMahon, J.)..........................................11-12

STATUTES

15 U.S.C. §§ 80b-6, 80b-15 ...............................................................................12

Investment Advisers Act of 1940 ..................................................................2, 12, 16

Defendants HDG Mansur Investment Services, Inc. ("HDG Investment"), HDGM Advisory Services, LLC ("HDG Advisory" and, together with HDG Investment, the "HDG Entities"), and Harold D. Garrison ("Garrison" or "Mr. Garrison" and, together with the HDG Entities, "Defendants") respectfully submit this Memorandum of Law, together with the Declaration of Harold D. Garrison ("Garrison Decl.") and the exhibits attached thereto, in opposition to the application of plaintiffs GPIF-I Equity Co., Ltd. and GPIF-I Finance Co., Ltd. (together the "Funds" or "Plaintiffs") for a preliminary injunction requiring Defendants to place $5,818,682 in an escrow account or constructive trust pending the resolution of a dispute over that sum of money.

## PRELIMINARY STATEMENT

Plaintiffs bring this motion for a preliminary injunction despite seeking only money damages. If Plaintiffs were to ultimately prevail after trial, their damages would be $5,818,682. Additionally, Plaintiffs do not explain why, if this motion is so urgent, they did not act for over a month, and possibly many months, after learning of the activity of which it now complains. Plaintiffs have alleged nothing that they did not know in mid-December. Plaintiffs' delays in making this motion reinforce the simple truth that there is no imminent irreparable harm, the crucial requirement for a preliminary injunction. There simply is no basis here for such extraordinary relief from this Court.

There also is no indication, according to the applicable agreements, that Plaintiffs can demonstrate a likelihood of success on the merits. Defendants did pay themselves approximately $5.8 million, pursuant to Sections 3 and 5.5 of the Fund Management Agreements, which gave the Defendants the express authority to pay themselves. The plain language of the Fund

Management Agreements shows that the Defendants were, in fact, due this money, a fact brought to Plaintiffs' attention by Defendants and independent third parties.

Plaintiffs' non-contract claims also must fail. First, it is well accepted law that a party cannot restate a contract claim as fraud or breach of a fiduciary duty. Here, Plaintiffs' fraud and fiduciary duty claims are predicated on the same alleged wrongful conduct as set forth in the contract claim, and Plaintiffs seek to recover the same $5,818,682. Second, Plaintiffs' claims under the Investment Advisers Act either are barred by the language of the Act or fail for the same reasons discussed above.

Further, the balance of the equities does not tip decidedly in either party's favor. Should this matter continue, the Defendants intend to assert counterclaims for unpaid fees and contractually required termination fees that total in excess of $11 million. Plaintiffs' application is nothing more than one party's attempt to obtain an unwarranted advantage in a contractual dispute between two sophisticated parties.

Finally, Plaintiffs attempt to justify their application for a preliminary injunction by making: (1) unsworn allegations that the HDG Entities may suffer some financial difficulty because of reduced fees paid to them by the Funds and (2) nebulous recitations to the Investment Advisers Act as the basis for injunctive relief. Neither of these arguments provides the basis for a preliminary injunction. First, the risk that the HDG Entities may receive fewer fees does not warrant extraordinary relief such as a preliminary injunction. Second, a plain reading of Sections 206 and 215 of the Investment Advisers Act demonstrates that the Act does not contemplate injunctive relief in this situation.

It is respectfully submitted that a preliminary injunction is unwarranted under these circumstances.

## STATEMENT OF FACTS

Harold D. Garrison is the co-founder of the Mansur Group, which has provided $5.3 billion worth of capital advisory services in North America, Europe and Asia, and HDG Investment, a leading international real estate investment advisory firm which has advised, developed and managed international properties ranging from single tenant assets to complex international portfolios.  (Garrison Decl. ¶¶ 2-3.)

