UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
GPIF-I EQUITY CO., LTD. and
GPIF-I FINANCE CO., LTD.,

        Plaintiffs,

v.

HDG MANSUR INVESTMENT SERVICES, INC.,
HDGM ADVISORY SERVICES, LLC, and
HAROLD D. GARRISON

        Defendants.
------------------------------------------------------------------x

Case No. 13 Civ 547 (CM)

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON COUNT II, BREACH OF CONTRACT

MINTZ LEVIN COHN FERRIS
 GLOVSKY AND POPEO, P.C.
Francis J. Earley
John S. McMahon III
Chrysler Center
666 Third Avenue, 25th Floor
New York, New York 10017
FEarley@mintz.com
TMcMahon@mintz.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .......................................................................................................... 2

Defendants' Performance Under the Agreements ...................................................................... 3

Fees Paid to the HDG Entities .................................................................................................... 4

The HDG Entities Determine They Were Being Underpaid ...................................................... 6

ARGUMENT ............................................................................................................................... 7

I.      The Parties Have Reached Separate Interpretations of an Ambiguous
Provision ......................................................................................................................... 8

      A.      Plaintiffs' Reading of the FMA Creates Meaningless Phrases ............................... 9

      B.      Plaintiffs' Interpretation Reads in a New Term Which Violates
*Shari'ah* and the Intent of the Parties ...................................................................10

      C.      The Funds Held Out to Investors That the Fund Manager Would
Be Paid for "Equity" and Not "Equity Financing" ...............................................12

II.     Plaintiffs Cannot Use the Statute of Limitations to Force Specific
Performance When All Actions Have Been Timely Filed ............................................13

CONCLUSION ..........................................................................................................................14

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*118 East 60th Owners, Inc. v. Bonner Properties, Inc.,*
   677 F.2d 200 (2d Cir. 1982) .................................................................................................. 13

*Bonnant v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
   467 Fed. Appx. 4 (2d Cir. 2012) .............................................................................................. 8

*Cacace v. Meyer Mktg. (Macau Commer. Offshore) Co., Ltd.,*
   589 F. Supp. 2d 314 (S.D.N.Y. 2008) ................................................................................... 11

*Kass v. Kass,*
   91 N.Y.2d 554 (N.Y. 1998) ................................................................................................... 10

*McClellan v. Smith,*
   439 F.3d 137 (2d Cir. 2006) .................................................................................................... 8

*New York Times Co. v. FBI,*
   822 F. Supp. 2d 426 (S.D.N.Y. 2011) ..................................................................................... 7

**STATUTES**

Fed. R. Civ. P. 56(a) ..................................................................................................................... 7

**OTHER AUTHORITIES**

Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL
   TEXTS (2012) ...................................................................................................................... 9, 10

BLACK'S LAW DICTIONARY 1450-1451 (8th ed. 2004) .............................................................. 13

Defendants HDG Mansur Investment Services, Inc. ("HDG Investment"), HDGM Advisory Services, LLC ("HDG Advisory" and, together with HDG Investment, the "HDG Entities"), and Harold D. Garrison ("Garrison" or "Mr. Garrison" and, together with the HDG Entities, "Defendants") respectfully submit this Memorandum of Law, together with the Declaration of Harold D. Garrison ("Garrison Decl.") and the exhibits attached thereto, in opposition to the motion for summary judgment filed by plaintiffs GPIF-I Equity Co., Ltd. and GPIF-I Finance Co., Ltd. (together the "Funds" or "Plaintiffs") on Plaintiffs' claim for breach of contract only.

## PRELIMINARY STATEMENT

In 2012, after realizing they were significantly underpaid for services provided to the Funds, the HDG Entities, as Fund Manager, paid themselves $5.8 million in Financing Fees pursuant to the terms of the Fund Management Agreements. Plaintiffs claim that Section 5.5 of the Fund Management Agreement can only be read in a way that makes the Defendants' payment of the disputed Financing Fees inappropriate. This simply is not correct.

The specific language of section 5.5 that is at issue here reads as follows:

> It is acknowledged and agreed by Equity Co. and the Fund Manager that the Investment Financing Fees payable in connection with the financing of any investment in, or acquisition, construction or improvement of, the Property Investments **(including equity, debt, debt-equivalent and Islamic financing elements)** are payable in full on and prior to the time of the completion of the relevant financing, ... (emphasis added).

