UNITED STATES DRISTIC COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————x

GPIF-I EQUITY CO., LTD. and
GPIF-I FINANCE CO., LTD.,

        Plaintiffs-Counterclaim Defendants,

v.

HDG MANSUR INVESTMENT SERVICES, INC.,
HDGM ADVISORY SERVICES, LLC, and
HAROLD D. GARRISON,

        Defendants-Counterclaim Plaintiffs.

—————————————————————————x

HDG MANSUR INVESTMENT SERVICES, INC. and
HDGM ADVISORY SERVICES, LLC,

        Third-Party Plaintiffs,

v.

HSBC SECURITIES (USA) INC.,

        Third-Party Defendant.

—————————————————————————x

**Case No. 13 Civ. 547 (CM)**

### DECISION AND ORDER GRANTING PLAINTIFFS'
### MOTION FOR PARTIAL SUMMARY JUDGMENT

McMahon, J.:

Plaintiffs GPIF-I Equity Co., Ltd. and GPIF Finance Co., Ltd. (together, the "Funds" or

"Plaintiffs") bring this action against defendants HDG Mansur Investment Services, Inc., HDGM

Advisory Services, LLC (together, the "HDG Entities"), and Harold D. Garrison for violation of

the Investment Advisers Act, breach of contract, breach of fiduciary duty, aiding and abetting

breach of fiduciary duty, and fraud.

The Plaintiff Funds are real estate investment firms. They assert that the Defendants, their former Fund Manager, misappropriated the Funds' assets by withdrawing $5,818,682 in alleged "financing fees" from the Funds' accounts. Plaintiffs assert that Defendants were not entitled to these fees.

Plaintiffs filed their Complaint on January 24, 2013, along with a motion for a preliminary injunction, asking the Court to order the HDG Entities to deposit the $5.8 million in a constructive trust during the pendency of the litigation. The Court held a hearing on January 31, 2013, and denied the motion, on the ground that Plaintiffs had an adequate remedy at law.

On February 15, 2013, the HDG Entities asserted counterclaims against Plaintiffs for breach of contract and accounting. They claim that Plaintiffs owe the HDG Entities approximately $20.3 million in fees related to Plaintiffs' early termination of the parties' agreement, including, *inter alia*, fees owed on certain closed and pending transactions and a "severance payment."

Also on February 15, 2013, the HDG Entities brought a third-party complaint against HSBC Securities (USA) Inc. for tortious interference with contract, alleging that, as "Placement Agent" for the Funds, HSBC willfully failed to raise adequate capital for the Funds. As a result, the HDG Entities claim, the Funds lacked the cash flow necessary to take advantage of certain investment opportunities, and the HDG Entities missed out on fees they would have received for managing those transactions.

The instant motion, filed on February 5, 2013, pertains only to Plaintiffs' claim for breach of contract against the HDG Entities. Plaintiffs move for partial summary judgment on the breach of contract claim, their Second Claim for Relief.

For the following reasons, Plaintiffs' motion is granted.

2

## BACKGROUND

### I.     Statement of Facts

The facts relevant to this motion are not in dispute. They are drawn from Plaintiffs' Rule 56.1 Statement of Material Facts ("Pls.' Stm't"), Defendants' Rule 56.1 Counterstatement of Material Facts ("Defs.' Counterst."), the Declaration of Deborah Hazell ("Hazell Decl."), and the Declaration of Harold D. Garrison ("Garrison Decl.").

The Plaintiff Funds are real estate investment funds that were set up as an investment vehicle for religious Muslims, who are prohibited by *Shari'ah* law from paying or receiving interest or becoming direct lenders or borrowers. (Def. Br. at 3)

The two corporate defendants are real estate investment advisory firms that provided advisory and management services to the Plaintiff Funds. Harold D. Garrison is the co-founder of HDG Mansur Investment Services, Inc. ("HDG Investment"). Garrison is not a defendant on Plaintiffs' breach of contract claim, which is the subject of this motion, so the word "Defendants" as used hereinafter refers to the two corporate defendants.