In the early 1990's, HDG Investment began exploring the idea of a real estate investment vehicle which would appeal to religious Muslim investors by accommodating the requirements and restrictions of *Shari'ah*, Muslim religious law.  (*Id.* ¶ 4.)  Among other customizations, all transactions would be structured to follow the *Shari'ah* prohibition against the paying of interest, and the tenants of buildings owned by the fund would be vetted for compliance with *Shari'ah* requirements.  (*Id.*)  For example, tenants would be vetted to insure they have no involvement with pornography, alcohol, banking, or insurance.  (*Id.*)

Defendants' Performance Under the Agreements

On or about September 20, 2002, HDG Investment entered into fund management agreements with the plaintiff Funds.  (*Id.* ¶ 5.)  The Fund Management Agreements (together, the "FMA") are identical in all pertinent parts.  (*Id.*)  The Fund Management Agreement between GPIF-1 Equity Co., Ltd. and HDG Investment is attached as Exhibit A to the Declaration of Deborah Hazell in Support of Plaintiffs' Motion for a Preliminary Injunction ("Hazell Decl.").  The Fund Management Agreement between HDG Investment and GPIF-I Finance Co., Ltd is attached as Exhibit B to the Hazell Decl.

HDGM Advisory was created in 2012 as a member of the Mansur Group and a corporate relative to HDG Investment.  (*Id.* ¶ 6.)  On or about March 30, 2012, HDGM Advisory received

an assignment of all of HDG Investment's rights and obligations pursuant to the FMA. (*Id.* ¶ 7.)

The Assignment and Assumption Agreement was attached as Exhibit D to the Hazell Decl. (*Id.*)

Pursuant to Section 4.2 of the FMA, the HDG Entities were required to:

> identify, consider, select, investigate, acquire, manage, operate and
> maintain the real estate and real estate related investment opportunities . . .
> [,] perform customary financial market, credit, legal, physical and other
> appropriate due diligence investigations and activities with respect to each
> prospective investment and determine the need for, or advisability of,
> financing. In addition, [HDG Investment must] prepare, negotiate and
> execute, on the Fund's behalf, all agreements, documents and instruments
> necessary or advisable for the development, acquisition, management
> operation and maintenance of the Property Investments.

(FMA § 4.2; Garrison Decl. ¶ 8.) Pursuant to Section 4.1 of the FMA, the HDG Entities

were required to perform their "duties and services" in accordance with the principles of Islamic

*Shari'ah*, including the "structuring, acquisition and financing of investments." (FMA § 4.1;

Garrison Decl. ¶ 9.)

Accordingly, the HDG Entities investigated properties as potential acquisitions, both for

their prospects as investments and for their suitability under the Funds' special requirements of

compliance with *Shari'ah*. (Garrison Decl. ¶ 10.) Once an attractive property was identified,

HDG Entities negotiated the purchase and then presented the property to the Investment

Committee for approval. (*Id.*) The HDG Entities would then obtain suitable financing (again, in

accordance with *Shari'ah* requirements and prohibitions). (*Id.*) The HDG Entities also hired

property managers and leasing agents for each property. (*Id.*) Additionally, while most similar

funds report to investors on an annual basis, HDG Entities provided quarterly reporting to the

Funds' Boards of Directors (the "Boards"), which required a full valuation of the Funds' assets

each quarter, including the determination of the fair market value of each property in the Fund's

portfolios. (*Id.*) The net asset value provided the support for defining a quarterly share price

which was provided to the Board and also, when approved, provided to the investors on a

quarterly basis.  (*Id.*)

Fees Paid to the HDG Entities

    Pursuant to the FMA, the HDG Entities were paid several types of fees.  Among those

were:

    A.  **Fund Manager Compensation**- pursuant to section 5.1 of the FMA and
      Attachment A thereto, the HDG Entities were entitled to "a quarterly
      administration fee . . . in a net amount equal to 1.08% of the estimated
      Average Daily Total Assets of the Fund Companies on an annualized basis
      as of the last day of the relevant calendar quarter" as compensation for its
      work managing the fund and the properties, maintaining compliance with
      *Shari'ah* requirements and prohibitions, and reporting quarterly to
      investors.  See Attachment A to FMA.