Plaintiffs take the position that the terms in the parenthetical modify the phrase "financing elements." In other words, the parenthetical would refer to equity financing elements, debt financing elements, debt-equivalent financing elements, and Islamic financing elements.

Plaintiffs' position is incorrect. The only logical reading of Section 5.5 is that the terms in the parenthetical modify "elements." In other words, the parenthetical should refer to equity

1

elements, debt elements, debt-equivalent elements, and Islamic financing elements. Plaintiffs' reading of this provision creates a meaningless phrase because the term "Islamic" means nothing in the agreements without the term "financing" with it. Indeed, the canons of contractual construction prohibit such a reading. Defendants' reading also must fail because "equity financing" of the properties, as structured, is strictly prohibited under *Shari'ah* law. Finally, when this provision of the FMA is read in conjunction with the Funds' other governing documents, it becomes clear that Defendants must be paid on equity.

These competing interpretations have dramatically different impacts on the amount owed to the Fund Manager. Defendants' interpretation, in which Defendants must be paid Financing Fees based on a percentage of all financing, including equity elements, meant that Defendants had been underpaid over the life of the FMA.

Finally, Plaintiffs' statute of limitations argument is without merit. The claims at issue here clearly fall within the six-year statute of limitations for contract disputes. Here Plaintiffs attempt to use the statute of limitations to force Defendants to take affirmative steps. However, a statute of limitations cannot serve as an independent basis for relief and is not itself a cause of action upon which a party can be paid damages.

## STATEMENT OF FACTS

Harold D. Garrison is the co-founder of the Mansur Group, which has provided $5.3 billion worth of capital advisory services in North America, Europe and Asia, and HDG Investment, a leading international real estate investment advisory firm which has advised, developed and managed international properties ranging from single tenant assets to complex international portfolios. (Garrison Decl. ¶ 2.)

In the late 1990's, HDG Investment began exploring the idea of a real estate investment vehicle which would appeal to religious Muslim investors by accommodating the requirements and restrictions of *Shari'ah*, Muslim religious law. (*Id.* at ¶ 4.) Among other customizations, all transactions would be structured to follow the *Shari'ah* prohibitions against the payment or receipt of interest and against any entity structures which would make investors become direct lenders or borrowers for underlying assets, precluding any type of equity financing in this structure. (*Id.* at ¶¶ 4, 11.)

Defendants' Performance Under the Agreements

On or about September 20, 2002, HDG Investment entered into fund management agreements with the Funds. (*Id.* at ¶ 7.) The Fund Management Agreements (together, the "FMA") are identical in all pertinent parts. (*Id.*) The Fund Management Agreement between GPIF-1 Equity Co., Ltd. and HDG Investment is attached as Exhibit A to the Declaration of Deborah Hazell in Support of Plaintiffs' Motion for Summary Judgment ("Hazell Decl."). The Fund Management Agreement between HDG Investment and GPIF-I Finance Co., Ltd is attached as Exhibit B to the Hazell Decl.

HDGM Advisory was created in 2012 as a member of the Mansur Group and a corporate relative to HDG Investment. (*Id.* at ¶ 8.) On or about March 30, 2012, HDGM Advisory received an assignment of all of HDG Investment's rights and obligations pursuant to the FMA. (*Id.* at ¶ 9.) The Assignment and Assumption Agreement is attached as Exhibit D to the Hazell Decl.

Pursuant to Section 4.2 of the FMA, the HDG Entities were required to:

> identify, consider, select, investigate, acquire, manage, operate and maintain the real estate and real estate related investment opportunities . . . [,] perform customary financial market, credit, legal, physical and other appropriate due diligence investigations and activities with respect to each

> prospective investment and determine the need for, or advisability of, financing. In addition, [HDG Investment must] prepare, negotiate and execute, on the Fund's behalf, all agreements, documents and instruments necessary or advisable for the development, acquisition, management operation and maintenance of the Property Investments.

(FMA § 4.2; Garrison Decl. ¶ 10.)   Pursuant to 4.1 of the FMA, the HDG Entities were required to perform their "duties and services," including "the structuring, acquisition and financing of investments," in accordance with the principles of Islamic *Shari'ah*, through the guidance and oversight of *Shari'ah* scholars and an HSBC committee on *Shari'ah* law. (FMA § 4.1; Garrison Decl. ¶ 11.)