From 2002 through March 2012, Defendant HDG Mansur Investment Services (HDGMIS) acted as the Fund Manager to the Funds. HDGMIS entered into a Fund Management Agreement (the "Agreements" or the "FMA") with each of the Plaintiff Funds. The two Fund Management Agreements are identical in all relevant respects, so I will hereafter cite only to the FMA between HDGMIS and GPIF-I Equity Co., Ltd., attached at Exhibit A to the Hazell Declaration. The reader will understand that the other FMA is identical to Exhibit A in all material respects.

In 2012, Defendant HDGM Advisory Services (HDGMAS) was created, and on March 30, 2012, it took an assignment of all of HDGMIS' rights and obligations under the FMAs.

3

The FMAs provided that the HDG Entities would provide various services to the Funds,

including "the structuring, acquisition and financing of investments, in accordance with the

principles of Islamic Shariah as interpreted by the Shariah committee [a committee at HSBC that

oversees Shariah-compliant investment services]." (FMA § 4.1) In return for these services, the

HDG Entities were entitled to receive two types of fees from the Funds.

The first type of fee was called Investment Financing Fees ("Financing Fees"). Schedule

X of the Agreements ("Definitions; Rules of Usage and Interpretation") provides:

> with respect to each Project Investment, a financing fee payable to
> the Fund Manager . . . in connection with the acquisition by the
> Fund . . . of a Property Investment, which financing fee shall be an
> amount equal to 1% of the aggregate amount of financing with
> respect to such Property Investment . . . .

(Hazell Decl., Ex. C (Schedule X).) Section 5.5 of the FMA (as contained in the First

Amendment to the Agreements) specifies when Financing Fees are payable:

> the Investment Financing Fees payable in connection with the
> financing of any investment in, or acquisition, construction or
> improvement of, the Property Investments (including equity, debt,
> debt-equivalent and Islamic financing elements) are payable in full
> on and prior to the time of the completion of the relevant financing
> . . . . The Fund Manager shall be entitled to receive the Financing
> Fees at the time of financing of a Property Investment . . . .

(FMA, First Amendment at 3.)

Schedule X of the Agreements also provides for the payment of Investment Acquisition

Fees ("Acquisition Fees"), as follows:

> with respect to each Property Investment, an acquisition fee
> payable to the Fund Manager . . . in connection with the
> acquisition by the Fund . . . of a Property Investment, which
> acquisition fee shall be equal to 1 % of the aggregate gross
> acquisition price of such Property Investment . . . .

4

(Schedule X.) Section 5.4 of the FMA (also found in the First Amendment to the Agreements)
sets forth when Acquisition Fees were payable:

> the Investment Acquisition Fees payable in connection with the
> acquisition of the Property Investments are payable in full upon
> acquisition of a property . . . . The Fund Manager shall be entitled
> to receive the Investment Acquisition Fees at the time of
> acquisition of a Property Investment . . . .

(FMA, First Amendment at 2-3.)

The FMA clearly distinguishes between the way the Financing Fees are calculated and
the way Investment Fees are calculated. Financing Fees are payable as a percentage of the
"aggregate amount of financing" of an investment, while "Acquisition Fees" are payable as a
percentage of the "aggregate gross acquisition price" of the investment. Under settled principles
of contract construction – notably the presumptions of consistent usage and meaningful
variation, which follow from the duty to construe the contract as a whole rather than in isolated
provisions, *see Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 567-69 (1995) – the parties' use of
different language to describe the base off which the two types of fees would be calculated
means that the "aggregate amount of financing" is not the same thing as the "aggregate gross
purchase price."