    B.  **Reimbursement of Expenses**- pursuant to § 5.2 of the FMA, the HDG
      Entities were entitled to reimbursement of certain fees, costs, and expenses
      incurred in the process of executing their duties and responsibilities
      pursuant to the FMA.

    C.  **Transactional Fees**- pursuant to §5.4-5.6 of the FMA, HDG Entities were
      entitled to (1) Acquisition Fees, (2) Financing Fees, and (3) Disposition
      Fees, each in exchange for providing the Funds with different services,
      since "the Fund Manager . . . has the capability of providing such services
      rather than having a third party provide such services."

    (FMA §§ 5.1, 5.2, 5.4-5.6; Garrison Decl. ¶ 11.)  Pursuant to Section 5.4 of the FMA, for

the HDG Entities' work in identifying and negotiating acquisitions, the HDG Entities were paid

a fee of 1% of the acquisition price of a Property Investment[1] made by the Funds in accordance

with the precepts of Islamic *Shari'ah*.  (FMA § 5.4; Garrison Decl. ¶ 12.)

    The HDG Entities were also entitled to a fee for their services provided in obtaining

*Shari'ah*-compliant financing for Property Investments made by the Funds.  (FMA § 5.5;

Garrison Decl. ¶ 13.)  The Financing Fee is defined as 1% of all financing used to acquire

---

[1]    A Property Investment is "a real estate investment made directly or indirectly by any or
all of the Fund Companies . . . in accordance with the precepts of Islamic *Shari'ah* . . . ."  *See*
Schedule X- Definitions, which is attached as Exhibit C to the Hazell Decl.

Property Investments, "including equity, debt, debt-equivalent and Islamic financing elements."
(*Id.*)

The FMA specifically provided the HDG Entities with the right to be paid Financing Fees "prior to the time of the completion of the relevant financing." (FMA §5.5; Garrison Decl. ¶ 17.) The FMA was structured this way because of the unusually complicated and time-consuming finance and tax structures employed to insure the investments were *Shari'ah*-compliant. (Garrison Decl. ¶ 17.) Accordingly, over their ten years as Fund Manager, the HDG Entities periodically paid themselves financing fees based on a transaction not yet closed. (*Id.*)

Additionally, the HDG Entities also received a fee on the disposition of all Fund Property Investments. (Garrison Decl. ¶ 14.) This fee was 1% of aggregate gross proceeds from the disposition. (FMA § 5.6; Garrison Decl. ¶ 14.)

Each of the above fees was designed to compensate the HDG Entities for a distinct service they provided to the Funds. (Garrison Decl. ¶ 15.) The HDG Entities only received these fees when they provided the associated services. (*Id.*)

Pursuant to Section 3 of the FMA, the HDG Entities were allowed to withdraw funds to pay themselves without seeking approval from Plaintiffs or the Board of Directors. (FMA § 3; Garrison Decl. ¶ 16.) The HDG Entities did so repeatedly throughout the life of the FMA. (Garrison Decl. ¶ 16.)

The HDG Entities Determine They Were Being Underpaid

Between 2002 and 2012, the HDG Entities were erroneously paid Financing Fees based solely on the debt portion of acquisitions. (*Id.* ¶ 18.) In late 2011 and early 2012, discussions began between the Board and the HDG Entities concerning the Boards' desire for a "review of procedures" pursuant to the FMA and other governing documents. (*Id.*) In preparation for the

review, the HDG Entities began an internal review of fees they had been paid.  (*Id.*)  The HDG

Entities then became aware that an error had been made in how their fees had been calculated,

that the fees should have been based not only on debt financing, but on "equity, debt, debt-

equivalent, and Islamic financing elements," as per Section 5.5 of the FMA.  (*Id.*; FMA § 5.5.)