As part of their role as Fund Manager, the HDG Entities were responsible for cash and liquidity management for the Funds, including bills, expenses, dividends, and other obligations incurred by the properties owned by the Funds. (Garrison Decl. ¶ 13.) It was originally anticipated and often the case that the HDG Entities would have to transfer funds between properties owned by the Funds, in a process referred to internally as "inter-company loans," to pay bills, expenses, dividends, and other obligations incurred. (*Id.*) For example, proceeds from the sale of a property would be distributed to other properties to ensure that each property had sufficient cash reserves. (*Id.*) This structure and these procedures were developed with guidance from the Funds' legal, accounting, and tax consultants. (*Id.*)

Fees Paid to the HDG Entities

Pursuant to the FMA, the HDG Entities were paid several types of fees, many of which were created to align the interests of the HDG Entities with the interests of the investors. (*Id.* at ¶ 5.) Among the fees paid to the HDG Entities were:

> A. **Fund Administration Fees** – pursuant to section 5.1 of the FMA and Attachment A thereto, the HDG Entities were entitled to their share, split equally with the Funds' placement agent, HSBC Securities (USA), Inc., of "a quarterly administration fee . . . in a net amount equal to 1.08% of the

4

estimated Average Daily Total Assets of the Fund Companies on an annualized basis as of the last day of the relevant calendar quarter," subject to a ceiling of 2.7% of net asset value, as compensation for its work managing the fund and the properties, maintaining compliance with *Shari'ah* requirements and prohibitions, and reporting quarterly to investors. See Attachment A to FMA.

B. **Reimbursement of Expenses** – pursuant to § 5.2 of the FMA, the HDG Entities were entitled to reimbursement of certain fees, costs, and expenses incurred in the process of executing their duties and responsibilities pursuant to the FMA.

C. **Transactional Fees** – pursuant to §5.4-5.6 of the FMA, HDG Entities were entitled to their share, split with the Funds' placement agent, HSBC Securities (USA), Inc., of (1) Acquisition Fees, (2) Financing Fees, and (3) Disposition Fees, each in exchange for providing the Funds with different services, since "the Fund Manager . . . has the capability of providing such services rather than having a third party provide such services."

(FMA §§ 5.1, 5.2, 5.4-5.6; Garrison Decl. ¶ 16.) Pursuant to Section 5.4 of the FMA, for the HDG Entities' work in identifying and negotiating acquisitions, the HDG Entities were paid a fee of 1% of the acquisition price of a Property Investment[1] made by the Funds in accordance with the precepts of Islamic *Shari'ah*. (FMA § 5.4; Garrison Decl. ¶ 17.)

The HDG Entities were also entitled to a fee for their services provided in obtaining *Shari'ah*-compliant financing for Property Investments made by the Funds. (FMA § 5.5; Garrison Decl. ¶ 17.) The Financing Fee is defined as 1% of all financing used to acquire Property Investments, "including equity, debt, debt-equivalent and Islamic financing elements." (FMA § 5.5; Garrison Decl. ¶ 18.)

The FMA specifically provided the HDG Entities with the right to be paid Financing Fees "prior to the time of the completion of the relevant financing." (FMA §5.5; Garrison Decl. ¶ 22.) The FMA was structured this way because of the unusually complicated and time-consuming

---

[1] A Property Investment is "a real estate investment made directly or indirectly by any or all of the Fund Companies . . . in accordance with the precepts of Islamic *Shari'ah* . . . ." See Schedule X—Definitions, which is attached as Exhibit C to the Hazell Decl.

5

finance and tax structures employed to insure the investments were *Shari'ah*-compliant. (Garrison Decl. ¶ 22.) Accordingly, over their ten years as Fund Manager, the HDG Entities periodically paid themselves financing fees based on transactions not yet closed. (*Id.*) Additionally, the HDG Entities also received a fee on the disposition of all Fund Property Investments. (*Id.* at ¶ 19.)

Each of the above fees was designed to compensate the HDG Entities for a distinct service they provided to the Funds. (Garrison Decl. ¶ 20.) The HDG Entities only received these fees for providing these specific services. (*Id.*)

Pursuant to Section 3 of the FMA, the HDG Entities were allowed to withdraw funds to pay themselves without seeking approval from Plaintiffs or the Board of Directors. (FMA § 3; Garrison Decl. ¶ 21.) The HDG Entities did so repeatedly throughout the life of the FMA. (Garrison Decl. ¶ 21.)