Between 2002 and 2008, the Funds entered into sixty-eight transactions, which both
parties in their papers refer to as "Property Investments,"[1] each of which generated Financing
Fees for the HDG Defendants. As provided in the FMAs, the HDG Entities paid themselves
Financing Fees out of the Funds' accounts around the time of the completion of the relevant
financing. (*See* FMA §§ 3, 5.5.) For all those years, HDG took out Financing Fees calculated as

---

[1] In discussing "Financing Fees" Schedule X refers to something called a "Project Investment" ("with respect to
each Project Investment, a financing fee payable to the Fund Manager"), but then goes on to discuss "Property
Investment," which is also the term used in connection with Acquisition Fees. I assume either that Project
Investment is a typographical error or that the terms Project Investment and Property Investment are
interchangeable; as the parties never use the term "Project Investment," the former is more likely true.

an amount equal to 1% of the debt financing that it arranged in order to conclude the transactions. None of the transactions involved any equity financing (which Black's Law Dictionary defines as financing involving the issuance of capital securities, or shares in a business, rather than by making loans or selling bonds, *see* Black's Law Dictionary (9th ed. 2009) at page 645). According to Defendants, *Shari'ah* law precluded the use of equity financing.

*Shari'ah* does not, however, preclude the use of Fund assets (i.e., the money that Fund investors invested in the Funds) to pay a portion of the aggregate purchase price of each Property Investment (what is commonly understood to be the investors' equity in the Property Investment, more commonly known in real estate circles as a "down payment"). The aggregate gross purchase price of each Property Investment consisted in part of such an infusion of equity using Fund assets and in part of *Shari'ah*-compliant debt financing arranged by HDGMIS. In addition to its Financing Fees, HDGMIS collected Investment Acquisition Fees for each Property Investment, calculated as 1% of the aggregate gross purchase price, which is the sum of (1) the Funds' equity in the investment and (2) the debt financing arranged by HDGMIS.

In late 2011 or early 2012, Defendants suddenly decided that they had been reading the FMA incorrectly for the past decade. They concluded that the Financing Fees, like the Acquisition Fees, should have been calculated as a percentage of the sum of the Funds' equity in the Property plus the debt financing arranged by HDGMIS. Defendants reached this belated conclusion because the word "equity" appears in Section 5.5 of the FMA – the provision that specifies when Financing Fees are due and payable. As noted above, this clause provides that, "Investment Financing Fees payable in connection with the financing of any investment in . . . the Property Investments (including equity, debt, debt-equivalent and Islamic financing

6

elements) are payable in full on and prior to the time of the completion of the relevant financing."

Armed with their new reading of the FMAs, Defendants concluded that they were entitled to an additional $5,818,682 in Financing Fees – which sum they proceeded to withdraw from various of the Funds' accounts, in some thirty different transactions, of differing amounts, all without obtaining any approval from Plaintiffs or the Board of Directors. Indeed, it is not clear that Plaintiffs were notified of Defendants' contractual epiphany until after the money had been taken from the Funds. Defendants claim that they were simply exercising their contractual right to self-help as set forth in Section 3 of the FMAs.

These withdrawals – which Defendants refer to as "truing up" – commenced in January 2012. Forty-six of the 68 transactions on which additional payments were allegedly due had closed more than six years prior to January 2012. As the failure to pay (even to pay oneself) a fee when that fee is due and payable is a breach of contract, and the statute of limitations for a breach of contract claim is six years, it is highly doubtful whether Defendants could not have gone to court and obtained a judgment for those "unpaid" Financing Fees.

The Plaintiff Funds finally learned of Defendants' new contract interpretation in the fall of 2012. They brought this action in January 2013, seeking the return of the $5.8 million that the Defendants withdrew from their accounts.

## DISCUSSION

Plaintiffs move for summary judgment in their favor on the Second Claim for Relief (Breach of Contract) on two grounds.

First, Plaintiffs argue that Defendants have misconstrued the FMA. They assert that the HDG Entities were entitled to Financing Fees calculated off a base consisting only of the

7

"aggregate amount of financing" for each of the Property Investments – which is to say, the debt financing, since debt financing was the only type of financing used in connection with those transactions. (This fact is not in dispute.) They reject Defendants' newfound contention that Financing Fees were owed based on the aggregate gross acquisition price of each Property Investment – i.e., the portion of the acquisition price that was financed with *Shari'ah*-compliant debt plus the "down payment," or equity, that the Funds put into the investment from their own assets.