In early 2012, KPMG was engaged to perform an "Agreed Upon Procedure" review of

the Funds for the period from 2009 through 2011.  (Garrison Decl. ¶ 19.)  While KPMG's review

was ongoing, the HDG Entities informed the Boards of Directors of the Funds about the

underpayments, broadly estimating that they were owed in the area of $5 million.  (*Id.*)

The final report from KPMG ("KPMG Report"), attached as Exhibit 1 to the Garrison

Decl., highlighted the basis for the calculation of the HDG Entities' Finance Fee, noting that the

Financing Fee should be "equal to **1% of the aggregate amount of financing**" which includes

"equity, debt, debt-equivalent, and Islamic financing elements" used to acquire a Property

Investment.  (KPMG Report at 71 (emphasis in original); Garrison Decl. ¶ 21.)  KPMG's report

is consistent with the HDG Entities' interpretation of the FMA.  (Garrison Decl. ¶ 21.)

The HDG Entities then completed their audit of the past Financing Fee calculations.  (*Id.*

¶ 22.)  This process revealed the underpayment totaling $5,818.682 to the HDG Entities.  (*Id.*)

The HDG Entities also reported this underpayment and made a presentation about it at the third-

quarter 2012 meeting of the Board of Directors.  (*Id.*)

Accordingly, pursuant to their rights under the FMA, the HDG Entities began the process

of "truing-up" the underpaid financing fees in 2012.  (*Id.* ¶ 23.)  The underpaid fees were taken

incrementally, so as not to harm the Funds or their investors.  (*Id.*)

The Termination of the FMA

On December 27, 2012, at a telephonic meeting of the Board of Directors, there was a vote to terminate the FMA. (Garrison Decl. ¶ 25.) Although the termination was referenced in a letter from Ms. Hazell dated January 8, 2013 ("Hazell Letter"), attached as Exhibit 2 to the Garrison Decl., no formal notice of termination, as required by Section 6.2 of the FMA, was received by the Defendants until they received a letter from Paul Dawe dated January 14, 2013, attached as Exhibit 3 to the Garrison Decl. That letter named January 2, 2013 as the termination date.. (Hazell Letter; FMA § 6.2; Garrison Decl. ¶ 25.) Additionally, pursuant to Section 6.2 of the FMA, certain monies are due to the HDG Entities at the termination of the FMA. Those sums have not been paid. (FMA § 6.2; Garrison Decl. ¶ 26.)

Nonetheless, the HDG Entities have, in the interest of the Funds and the Funds' investors, worked with the Funds to make the transition to the new manager as smooth as possible. (Garrison Decl. ¶ 26.) As recently as January 10th, Ms. Hazell wrote to thank Defendants for their assistance and ongoing support with the transition to new management. (Id.) Ms. Hazell's January 10, 2013 e-mail ("Hazell Email") is attached as Exhibit 4 to the Garrison Decl. Since the HDG Entities are cooperating with the Funds and providing services to accomplish an orderly transfer to the new fund manager, they are entitled to their fees under the FMA for 30 days after the date of termination, in addition to unpaid fees from the term of the FMA. (FMA § 6.4; Garrison Decl. ¶ 26.) The administrative fees and reimbursements for that period total approximately $134,010. (Garrison Decl. ¶ 26.)

According to Sections 6.2 and 6.4 of the FMA, the Funds' election to terminate the agreement at the end of 2012 entitles the HDG Entities' to a severance payment of $5,465,928. (Garrison Decl. ¶ 27; FMA §§ 6.2, 6.4.) This severance payment was due at termination. See id.