The HDG Entities Determine They Were Being Underpaid

Between 2002 and 2012, the HDG Entities were erroneously paid Financing Fees based solely on the debt portion of acquisitions. (*Id.* at ¶ 23.) In late 2011 and early 2012, discussions began between the Board and the HDG Entities concerning the Boards' desire for a "review of procedures" pursuant to the FMA and other governing documents. (*Id.*) In preparation for the review, the HDG Entities began an internal review of fees they had been paid. (*Id.*) The HDG Entities then became aware that an error had been made in how their fees had been calculated, that the fees should have been based not only on the debt portions of acquisitions, but on equity elements, debt elements, debt-equivalent elements, and Islamic financing elements, as per Section 5.5 of the FMA. (Garrison Decl. ¶ 23; FMA § 5.5.)

In early 2012, KPMG was engaged to perform an "Agreed Upon Procedure" review of the Funds for the period from 2009 through 2011. (Garrison Decl. ¶ 25.) While KPMG's review was ongoing, the HDG Entities informed the Boards of Directors of the Funds about the underpayments, broadly estimating that they were owed in the area of $5 million. (*Id.*)

The final report from KPMG ("KPMG Report"), attached as Exhibit 2 to the Garrison Decl., highlighted the basis for the calculation of the HDG Entities' Finance Fee, noting that the Financing Fee should be "equal to **1% of the aggregate amount of financing**" which includes "equity, debt, debt-equivalent, and Islamic financing elements" used to acquire a Property Investment. (KPMG Report at 71 (emphasis in original); Garrison Decl. ¶ 26.) KPMG's report is consistent with the HDG Entities' interpretation of the FMA. (Garrison Decl. ¶ 26.)

The HDG Entities then completed their audit of the past Financing Fee calculations. (*Id.* at ¶ 27.) This process revealed the underpayment totaling $5,818,682 to the HDG Entities. (*Id.*) The HDG Entities reported this underpayment and made a presentation about it at the third-quarter 2012 meeting of the Board of Directors. (*Id.*)

Accordingly, pursuant to their rights under the FMA, the HDG Entities began the process of "truing-up" the underpaid financing fees in 2012. (*Id.* at ¶ 28.) The underpaid fees were taken incrementally and in consideration of the Funds' cash flow and budget, so as not to harm the Funds or their investors. (*Id.* at ¶ 30.)

## ARGUMENT

"Summary judgment may only be granted where the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *New York Times Co. v. FBI*, 822 F. Supp. 2d 426, 430 (S.D.N.Y. 2011) (citing Fed. R. Civ. P. 56(a)). "In ruling on a motion for summary judgment, a court must resolve all

ambiguities and draw all factual inferences in favor of the non-moving party." *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006).

"In a contract dispute, generally, a motion for summary judgment may be granted only when the contract language is wholly unambiguous and conveys a definite meaning." *Bonnant v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 467 Fed. Appx. 4, 7 (2d Cir. 2012) (internal citations omitted). "A contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Id.* (internal citations omitted).

### I.  The Parties Have Reached Separate Interpretations of an Ambiguous Provision

The heart of this claim is the interpretation of Section 5.5 of the FMA, which states, in relevant part:

> It is acknowledged and agreed by Equity Co. and the Fund Manager that the Investment Financing Fees payable in connection with the financing of any investment in, or acquisition, construction or improvement of, the Property Investments **(including equity, debt, debt-equivalent and Islamic financing elements)** are payable in full on and prior to the time of the completion of the relevant financing, …

FMA § 5.5 (emphasis added). Plaintiffs take the position that the terms in the parenthetical modify the phrase "financing elements." (Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment on Count II, Breach of Contract ("Pl. Mem.") at 7.) In other words, the parenthetical would refer to equity financing elements, debt financing elements, debt-equivalent financing elements, and Islamic financing elements.

Plaintiffs' position is incorrect. The only logical reading of Section 5.5 is that the terms in the parenthetical modify "elements." In other words, the parenthetical should refer to equity elements, debt elements, debt-equivalent elements, and Islamic financing elements.

8

These two interpretations have dramatically different impacts on the amount owed to the Fund Manager. Defendants' interpretation, in which Defendants must be paid Financing Fees based on a percentage of all financing, including equity elements, meant that Defendants had been underpaid over the life of the FMA.