Second, Plaintiffs argue that, even if Defendants' novel reading of the FMAs were correct, the six-year statute of limitations for breach of contract actions precluded them from recovering the additional "fees" that should have been paid more than six years before Defendants first started withdrawing money from the Funds, in January 2012. $3,904,659 of the total funds withdrawn relate to transactions in this "time barred" category.

Because the Financing Fees are unambiguously calculated as 1% of the "aggregate amount of financing with respect to such Property Investment," not the "aggregate gross acquisition price" of the Investment, I reject Defendants' re-interpretation of the FMA and enter summary judgment for Plaintiffs in the full amount wrongfully taken from the Funds – $5,818,682, plus interest from the date of each unauthorized withdrawal.

## I.      **Standard of Review**

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). On a motion for summary judgment, the court must view the record in the light most favorable to the

8

nonmoving party and draw all reasonable inferences in its favor. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the nonmoving party must present "specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Moreover, not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248.

To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party.

## II.    Principles of Contract Law

To establish a breach of contract under New York law, a plaintiff must show (1) the existence of an agreement, (2) adequate performance of the contract by the claimant, (3) breach of contract by the accused, and (4) damages. *Stadt v. Fox News Network LLC*, 719 F. Supp. 2d 312, 318 (S.D.N.Y. 2010).

Under New York law, a written contract must be interpreted according to the parties' intent, which is "derived from the plain meaning of the language employed in the agreements." *In re Lehman Bros. Inc.*, No. 11 Civ. 6053 (KBF), 2012 WL 1995089, at *11 (S.D.N.Y. June 5, 2012). Where the terms of an agreement are clear and unambiguous, courts do not look beyond

9

the four corners of the agreement, and parol evidence of the parties' intentions is inadmissible.
*R/S Assoc. v. N.Y. Job Dev. Auth.*, 98 N.Y.2d 29, 33 (N.Y. 2002). "In a contract dispute,
generally, a motion for summary judgment may be granted only when the contract language is
wholly unambiguous and conveys a definite meaning." *Bonnant v. Merrill Lynch, Pierce, Fenner
& Smith, Inc.*, 467 Fed. App'x 4, 7 (2d Cir. 2012).

In interpreting the plain language of a contract, a court must consider the language of the
terms of the contract when the contract is "read as a whole" and "avoid interpretations that
render contract provisions meaningless or superfluous." *In re Lehman Bros. Inc.,* No. 11 Civ.
6053 (KBF), 2012 WL 1995089, at *11 (S.D.N.Y. June 5, 2012).

## II.     The FMA Is Unambiguous: Financing Fees Are Based on the Amount of Financing Arranged by the HDG Entities

The only issue raised by this motion is whether Defendants had the right to recalculate
their Financing Fees based on their new reading of an old contract. I conclude that they did not.

The relevant term in the FMAs reads as follows: "a financing fee payable to the Fund
Manager . . . in connection with the acquisition by the Fund . . . of a Property Investment, which
financing fee shall be an amount equal to 1% of the aggregate amount of financing with respect
to such Property Investment." (Schedule X, "Investment Financing Fees.") This section defines
what the Financing Fee consists of, and it could not be clearer – the financing fee equals 1% of
the aggregate amount of *financing* on the Property Investment. It does not calculate the
Financing Fee off a base consisting of the entire purchase price of the Investment.

Section 5.5 does not redefine how to calculate the Financing Fee. Instead, it specifies
when such a fee becomes payable. It provides: "The Investment Financing Fees payable in
connection with the financing of any investment in, or acquisition, construction or improvement
of, the Property Investments (including equity, debt, debt-equivalent and Islamic financing

10

elements) are payable in full on and prior to the time of the completion of the relevant financing .
. . " By providing that the fees are "payable in connection with the financing of any investment in
. . . the Property Investments," Section 5.5 simply reinforces Schedule X's plain statement that
the Investment Financing Fee is calculated as a percentage of the amount of the *financing* on the
Property Investment – not the total amount of the Property Investment, which would be the
aggregate gross acquisition price of the Investment.