8

Plaintiffs have not paid the termination fee to the HDG Entities. (Garrison Decl. ¶ 27.) Also as per Sections 6.2 and 6.4 of the FMA, such a termination entitles the HDG Entities to a payout of the HDG Entities' co-investments in the Fund, which total $1,657,300 (according to the September 2012 financials). (Garrison Decl. ¶ 28; FMA §§ 6.2, 6.4.) Those sections of the FMA also provide that the HDG Entities are entitled to receive $503,342, representing its full fees for transactions that closed prior to the termination of the FMA and for expenses incurred before that date. (Garrison Decl. ¶ 29; FMA §§ 6.2, 6.4.) A breakout of those fees is as follows:

| Event | HDG Entities' Fee |
|---|---|
| Nederbipp disposition fee | 396,671 |
| Neiderbipp CAPF | 213,519 |
| Less: Niederbipp paid early on estimate | (639,571) |
| AW Plano Disposition Fee | 369,900 |
| UK Portfolio consensual sale "top-up"- Solihul | 56,227 |
| UK Portfolio consensual sale "top-up"- Hemel | 41,655 |
| SA Andover Lease Commission | 64,941 |
| TOTAL | 503,342 |

Additionally, the HDG Entities are entitled to their fees for financing transactions on which they worked and which are scheduled to close within 180 days after their termination. (*See* definition of "Termination Payment Elements" on page 12 of Schedule X- Definition Rules of Usage and Interpretation, attached as Exhibit C to the Hazell Decl.; Garrison Decl. ¶ 30.) Accordingly, HDG Entities are due the following payments:

| Financing | HDG Entities' Fee |
|---|---|
| ING Senior | 1,858,500 |
| ING Mezz | 148,500 |
| HSBC Bank of Bermuda Mezz | 522,000 |
| HSBC Bank of Bermuda 5-Pack Sr & Jr | 864,000 |
| TOTAL | 3,393,000 |

Accordingly, Plaintiffs currently owe the HDG Entities at least $11,153,580, approximately double what Plaintiffs are seeking from Defendants in this action.[2/] (Garrison Decl. ¶ 31.) Further, Defendants have been engaged with the Funds with respect to a resolution of the fee issues since December of 2012. (*Id.* ¶ 24.)

## ARGUMENT

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original). "A preliminary injunction … should not be routinely granted…because it is one of the most drastic tools in the arsenal of judicial remedies." *ImOn, Inc. v. ImaginOn, Inc.*, 90 F. Supp. 2d 345, 349 (S.D.N.Y. 2000) (internal citations omitted).

In order to meet this heavy burden of persuasion, Plaintiffs "must demonstrate (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000).

Plaintiffs have not met this burden here. Plaintiffs cannot demonstrate irreparable injury, a likelihood of success on the merits, or a balance of hardships tipping decidedly in their favor. Therefore, their motion for a preliminary injunction should be denied.

---

[2/] This number does not include the fees owed to the HDG Entities for the leases it negotiated with tenants of the Funds' properties.

I.   **Plaintiffs Cannot Show Irreparable Harm**

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.  Accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Emirates Int'l Inv. Co. v. ECP Mena Growth Fund, LLC*, 2012 U.S Dist. LEXIS 83616, *17-18, 2012 WL 2198436 (S.D.N.Y. June 15, 2012) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234-235 (2d Cir. 1999)).

Plaintiffs cannot show irreparable harm here. Plaintiffs' application concedes that they seek only money damages, which is not sufficient justification for a preliminary injunction. Further, Plaintiffs' delay in making this motion reveals the lack of any genuine urgency.

A.   Injunctive Relief Is Unavailable in Cases About Only Money Damages

In essence, Plaintiffs seek approximately $5.8 million from Defendants.  It is well established that a court cannot grant a preliminary injunction where, as here, the plaintiff seeks only a money judgment. *See Grupo Mexicano De Desarrollo v. Alliance Bond Fund*, 527 U.S. 308, 333 (1999).  "This is a dispute about money and to the degree that the [Court] eventually find[s] that the petitioner is entitled to some award, there is no showing that the petitioner cannot be made whole through money damages.  The mere possibility that distributions might occur at some point before the [Court] has ruled is too remote and too speculative to warrant the issuance of a preliminary injunction." *Emirates Int'l Inv. Co.*, 2012 U.S. Dist. LEXIS 83616 at *18.