    A.    <u>Plaintiffs' Reading of the FMA Creates Meaningless Phrases</u>

On its face, Plaintiffs' reading of the FMA does not make sense. As discussed above (*see supra* at 8), Plaintiffs interpret Section 5.5 of the FMA so that the terms modify the phrase "financing elements." As a result, according to Plaintiffs' reading, there are four kinds of financing elements: equity, debt, debt-equivalent, and Islamic. Equity, debt, and debt equivalents are all financial concepts. "Islamic," on the other hand, means nothing by itself. It is a well-worn canon of contract interpretation that each word and term in an agreement must be given meaning. *See* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 174 (2012) ("If possible, every word and every provision is to be given effect…None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence. … More frequently, this canon prevents not the total disregard of a provision, but instead an interpretation that renders it pointless."). Plaintiffs' interpretation, then, must fail because there is no parallel structure among the modifiers to give each term validity.

Defendants' reading, on the other hand, can be fully diagrammed without losing plausibility. If the term being modified is "elements," then there are four kinds of elements: equity, debt, debt-equivalent, and Islamic financing. While "Islamic" has no independent meaning as a stand-alone term, "Islamic financing" is a reasonable element upon which

9

Defendants should be paid. As such, Defendants' interpretation is the only reading that holds up to close scrutiny.

  B. Plaintiffs' Interpretation Reads in a New Term Which Violates *Shari'ah* and the Intent of the Parties

A disputed provision in a contract must be read in the context of the rest of the agreement. "[I]n deciding whether an agreement is ambiguous courts should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed," and "[p]articular words should be considered, not as if isolated from context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Kass v. Kass*, 91 N.Y.2d 554, 566 (N.Y. 1998); *see also* Scalia & Garner at 167 ("Perhaps no interpretative fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of many of its parts.") Indeed, Section 5.5 of the FMA must be read in conjunction with the rest of the agreement.

Section 4.1 of the FMA makes clear that "[t]he Fund Manager will perform its duties and services under this Section 4, including the structuring, acquisition and financing of investments, in accordance with the principles of Islamic Shariah as interpreted by the Shariah committee." FMA § 4.1. As such, the only reasonable interpretation of the FMA is to view its terms in a way that does not violate *Shari'ah* law.

Equity financing of the Funds, as structured, is forbidden under *Shari'ah* law. (Garrison Decl. ¶ 11.) One of the primary reasons that Defendants created such a complex entity structure is to allow investors to have an economic interest in property that is encumbered with third-party debt. (*Id.*) Thus, to avoid violating *Shari'ah* law, the Funds are structured so that investors

merely make their investment in the Funds and then receive return payments from the Fund's shares. (*Id.*) There is no point at which the investors finance the underlying investments.

As such, Section 5.5 of the FMA cannot be reasonably read to allow Defendants to pay themselves for equity financing. Plaintiffs admit that there was no equity financing at any point during the life of the FMA. (Pl. Mem. at 7.) Plaintiffs do not even attempt, however, to explain why the parties would write a contract to include a provision which would not have any effect. In fact, this provision *could not* be given any effect. Not only was there no equity financing in the Funds, such a practice would be in violation of the *Shari'ah* law around which the entire complex entity structure was based. Plaintiffs' reading, then, would defeat the entire purpose of the FMA, as explicitly delineated in Section 4.1 of the FMA itself.

As discussed above (*see supra* at 9-10), each word and term in an agreement must be given meaning. A reading of a contract provision which renders a term "potentially meaningless" contradicts "the well-known axiom of contract interpretation that courts are to give meaning to every word or phrase in a contract." *Cacace v. Meyer Mktg. (Macau Commer. Offshore) Co., Ltd.*, 589 F. Supp. 2d 314, 323 (S.D.N.Y. 2008). As such, Plaintiffs' interpretation of the FMA, which gives the word "equity" no meaning, should be disregarded.

The interpretations of Section 5.5 presented herein illustrate the ambiguity of the clause on its face. Nowhere in the provision, or elsewhere in the FMA, is there a clear indication of whether "financing elements" or "elements" is the term modified. The FMA does not use hyphens, quotation marks, or any other guidelines to suggest that the modified term is "financing elements" or that one of the modifiers is "Islamic financing." Without any guideline, the contract is simply ambiguous. As such, summary judgment on Plaintiffs' contract claim should be denied.