     Financing has a commonly understood meaning in the real estate industry. It refers to the
amount of the total purchase price that is paid for with borrowed money – money raised from a
source other than the purchaser, money other than the money taken out of the purchaser's own
pocket. Financing is the money needed to bridge the gap between the total purchase price of a
property and the down payment or equity that the purchaser puts into the purchase. There are
many different ways of "financing" the purchase of property, the most common being the
issuance of capital securities (equity financing), bonds or notes (debt financing), or mortgages.

     As if this common understanding were not enough to foreclose Defendants' argument
that the "financing" of a Property Investment includes the Funds' equity infusion, the FMA
defines the term "financing or refinancing services" in a way that precludes the term's
application to the Funds' equity in Property Investments. Section 4.5 of the FMA, entitled

**Financing or Refinancing**, provides:

> The Fund Manager, in its discretion, may structure and determine
> the amount and terms and conditions of any financing
> arrangements with respect to the . . . investment in, the Property
> Investments . . . [and] will prepare, negotiate and execute, on the
> Fund's behalf, all agreements, documents and instruments
> necessary or advisable for or in connection with any such financing
> arrangements . . . The Fund Manager may engage third parties or,
> subject to Section 4.8, an Affiliate to provide, for a fee, financing
> or refinancing services, including the arrangement of credit
> facilities and property specific debt, debt-equivalent leverage and

11

> mortgage brokerage services, for Equity Co. and the Fund, any
> assets of Equity Co. or the Fund or any entities in which Equity
> Co., or the Fund invests . . . .

Thus, "financing," for purposes of the FMA and the calculation of Financing Fees thereunder,

encompasses what Defendants were hired to do: arrange for the borrowing of money (financing

arrangements) in a *Shari'ah*-compliant manner, including via credit facilities or debt, debt-

equivalent leverage or mortgages. This definition of the phrase "financing services" precludes

any assertion that the 1% of the "aggregate financing" of a Property Investment includes

amounts put toward the purchase price of the Investment by the Funds out of their own assets –

i.e., their non-financed "equity" in the properties.

Defendants accepted this commonly-understood meaning of the word "financing" as used

in the FMA for a decade; during the entire period encompassed by the acquisition of the Property

Investments at issue in this case, going back to 2002, they calculated their Financing Fees on the

basis of "financing" as defined in Section 4.5 of the FMA and never once suggested that they

were also entitled to 1% of the equity invested in the properties by the Funds – which, needless

to say, Defendants had nothing to do with "arranging."

Nonetheless, they come before this Court and argue that a parenthetical clause

"(including equity, debt, debt-equivalent and Islamic financing elements)" in Section 5.5 refines

the Schedule X definition of Investment Financing Fee, as well as Section 4.5's definition of

"financing;" and entitles them to a Financing Fee calculated off a base consisting of both the debt

financing Defendants arranged and the Funds' equity in the Property Investments. They reach

this conclusion by arguing that the parenthetical phrase should be referring to "equity elements,"

"debt elements," "debt-equivalent elements," and "Islamic financing elements." They argue that

to read the phrase as referring to "equity financing elements," "debt financing elements," "debt-

12

equivalent financing elements" and "Islamic financing elements" renders it meaningless, because equity, debt, and debt-equivalent are all actual financial concepts, whereas "Islamic" is not.