This principle holds true even when a plaintiff attempts to circumvent the rule with a tacked-on claim for equitable relief.   Indeed, "equitable power has never extended to a contract case where the only alleged 'irreparable' harm is that assets might not be available to satisfy a pending judgment." *Tang Capital Partners, LP v. Cell Therapeutics, Inc.*, 591 F. Supp. 2d 666,

11

672 (S.D.N.Y. 2008) (McMahon, J.); *see also Delta Air Lines, Inc. v. Tie Cargo Corp.,* 1996

U.S. Dist. LEXIS 22755, *8-10, 1996 WL 1088913 (E.D.N.Y. Oct. 17, 1996) (assertion that

defendant will dissipate funds not sufficient where defendant is a "going concern" still

conducting business).

Here, Plaintiffs seek only money damages, and have made no showing that they could not

be made whole through the payment of money.  They seek the current injunctive relief in aid of

the recovery of a prospective money judgment, an inappropriate use of an injunction.  The HDG

Entities are a going concern, continuing to do business in the ordinary course.  (Garrison Decl. ¶

33.)  Under these circumstances, as illustrated by Plaintiffs' failure to cite any cases where

injunctive relief was granted in a case with similar facts, injunctive relief is not available or

appropriate for a case solely about money damages.

Indeed, this case is far different than the picture Plaintiffs paint.  (Compl. ¶¶ 19-30;

Plaintiffs' Memorandum of Law in Support of Their Motion for a Preliminary Injunction ("Pl.

Mem.") at 2-5.)  Not only did Defendants have authority under the FMA to make the payments

at issue, but Plaintiffs owe Defendants approximately another $11 million for termination fees

and other fees associated with the Defendants' management of the Funds.  *See infra* at 8-10.

Indeed, Defendants intend to counter-claim for these additional monetary damages.

Plaintiffs' attempt to justify their request for a preliminary injunction with a claim under

the Investment Advisers Act of 1940 also is without merit.  (Compl. ¶ 34.)  Indeed, Plaintiffs

have not explained how this claim should win them a preliminary injunction.  Neither of the

provisions of the Investment Advisers Act cited by Plaintiffs refers to a preliminary injunction, a

temporary restraining order, or anything of the sort.  (*See* 15 U.S.C. §§ 80b-6, 80b-15; Compl. ¶

34.)  Further, Plaintiffs do not cite a single case that illustrates how either their request for money

damages or their claim under the Investment Advisers Act compels a preliminary injunction, much less the creation of a constructive trust.

B.    Plaintiffs' Delay Exposes the Lack of Any Real Urgency

"Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such a drastic, speedy action." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).  Plaintiffs' delay here indicates a lack of need for urgent action.  In fact, Plaintiffs felt no apparent need to seek relief from this Court while Defendants assisted with the smooth transition to the next fund manager.

The parties spent December 2012 and early January 2013 working together on these negotiations and the complicated process of transitioning Defendants out of the business. (Garrison Decl. ¶ 24.)  Plaintiffs concede that they knew of the payments no later than December 17, 2012.  (Pl. Mem. at 2.)  Only after Plaintiffs identified new managers for the Funds and transitioned the work to the new managers did Plaintiffs make this application.

Indeed, Plaintiffs retained counsel well before filing the complaint and moving for an injunction.  It is unclear when Plaintiffs first contacted counsel in this matter, but Plaintiffs admitted to Mr. Garrison that they were "in the process of engaging counsel" in a letter dated January 8, 2013, over two weeks before the Complaint was filed on January 24.  (Hazell Letter.) If their need for a preliminary injunction is so desperate, it is unclear why Plaintiffs waited over one month from learning of the payments and at least sixteen days after engaging counsel to take such a purportedly urgent action.