11

  C. The Funds Held Out to Investors That the Fund Manager Would
    <u>Be Paid for "Equity" and Not "Equity Financing"</u>

Plaintiffs marketed the Funds to prospective investors through a Private Placement Memorandum ("PPM"), often known as a prospectus, in which Plaintiffs described in detail the Funds' nature, business, expectations, and operating structures. (Garrison Decl. ¶ 6.) The PPM is attached as Exhibit 1 to the Garrison Decl. As is typical for prospectuses, the PPM, dated September 23, 2002, is a lengthy description to investors of exactly the product in which they would invest. The PPM, then, is central to the relationship between Plaintiffs, Defendants, and the investors in the Funds.

The PPM reinforces Defendants' interpretation of the FMA completely. In a section entitled "Fund Manager and Expenses," the PPM states that:

> The Fund Manager and its affiliates may be engaged to perform certain additional services on behalf of the Fund (directly or indirectly, including for the Investment Entities), for which the Fund Manager will receive market-based fees consistent with the fees that would have been otherwise payable to third-party service providers. In such event, the Fund Manager or the applicable affiliate will receive additional fees for such services. **These services may include the following: (1) equity, debt, debt-equivalent and Islamic financing services**, including arrangement of credit facilities and property-specific financing for the Fund, the Investment Entities, the Property Investments, and the Shariah-compliant liquidity investments; (2) acquisition and disposition services; (3) property management services; (4) development and redevelopment services; and (5) development oversight, general contracting or construction management services.

PPM at 73 (emphasis added). Here, the language could not be clearer that the modified term should be "services," since each of the subparts (1)-(5) describes different kinds of "services." And here, the four kinds of "services" in subpart (1) are equity, debt, debt-equivalent, and Islamic financing, the four same exact elements as in Defendants' interpretation of Section 5.5 of the FMA.

12

So although the interpretation of Section 5.5 of the FMA is ambiguous when read alone, within the context of the other governing documents for the Funds, the meaning is clear: Defendants must be paid based on equity.

## II.   Plaintiffs Cannot Use the Statute of Limitations to Force Specific Performance When All Actions Have Been Timely Filed

Finally, Plaintiffs attempt to argue that New York's six-year statute of limitations on contract actions should dictate that Plaintiffs be awarded over $3.9 million regardless of the success of any of their claims. There is no basis for their argument.

Since Plaintiffs argue that Defendants made allegedly improper payments over the course of 2012, Plaintiffs' breach of contract action would be time-barred if brought more than six years after the first such payment in 2012. Similarly, New York's statute of limitations would bar Defendants' counterclaim for breach of contract if it were commenced after January 2019, six years after the HDG Entities' termination as Fund Manager. All claims brought in this action are clearly timely.

A statute of limitations, of course, is "[a] law that bars claims after a specific period" and "establish[es] a time limit for suing in a civil case." BLACK'S LAW DICTIONARY 1450-1451 (8th ed. 2004). Plaintiffs attempt to twist this bedrock rule into an extra-legal remedy that dictates conduct between parties beyond the scope of any legal action, which is an inappropriate use of the statute of limitations. "The purposes underlying statutes of limitation —the prevention of stale litigation and the protection of repose —do not apply when a time-barred defense is asserted against a timely claim that initiates a lawsuit." *118 East 60th Owners, Inc. v. Bonner Properties, Inc.*, 677 F.2d 200, 203 (2d Cir. 1982) (declining to apply statute of limitations because "[w]hen a party is

13

'attacked,' he can rely on the statute of limitations as a shield, but when a party is the 'aggressor,' equity precludes the use of the time bar as a sword").

A statute of limitations, then, cannot serve as a basis for relief and is not itself a cause of action upon which a party can be paid damages. The instant action and motion for summary judgment concern allegations of breach of contract, and no party has argued that the FMA was breached more than six years prior to the commencement of this action. The statute of limitations does not apply.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment.

Dated: February 15, 2013  
       New York, New York

MINTZ LEVIN COHN FERRIS
GLOVSKY AND POPEO, P.C.

By: /s/ Francis Earley  
Francis J. Earley  
John S. McMahon III  
Chrysler Center  
666 Third Avenue, 25th Floor  
New York, New York 10017  
(212) 935-3000  
FEarley@mintz.com  
TMcMahon@mintz.com

*Attorneys for Defendants HDG Mansur Investment Services, Inc., HDGM Advisory Services, Inc., and Harold D. Garrison*

14