Simply reciting Defendants' argument reveals how unpersuasive it is. The entire phrase within the parentheses – "equity, debt, debt-equivalent and Islamic financing elements" – is a modifier. The parenthetical phrase modifies the words "financing of any investment in . . . the Property Investments." Or, even more succinctly, the parenthetical phrase modifies the word "financing" as found in the phrase "Investment Financing Fees payable in connection with the *financing* of any investment in . . . the Property Investments." As so read (and there really is no other way to read the sentence in its entirety), the words in the parenthetical are all types (elements) of "financing:" equity, debt, debt-equivalent, and Islamic. There can be no question that "Islamic financing" is an element (a type) of financing – it is *Shari'ah*-compliant financing of the very sort that Defendants were hired to arrange for the Funds – just as there can be no question that there is equity financing, debt financing, and debt-equivalent financing, and that all are financing "elements."

Although Defendants do not mention something known as the Rule of the Last Antecedent, I assume that they are intending to apply it. The Rule of the Last Antecedent is a rule of grammar; it provides that, where no contrary intention appears, a limiting word, clause, or phrase should ordinarily be read as modifying only the noun or the phrase that it immediately follows. 2A NORMAN J. SINGER, SUTHERLAND STATUTES & STATUTORY CONSTRUCTION § 47:33 (7th ed. 2012). The Supreme Court has held on various occasions that it is "quite sensible as a matter of grammar" to construe statutes in conformity with the rule of the last antecedent. *See Nobelman v. American Savings Bank*, 508 U.S. 324, 330 (1993); *see also Barnhart v. Thomas*, 540 U.S. 20 (2003); *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385

13

(1959). The rule applies equally to contract disputes under New York law. New York courts apply general principles of contract law, and under ordinary contract construction rules, the rules of English grammar apply – the rule of the last antecedent is such a rule. *See In re Enron Creditors Recovery Corp.*, 380 B.R. 307, 322 (S.D.N.Y. 2008). Moreover, the New York Court of Appeals has specifically relied on the principles underlying the rule of the last antecedent in resolving an insurance contract dispute. *Maurice Goldman & Sons, Inc., v. Hanover Ins. Co.*, 80 N.Y.2d 986 (N.Y. 1992).

Defendants' argument under the Rule of the Last Antecedent (had they referred to the Rule in making their argument) would be that the limiting word "elements" is modified only by the nominative phrase "Islamic financing," which immediately precedes it.

This Court has more than passing familiarity with the Rule of the Last Antecedent; I discussed its application in great detail in *In re Enron Creditors Recovery Corp.*, 380 B.R. 307, 319-23 (S.D.N.Y. 2008) (McMahon, J.). As I noted in that case, the Rule is not an absolute; it can be overcome by indicia of contrary intent. *See Enron*, 380 B.R. at 319 (citing *Barnhart v. Thomas*, 540 U.S. 20 (2003) (Scalia, J.)).

Here there are at least two indicia of contrary intent.

First, in the very contract that contains the disputed parenthetical expression, the parties use the word "financing," and the phrase "financing services," to refer only to the types of financing arrangements that Defendants were retained to provide. They do not use those terms elsewhere in the contracts to refer to equity put into investments by the Funds out of their own assets.

Second, the FMAs provide for payment to Defendants, not only of a Financing Fee, but also of a separate acquisition fee, which is calculated as a percentage of each Investment's

14

aggregate gross purchase price – i.e., the Funds' equity plus the debt raised to finance the purchase – rather than simply on the "financed" portion of the Investment. When the parties wanted a fee that was payable to Defendants to include equity as well as debt (financed) portions of an Investment's purchase price, they knew how to so specify. Reading the definition of Financing Fee (1% of the financing) in a manner that makes it congruent with the Acquisition Fee (1% of the Aggregate Gross Acquisition Price) violates the presumptions of consistent usage and meaningful variation. *See Gustafson*, 513 U.S. at 567-69.

When Section 5.5 is properly (not to mention sensibly) construed, the words inside the parentheses – "equity, debt, debt-equivalent and Islamic financing elements" – are a single adjectival phrase that modifies the immediately preceding phrase outside the parentheses. The limiting term in the adjectival phrase is not "elements" but "financing elements," and four separate types of financing elements are specified. Not only is this construction of the sentence grammatically sound, it is entirely consistent with the way the parties operated for the first decade of their relationship.