13

II.     **Plaintiffs Are Unlikely to Succeed on the Merits**

Even if Plaintiffs could successfully show irreparable harm, which they cannot, they are

unlikely to prevail on the underlying claims.

A.      The Agreement Between the Parties Allows Defendants to Pay
        Themselves, So There Is No Breach of Contract

Although Plaintiffs start their complaint with allegations that Defendants

"misappropriated" funds and "fraudulently paid themselves," Plaintiffs fail to mention that

Defendants are expressly authorized to pay themselves pursuant to the terms of the FMA.

(Compl. ¶¶ 1, 3.)  The FMA plainly states that Defendants can pay themselves.  (FMA § 3;

Garrison Decl. ¶ 16.)  Indeed, Defendants have paid themselves since the FMA was executed on

September 20, 2002, over ten years ago.  (Garrison Decl. ¶ 16.)

B.      Defendants Were Entitled to the Money

Plaintiffs suggest that Defendants manufactured the idea of having been underpaid after

other attempts to inappropriately abscond with the $5.8 million had failed.  (Compl. ¶¶ 27-30.)

This allegation is simply false.  The sum of $5,818,682 is the exact amount Plaintiffs owed

Defendants due to a chronic underpayment resulting from an inaccurately narrow interpretation

of the plain language of the FMA.  (Garrison Decl. ¶ 22.)

Further, Defendants and independent advisors informed Plaintiffs of the underpayment

repeatedly, starting well before this litigation was commenced.  (Garrison Decl. ¶¶ 20, 22.)  In

early 2012, KPMG was engaged to perform an "Agreed Upon Procedure" review of the Funds

for the period from 2009 through 2011.  (Garrison Decl. ¶ 19.)  While KPMG's review was

ongoing, the HDG Entities informed the Boards of Directors of the Funds about the

underpayments, broadly estimating that they were owed in the area of $5 million.  (*Id.*)  The

KPMG Report highlighted the definition for the calculation of the HDG Entities' Finance Fee,

noted that the Financing Fee should be "equal to 1% of the **aggregate amount of financing**" which includes "equity, debt, debt-equivalent, and Islamic financing elements" used to acquire a Property Investment. (KPMG Report at 71 (emphasis in original); Garrison Decl. ¶ 21.) KPMG's report is consistent with the HDG Entities' interpretation of the FMA. The KPMG report and presentation of the terms of the FMA further supported the fact that the HDG Entities have been underpaid.

Despite Plaintiffs' claims that Defendants simply grabbed any money they could find, the total underpayment was calculated as $5,818,682, the precise amount Defendants paid themselves in underpaid compensation and which Plaintiffs seek now. (Garrison Decl. ¶ 22.) The parties have been discussing the approximately $5.8 million, as well as a host of other issues, as the parties worked together to transition Defendants out of the Funds. (*Id.*)

C.    Plaintiffs Will Not Be Able to Prevail on Any of Their Non-Contract Claims

Defendants have complied with the FMA, making it unlikely that Plaintiffs will succeed on their claim for breach of contract. There are serious issues with their other claims that may prove fatal as well.

First, Plaintiffs' fraud claim is nothing more than a restatement of their breach of contract claim. "New York State law holds that where the alleged fraud is indistinguishable from the breach of contract, no fraud cause of action arises." *Rafter v. Liddle*, 704 F. Supp. 2d 370, 376 (S.D.N.Y. 2010). Thus, to the extent that any of Plaintiffs' claims sound in fraud, those claims should fail.

Plaintiffs' breaches of fiduciary duty claims are similarly duplicative, and thus barred as well. "Where a fiduciary duty is based upon a comprehensive written contract between the parties, a claim for breach of fiduciary duty is duplicative of a claim for breach of contract."