And this construction accords with the rule of common sense (which can be just as important as a rule of grammar in construing a contract). Defendants were hired to find *Shari'ah* compliant financing for projects in which the Funds wished to invest. It makes perfect sense that they would be paid a fee for that particular service in the form of a percentage of the financing they were hired to arrange. It makes no sense at all that they would be paid a "financing fee" calculated off a base that includes the Plaintiff Funds' equity in the Property Investments, which they neither raised nor arranged.

Defendants refer the Court to the Funds' prospectus, the "Private Placement Memorandum," to support their argument that Section 5.5 of the First Amendment redefines

15

"financing" for the purposes of Section X to include Plaintiffs' equity in the Property Investments. The prospectus is not part of the FMAs and is not incorporated into the FMAs by reference, so it ought not even be considered when interpreting the plain language of the contract. But if I were to consider it, it would bolster Plaintiffs' position, not Defendants'.

The prospectus says that the Fund Manager will provide certain services to the Funds for a fee and that "These services may include the following: (1) *equity, debt, debt-equivalent and Islamic financing services*, including arrangement of credit facilities and property-specific financing for the Fund, the Investment Entities, the Property Investments, and the Shariah-compliant liquidity investments." For the reasons discussed above, the only grammatically correct way to read the italicized words, as well as the only way that is consistent with what the Defendants were hired by Plaintiffs to do, is as an adjectival phrase ("equity, debt, debt-equivalent and Islamic financing services") that modifies the word "services" in the immediately preceding phrase, "These services may include the following." Per Defendant's reading, the words "equity," "debt," debt-equivalent" and "Islamic financing" should all modify the word "services," but there is no such thing as "equity services," "debt services" or "debt-equivalent services," so Defendants' proposed reading of this phrase is nonsensical. Furthermore, the specific exemplars of the types of "services" that the Fund Manager was to provide, as itemized in the phrase quoted above – the "arrangement of credit facilities and property-specific financing" – are taken, *in haec verba*, from the description of the "financing services" to be performed by the HDG Entities per Section 4.5 of the FMAs – which, as I have already noted, is the "Financing and Refinancing" section of the contract, not the "Equity" section of the contract. (FMA § 4.5.)

16

Finally, Defendants are incorrect that "equity" in the Section 5.5 parenthetical cannot refer to "equity financing" because any sort of equity financing would violate *Shari'ah* law, and Section 4.1 of the FMA required Defendants to carry out their responsibilities in accordance with *Shari'ah*. Defendants claim that interpreting the parenthetical expression in accordance with what Plaintiffs and the Court deem its plain meaning would contravene both the principle of contract interpretation that courts are to give meaning to every word or phrase in a contract, and the parties' intention that investments be financed only in accordance with the principles of *Shari'ah*.

In making this argument, Defendants go well beyond the four corners of the contract, to assert a fact (namely, that equity financing is barred by *Shari'ah*) that may or may not be true – but that does not bear on the construction of the words of the FMA.

Section 4.1 was included in the FMA to ensure that all investment transactions were performed in a way that would not violate the religious beliefs of the Funds' investors. But Section 4.1 does not purport to define the terms financing or Financing Fee, or to explain the basis on which such a Fee is calculated. Schedule X does that, and Schedule X limits the Financing Fee to 1% of any "financing." Nor does Section 4.1 specify what particular types of financing Defendants can and cannot employ on behalf of the Funds – it does not say, for example, that Defendants cannot ever issue equity securities. All Section 4.1 does is generally limit Defendants' options for obtaining financing for Fund investments to those that are Shari-ah compliant, as determined by a special advisory committee with expertise in Islamic law. If that committee were to determine that there existed some form of *Shari'ah*-compliant equity financing, nothing in Section 4.1 prohibits its use in connection with Fund investments.