15

*Alitalia Linee Aeree Italiane v. Airline Tariff Publ. Co.,* 580 F. Supp. 2d 285, 294 (S.D.N.Y. 2008).  Plaintiffs also refer to a duty under Section 206 of the Investment Advisers Act for their claim of breach of fiduciary duty.  (Compl. ¶ 40.)  However, "[i]t is well-settled that no implied private right of action for damages exists under Section 206 of the Investment Advisers Act of 1940." *S. Cherry St. LLC v. Hennessee Group LLC* (*In re Bayou Hedge Fund Litig.*), 534 F. Supp. 2d 405, 420 (S.D.N.Y.  2007) (McMahon, J.) (internal citations omitted).

While Section 215 of the Act does allow a court to rescind a contract for violations of other sections of the Act and allows for a private right of action, any such rescission would still only amount to money damages.  The FMA, the overarching agreement between the parties, has been terminated (*see* Hazell Letter), so Defendants no longer have any obligations to Plaintiffs.  As a result, although Plaintiffs have failed to allege any specific violation of the Act, even if they were to succeed, the only available remedy to Plaintiffs would be for Defendants to return past fees, i.e. money damages.  Therefore, Plaintiffs' claim under the Investment Advisers Act, like all the others, only seeks money damages.  Further, as discussed above, Defendants' conduct was not "fraudulent, deceitful, and manipulative" as alleged, so Plaintiffs' Investment Advisers Act claim should fail on that ground as well. (Compl. ¶ 34.)

III.   **The Balance of the Equities Does Not Decidedly Tilt Towards Either Party**

A.   Plaintiffs Are Withholding Defendants' Fees Worth Significantly More Than the Amount in Dispute Here

Plaintiffs argue that their contract with Defendants has been terminated, but Plaintiffs fail to mention that such termination requires a substantial severance payment to be made to Plaintiffs pursuant to Sections 6.2 and 6.4 of the FMA.  (Compl. ¶ 26; FMA §§ 6.2, 6.4.)  This severance payment reflects the decade Plaintiffs have spent steering Defendants through complex forms of law and finance into substantial profits for all parties concerned.  This

payment alone is $5,465,928, almost as much as the approximately $5.8 million Plaintiffs seek, and was due at termination, but it has been held back by the Plaintiffs. (Garrison Decl. ¶ 27.)

Plaintiffs owe Defendants still other funds as well. Sections 6.2 and 6.4 of the FMA entitle Defendants to a payout of the HDG Entities' co-investments in the Fund, which total $1,657,300, according to Plaintiffs' September 2012 financial statements. (Garrison Decl. ¶ 28.) Plaintiffs also owe Defendants fee payments for transactions closed (a) prior to the constructive termination of the FMA, under Sections 6.2 and 6.4 of the FMA, and (b) within 180 days of the constructive termination of the FMA, under Section 6.4 of the FMA. (FMA §§ 6.2, 6.4.) These payments total $503,342 and $3,393,000 respectively. (Garrison Decl. ¶¶ 29-30.)

      B.    <u>Defendants Have Cooperated Since Termination, In Contrast to Plaintiffs</u>

Finally, as shown above (*see supra* at 8), even Plaintiffs have acknowledged that Defendants have cooperated in good faith to ensure a smooth transition at the Funds. (Hazell Email; Garrison Decl. ¶ 26.) Defendants understand the complexity of managing *Shari'ah*-compliant funds and want to ensure that the parties' work over the past decade does not come undone. In contrast, Plaintiffs abruptly ceased negotiations over the issues in dispute and turned to litigation and an unnecessary motion for preliminary injunction.

In sum, this is a contract dispute between sophisticated parties about money and the equities do not tip decidedly tip in either parties' favor.

17

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: January 29, 2013
       New York, New York

MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.

By: _Francis Earley_
    Francis J. Earley
    John S. McMahon III
    Chrysler Center
    666 Third Avenue, 25th Floor
    New York, New York 10017
    (212) 935-3000
    FEarley@mintz.com
    TMcMahon@mintz.com

*Attorneys for Defendants HDG Mansur*
*Investment Services, Inc., HDGM Advisory*
*Services, Inc., and Harold D. Garrison*

11619453