17

Above all, the restriction in Section 4.1 of the FMA cannot be used to rewrite *other* provisions in the contract – provisions that can be understood in accordance with their plain meaning without resort to any parol evidence from Defendants about what does and does not comport with Islamic law. Nothing in this Court's construction of Section 5.5 – which includes (parenthetically) a list of the various types of financing mechanisms that the marketplace commonly employs – either permits or compels the Fund Manager to use equity financing (or any other type of financing) if doing so would violate *Shari'ah*. Therefore, nothing in the Court's plain meaning construction of Section 5.5 causes that section to contravene the parties' intent that only *Shari'ah*-compliant financing mechanisms can be employed on the Funds' behalf.

Plaintiffs' motion for partial summary judgment is granted.

## III.   Damages

The parties agree that the total amount Defendants withdrew in alleged Financing Fees is $5,181,682. The HDG entities are entitled to damages in this amount in out-of-pocket losses resulting from the HDG Entities' breach of the contract.

In diversity actions before courts in the Second Circuit, state law governs the award of prejudgment interest, and federal law governs the award of post-judgment interest. *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 102 (2d Cir. 2004).

Under New York law, "a plaintiff who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right." *Moras v. Marco Polo Network, Inc.*, No. 11 Civ. 2081, 2012 WL 6700231, at *14 (S.D.N.Y. Dec. 20, 2012). The statutory rate for prejudgment interest on a claim for breach of contract is nine percent per year. *See id.* (citing N.Y. C.P.L.R. § 5004). In a breach of contract case, prejudgment interest is calculated from the date of the breach to the date of judgment.

18

Under 28 U.S.C. § 1961, "interest shall be allowed on any money judgment in a civil case recovered in a district court." Post-judgment interest "shall be calculated from the date of the entry of judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment." 28 U.S.C. § 1961.

Plaintiffs are entitled to prejudgment interest, at New York's statutory rate of 9%, commencing on the date of each withdrawal. So, for example, if Defendants withdrew $350,000.00 from "NL Niederbipp" on January 12, 2012 to "true up" fees to which they were not entitled, as suggested by the chart at Exhibit F to the Hazell Declaration, Plaintiffs are entitled to pre-judgment interest on that particular amount from the date of withdrawal to and including the date on which judgment is entered. And if Defendants withdrew another $45,937.00 from "NL Niederbipp" on January 25, 2012, Plaintiffs are entitled to pre-judgment interest on that amount from the date of the withdrawal to and including the date of the judgment. The amount of the judgment to which Plaintiffs are entitled on Count Two must be calculated as the sum of all wrongful withdrawals, plus prejudgment interest calculated separately for each withdrawal. Pre-judgment interest runs through the date of the judgment, not the date the motion for summary judgment was made.

Plaintiffs are also entitled to post-judgment interest, which will accrue on the total amount of the judgment beginning on the date of the judgment, at the rate published by the Board of Governors of the Federal Reserve System for the calendar week preceding the date of the judgment. *See* 28 U.S.C. § 1961.

Plaintiffs are responsible for calculating the appropriate amounts of prejudgment and post-judgment interest.

Of course, Defendants have a variety of claims against Plaintiffs, which they no doubt wish to offset. It is possible, now that the Court has ruled that Defendants were in material breach of the FMAs by taking money to which they were not entitled, that these claims can be resolved rather quickly. Or perhaps not. But at present I see no reason to enter a partial final judgment, which is what Plaintiffs seem to want.

I will, however, enter judgment on the main action as soon as it is fully decided, whether by motion or after a trial. I hereby sever the Third Party Action, which raises entirely different issues, and stay it pending resolution of the action filed by the Funds against the HDG Entities and Garrison. I expect Plaintiffs' case against the HDG Defendants to be ready for trial (i.e., Joint Pre-Trial Order filed) by January 12, 2014, which means that all discovery on the main action (claims and counterclaims) must be concluded by December 13, 2013. No extension of these dates will be granted.

## CONCLUSION

The motion for partial summary judgment is granted. The Clerk of the Court is directed to remove the motion at Docket No. 18 from the Court's list of pending motions.

August 1, 2013

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

20