UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
GPIF-I EQUITY CO., LTD. and                                  :
GPIF-I FINANCE CO., LTD.,                                    :
                                                            :
              Plaintiffs,                                   :
                                                            :
v.                                                          :       **Case No. 13 Civ 547 (CM)**
                                                            :
HDG MANSUR INVESTMENT SERVICES, INC.,                       :
HDGM ADVISORY SERVICES, LLC, and                            :
HAROLD D. GARRISON                                          :
                                                            :
              Defendants.                                   :
-------------------------------------------------------------x

## DEFENDANTS' COUNTERSTATEMENT OF
## MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1

Pursuant to Local Rule 56.1, defendants HDG Mansur Investment Services, Inc., HDGM

Advisory Services, LLC, and Harold D. Garrison (collectively "Defendants") submit the

following Counterstatement of Material Facts in response to the Statement of Material Facts filed

by plaintiffs GPIF-I Equity Co., Ltd. and GPIF-I Finance Co., Ltd. (collectively "Plaintiffs") in

support of their motion for summary judgment:

**Statement 18.** The Fund Managers acted as the managers and agents of the Funds.  As managers

and agents, the Fund Managers provided fund management and investment advisory services to

the Funds, and exercised discretionary authority over the assets and management of the Funds.

Defs. Answ. ¶¶ 2, 32, 40, 43 [Dkt. No. 22]; Equity Fund Management Agreement (Winer Decl.

Ex. 1); Finance Fund Management Agreement (Winer Decl. Ex. 2).

**DEFENDANTS' RESPONSE TO STATEMENT 18.**

Defendants admit that they were appointed as managers of the Funds pursuant to Section

2.1 of the Fund Management Agreements ("FMA") and acted as agents of the Funds in the

performance of its duties pursuant to Section 2.4 of the FMA.  Defendants deny the remaining

allegations in Statement 18 and respectfully refer the Court to Sections 2.3 and 4.1 of the FMA

for the terms of Defendants' services and relationship with Plaintiffs.  FMA (Winer Decl. Exs. 1-

2).

**Statement 19.** The Funds placed their trust and confidence in the Fund Managers to protect and

prudently manage the assets of the funds, which included the underlying property entity accounts

owned by the Funds. As a result, the Fund Managers have admitted they owed fiduciary duties to

the Funds under the common law and the Investment Advisers Act. Defs. Answer ¶¶ 2, 32, 40, 43

[Dkt. No. 22]; Jan. 13, 2014 Declaration of Deborah Hazell ("Hazell Decl.") ¶¶ 2-3.

**DEFENDANTS' RESPONSE TO STATEMENT 19.**

Defendants are without sufficient knowledge or information to form a belief as to the

Funds' mental impressions alleged in Statement 19.  Defendants deny the remaining allegations

in Statement 19 and respectfully refer the Court to (i) the deposition testimony of Deborah

Hazell in which she testified that any fiduciary duty owed by the Fund Manager to the Funds was

derived from the FMA (Hazell Dep. Tr. 126:20 – 127:6 (Earley Decl. Ex. 1)) and to (ii) Section

4.1 of the FMA (Winer Decl. Exs. 1, 2).

**Statement 20.** Beginning on February 8, 2012, and continuing until November 28, 2012, the Fund

Managers took money totaling $5,818,682 from the Funds' assets that the Fund Managers have

characterized variously as "fees," "reserves," "underpayments," or "prepayments" (hereinafter the

"Payments"). Winer Decl. Ex. 3 (Jan. 28, 2013 email attaching schedule of "finance fees"); *id.* Ex. 4

(July 23, 2012 email describing "Prepaid GPIF fees"); *id.* Ex. 5 (Sept. 17, 2012 email describing

"prepaid GPIF fees"); *id.* Ex. 6 (Sept. 20, 2012 email describing "advance Finance Fee"); *id.* Ex. 7

(Dec. 7, 2012 email describing "prepaid fees"); *id.* Ex 8 at 54:13-55:13, 124:6-25, 131:7-133:17

(testimony from Funds' auditor that Garrison told auditor he was "reserving for fees").

**DEFENDANTS' RESPONSE TO STATEMENT 20.**

As set forth in the parties' Stipulated Facts submitted as part of the parties' proposed

Joint Pretrial Order, Defendants admit that they authorized the Funds to make payments to the

Fund Manager totaling $5,818,682 in 2012.  Defendants otherwise deny the allegations in

Statement 20. *See* FMA §§ 5.5, 5.6 (Winer Decl. Exs. 1-2); Stipulated Facts ¶ 13 (Earley Decl.

Ex. 2).

**Statement 21.** The Fund Managers took this money without regard to whether the accounts

corresponded to any transaction for which a fee might be due. They did so in order to pay expenses

owed by the Fund Managers' other businesses, or related companies owned and controlled by

Garrison, which were experiencing financial difficulties. Winer Decl. Ex. 9 (Sept. 25, 2012 email

referring to overdrawn fees); *id.* Ex. 10 (Aug. 23, 2011 email discussing Fund Managers' cash

needs); *id.* Ex. 11 (Jan. 23, 2012 email referring to "prepayment" of fees from Fund property to

meet Fund Managers' cash needs); *id.* Ex. 12 (May 17, 2012 email instruction from Garrison to

"[m]ove 200" thousand dollars in prepaid finance fees to pay for Fund Managers' expenses); *id.* Ex.

13 (May 30, 2012 email from Garrison instructing Fund Managers employee to "advance more

fees" in the amount of $400,000 to meet "London Office Payroll"); *id.* Ex. 14 (July 22, 2012

email informing Garrison that Fund Managers "have been paid on a number of sales that are not

closing" and seeking guidance on "where cash is coming from" to pay Fund Managers' expenses);

*id.* Ex. 15 (Aug. 7, 2012 email in which Garrison instructs employee to "advance additional

disposition fee" to meet payroll and other expenses of Fund Managers); *id.* Ex. 16 at 47:10-48:4

(testimony from Fund Managers' director of accounting that fees were taken from property accounts that did not owe fees).

**DEFENDANTS' RESPONSE TO STATEMENT 21.**

Defendants deny the allegations in Statement 21.  Defendants object because Plaintiffs' citations to the record do not support the allegations therein.  The evidence in the record demonstrates that the Funds' lawyers and auditors advised the Fund Manager dating back at least to 2009 that it was in the Funds' best interest to make regular cash transfers between the Funds' project companies for the payment of fees and other expenses to avert negative tax consequences and avoid potential third-party cash grabs.   Nelson Dep. Tr. 48:9-19 (Earley Decl. Ex. 3) (providing that intercompany loans were made at the request of the Funds' counsel and auditors for tax purposes); Reeve Decl. ¶ 3 (stating that "the London Office" handled all day-to-day activities of the Funds' European properties); Earley Decl. Exs. 4, 5 (advice on intercompany loans).

**Statement 22.** The Fund Managers took the Payments even though they had been instructed by the Funds' Boards of Directors not to take fees without Board review and approval, and even though they knew that the Funds' Boards were concerned about the fees that the Fund Managers had been paying themselves. Hazell Decl. ¶ 4. The Fund Managers continued to take the Funds' assets even when their own internal analysis showed that they were overpaying themselves. Winer Decl. Ex. 17 (Sept. 25, 2012 email to Garrison informing him that the Fund Managers had taken closing fees for transactions that have "a zero probability of closing in 2012," and that Fund Managers had "overdrawn over $1M of fees").

**DEFENDANTS' RESPONSE TO STATEMENT 22.**

Defendants deny the allegations in Statement 22.  Defendants object because Plaintiffs'

citations to the record do not support the allegations therein.  The evidence in the record reflects

that the FMA did not require the Fund Manager to receive Board approval before receiving fees

and no resolution was passed requiring this.  Hazell Dep. Tr. 40:20-25, 41:11-14 (Earley Decl.

Ex. 1).  The Fund Managers never believed that transaction had a zero probability of closing or

that fees were overdrawn.  Nov. 15 Garrison Dep. Tr. 218:2-15 (Earley Decl. Ex. 6) (stating that

the blueprint to success was not something the Fund Manager took seriously or used); Nov. 21

Reeve Dep. Tr. 132:6-21 (Earley Decl. Ex. 7) (stating that the blueprint did not necessarily

provide an estimate on behalf of the Fund Manager).

**Statement 23.** The Fund Managers concealed the Payments in 2012 from the Funds and the Funds'

Board of Directors. In particular, the Fund Managers submitted quarterly Fund Management

Reports to the Funds' Boards of Directors in 2012 that misrepresented the amount of money that the

Fund Managers were receiving. Those quarterly reports contained Related Party Payment Schedules

misstating that the Fund Managers were not receiving financing and disposition fees, or were

receiving very little in fees, when in fact the Fund Managers were paying themselves millions of

dollars from the underlying property entity accounts. Winer Decl. Ex. 18 at 156735-36 (excerpt

from Q1 2012 report); *id.* Ex. 19 at 160391-92 (excerpt from Q2 2012 report); *id.* Ex. 20 at

164308-09 (excerpt from Q3 2012 report); *id.* Ex. 16 at 82:13-83:5, 87:16-88:7, 95:11-20

(testimony from Fund Managers' director of accounting, Brian Reeve, admitting that fees had

been taken but not disclosed in board reports); Hazell Decl. ¶¶ 5-6.

**DEFENDANTS' RESPONSE TO STATEMENT 23.**

Defendants deny the allegations in Statement 23.  Defendants respectfully refer the Court to the Private Placement Memorandum ("PPM") and advice from the Funds' legal counsel with respect to Defendants' reporting requirements.  Earley Decl. Exs. 8, 9.  The Funds' trial balances containing the accounting of the payments in 2012 were shared with the HSBC accounting team on a monthly basis and, on at least one occasion, sent to a member of the Boards.  Earley Decl. Ex. 10.  Prepayments on transactions that had not yet closed were not included on the Schedule of Related Party Transactions because they had not yet been incurred at the Fund level.  Nov. 21 Reeve Dep. Tr. 80:9-21; 87:16 – 88:7 (Earley Decl. 7).  The auditors and Board knew that these prepayments had been made in prior years and were disclosed either at the year-end audit or when they hit the Fund level.  Nelson Dep. Tr. 22:11-24, 23:11-15, 26:10-22 (Earley Decl. Ex. 3).

**Statement 24.** The quarterly reports also contained Inter-Company Loan Schedules that misrepresented the amount of cash transfers and inter-company loans being made among the underlying property entity accounts. These Schedules reported that cash transfers and intercompany loans were not being made, or that very few were being made, even though those transfers and loans were in fact occurring to facilitate the millions of dollars of Payments. As a result, the quarterly reports misrepresented that the Related Party Fee amounts and the Intercompany Loan amounts were far lower than they actually were for those quarters in 2012. Winer Decl. Exs. 18-20; *see also id.* Ex. 21 at 178547 (minutes from Q3 2012 board meeting in which Fund Managers' CFO, Thomas Kmiecik, stated that there had been "no material movements" in intercompany loans).

**DEFENDANTS' RESPONSE TO STATEMENT 24.**

Defendants deny the allegations in Statement 24.  The evidence in the record reflects that cash transfers were done with respect to many of the payments in 2012 because excess cash was specifically housed at one of the properties, PP Indianapolis IX ("PP IX"), due to the fact that this property did not have any issues with a lender looking to trap cash, and it was in the Funds' best interest for cash to be stored there.  Nov. 21 Reeve Dep. Tr. 51:13-19 (Earley Decl. Ex. 7). Whenever a particular property whose cash PP IX was storing needed to pay a fee, PP IX would send back that property's own cash.  Nelson Dep. Tr. 188:17 – 189:24 (Earley Decl. Ex. 3). Some members of the Fund Manager's accounting team did not view this as a conventional intercompany loan because it was simply a project company using a separate bank account to house its own cash. Nov. 21 Reeve Dep. Tr. 51:13-52:5, 89:3-93:17 (Earley Decl. Ex. 7).

**Statement 25.** The Fund Managers knew, or recklessly disregarded, that these reports were false at the time they were made, and made these reports to mislead the Funds' Boards of Directors. *Compare* Winer Decl. Exs. 4-7, 9, 16 (testimony and contemporaneous emails showing that Fund Managers knew that payments to Fund Managers and intercompany loans had been made), *with* Winer Decl. Exs. 18-21 (Fund Managers' representations to Funds' Boards of Directors that payments to Fund Managers and intercompany loans had *not* been made).

**DEFENDANTS' RESPONSE TO STATEMENT 25.**

Defendants deny the allegations in Statement 25 because they are contradicted by the evidence in the record.  *See* Nov. 21 Reeve Dep. Tr. 50:18 – 52:7; 89:3 – 93:17 (Earley Decl. Ex. 7) (explaining that the money used to pay prepayments from PP IX Indianapolis were not intercompany loans, because it was the return of cash PP IX Indianapolis was storing for that particular property).

**Statement 26.** The Fund Managers failed to disclose the Payments, or the intercompany loans or cash transfers accompanying these Payments, in any other communications to the Funds or the Funds' Boards of Directors. Garrison also failed to disclose these Payments, and the intercompany loans or cash transfers at the Board meetings he attended as a director. Hazell Decl. ¶ 6. The Payments were material because, based on the Funds' year-end valuation, the $5,818,682 taken from the Funds' assets amounted to 13% of the Funds' net asset value. Winer Decl. Ex. 22 at 178581 (excerpt of Funds' year-end 2012 financial statements showing net assets of $44.5 million).

**DEFENDANTS' RESPONSE TO STATEMENT 26.**

Defendants deny the allegations in Statement 26.  The evidence in the record reflects that the Funds' trial balances containing the accounting of the payments of the Payments in 2012 were shared with the HSBC accounting team on a monthly basis and, on at least one occasion, sent to a member of the Boards.  *See* Earley Decl. Ex. 10.  Defendants also object because the $5,818,682 in dispute reflects much less than 13% of the Funds' net asset value.  Before the Fund Manager was terminated, the Funds' third party appraiser, Cushman & Wakefield, completed its valuation of the Funds' properties and determined the NAV to be approximately $80,976,710.  *See* Earley Decl. Ex. 11.

**Statement 27.**  In addition, the Fund Managers and Garrison made accounting entries during 2012 that concealed from the Funds and the Funds' Boards of Directors the payments totaling $5,818,682. Those practices included the use of offsetting journal entries so that the Payments were not reflected as current expenses, which resulted in the Boards believing incorrectly that the Funds' expenses were lower, and that the Funds' financial position was materially better, than

8

was actually the case in 2012. Winer Decl. Ex. 16 at 217:7-219:15 (Reeve testimony that the

Fund Managers booked fees they had taken as "prepaid expenses"); Hazell Decl. ¶ 7.

**DEFENDANTS' RESPONSE TO STATEMENT 27.**

Defendants deny the allegations in Statement 27.  The evidence in the record reflects that

the Fund Manager's accounting was the proper way to account for a prepaid fee from an

accounting perspective because a prepaid fee is an asset until the close of the transaction.  Nelson

Dep. Tr. 66:2-14 (Earley Decl. Ex. 3); Hazell Dep. Tr. 88:4-21 (Earley Decl. Ex. 1).  The cash

transfers used to make the payments did not have the ability to hide or conceal the prepayment of

fees – they would have had no effect either way.  Nelson Dep. Tr. 100:11-20 (Earley Decl. Ex.

3).  Mr. Garrison played no role in determining how the payments at issue in this case were

accounted for until December 2012.  Reeve Decl. ¶ 2.

**Statement 28.** The Funds and the Funds' Board of Directors relied on the Fund Managers'

misstatements and misleading information regarding the Payments and the accompanying cash

transfers and inter-company loans. If these material facts had been accurately disclosed, the

Boards would have taken immediate steps to prevent any further payments, to recover any prior

payments, and to reduce the harm that the Funds have since suffered. Hazell Decl. ¶ 8.

**DEFENDANTS' RESPONSE TO STATEMENT 28.**

Defendants are without sufficient knowledge or information to form a belief as to the

allegations in Statement 28, except deny the allegations to the extent Plaintiffs characterize

Defendants' actions as "misstatements" and "misleading."

**Statement 29.** The Fund Managers and Garrison misrepresented and concealed material facts from

the Funds' Boards because they knew from their communications in 2012 with the Boards and

Board members that the Boards would not have permitted the Payments and intercompany loans or cash transfers to occur, and would have required the return of any Payments already made. Winer Decl. Ex. 23 (Oct. 16, 2012 email from Reeve referring to conversation in which Garrison agreed to "take the hit" for the "choice . . . to take fees in advance on dispositions and financings"); *id.* Ex. 24 (Nov. 9, 2012 email exchange between Fund Managers' controller and senior accountant stating that "once the audit starts, forget it," and that "the[r]e is just now [sic] way to hide all of those fees"); Hazell Decl. ¶ 4.

**DEFENDANTS' RESPONSE TO STATEMENT 29.**

Defendants deny the allegations in Statement 29.  Defendants respectfully refer the Court to the PPM and advice from the Funds' legal counsel with respect to Defendants' reporting requirements.  (Earley Decl. Exs. 8, 9.)  The evidence reflects that the Funds' trial balances containing the accounting of the payments of the Payments in 2012 were shared with the HSBC accounting team on a monthly basis and, on at least one occasion, sent to a member of the Boards.  *See* Earley Decl. Ex. 10.  Prepayments on transactions that had not yet closed were not included on the Schedule of Related Party Transactions because they had not yet been incurred at the Fund level.  Nov. 21 Reeve Dep. Tr. 80:9-21; 87:16 – 88:7 (Earley Decl. Ex. 7).  The auditors and Board knew that these prepayments had been made in prior years and were disclosed either at the year-end audit or when they hit the Fund level.  Nelson Dep. Tr. 22:11-24, 23:7-15, 26:10-22 (Earley Decl. Ex. 3).  Following the Fund Manager's termination, a non-HDG-affiliated Board member agreed that intercompany loans were a "standard practice to move cash around companies with the same cross-collateralized portfolio."  Earley Decl. Ex. 12.

**Statement 30.**  After the Payments were discovered by the Funds' Boards on December 18, 2012, Garrison and the Fund Managers refused to return the money when requested by the Funds

to do so. Winer Decl. Ex. 25 (Dec. 19, 2012 email in which Garrison claims to have been entitled to take the money); *id.* Ex. 26 (Dec. 20, 2012 letter stating same); *id.* Ex. 27 (Dec. 21, 2012 Hazell letter requesting that Fund Managers return money or place in escrow); *id.* Ex. 28 (Jan. 7, 2013 letter in which Garrison declines to return money or place in escrow).

**DEFENDANTS' RESPONSE TO STATEMENT 30.**

Defendants admit that the Fund Manager refused to return the money because, as Defendants communicated to the Board of the Funds throughout 2012, they believed they were owed $5,818,682 in underpaid financing fees. Hazell Dep. Tr. 101:12-24 (Earley Decl. Ex. 1).

**Statement 31.** Instead, of returning the money, the Fund Managers and Garrison made further misrepresentations, including in sworn declarations to this Court, concerning the money they had taken from the Funds. Garrison misrepresented that the Payments had been taken during the year to recover "underpayments" in prior transactions, even though the Fund Managers had accounted for the Payments as "prepayments" for transactions expected to occur in 2012 (as evidenced by contemporaneous documents cited herein). Winer Decl. Exs. 26, 28 (Garrison letters stating that money was taken as underpaid financing fees); Jan. 29, 2013 Garrison Decl. ¶¶ 18-23 [Dkt. No. 7]; Feb. 15, 2013 Garrison Decl. ¶¶ 23-31 [Dkt. No. 23]; Hazell Decl. ¶ 9.

**DEFENDANTS' RESPONSE TO STATEMENT 31.**

Defendants deny the allegations in Statement 31 because Plaintiffs' citations to the record do not support the allegations therein. The evidence demonstrates that the Fund Manager believed that the fees were properly taken as prepaid fees on anticipated transactions during the course of the year, consistent with the FMA and sanctioned in prior years by the Boards and the auditors; that at the same time, the Fund Manager believed that it was entitled to receive roughly

$5.8 million that was due as payment on historically underpaid financing fees; that and on or around December 18, 2012, Mr. Garrison made a final determination that the fees should be treated and accounted for as underpaid financing fees rather than prepayments.  Nov. 15 Garrison Dep. Tr. 85:7-23 (Earley Decl. Ex. 6); Earley Decl. Ex. 13; Defs.' Statement of Additional Material Facts ¶¶ 40-47 (citing additional evidence in the record).

**Statement 32.** The Fund Manager prepared a misleading schedule for the Boards purporting to show that the money was taken as "underpayments" for prior transactions (Winer Decl. Ex. 29), when in fact the Payments had never been accounted for that way. *Id.* Ex. 8 at 65:7-22; 163:11-177:8 (testimony from the Funds' outside auditor that, *inter alia*, Fund Managers had booked payments in journal entries as "prepayments of fees for future transactions that had not taken place," but that documents provided to Board stated that payments had been "payments for past transactions that [the Fund Managers] were underpaid for"); *id.* Ex. 16 at 38:9-40:18 (Reeve testimony that Fund Managers took fees as "prepayments" of transaction fees).

**DEFENDANTS' RESPONSE TO STATEMENT 32.**

Defendants deny the allegations in Statement 32.  Defendants object because Plaintiffs' citations to the record do not support the allegations therein.  The evidence demonstrates that the Fund Manager believed that the fees were properly taken as prepaid fees on anticipated transactions during the course of the year, consistent with the FMA and sanctioned in prior years by the Boards and the auditors; that at the same time, the Fund Manager believed that it was entitled to receive roughly $5.8 million that was due as payment on historically underpaid financing fees; and that on or around December 18, 2012, Mr. Garrison made a final determination that the fees should be treated and accounted for as underpaid financing fees rather than prepayments.  Nov. 15 Garrison Dep. Tr. 85:7-23 (Earley Decl. Ex. 6); *see also* Defs.'

Statement of Additional Material Facts ¶¶ 40-47 (citing additional evidence in the record).  The schedule to which Plaintiffs refer was prepared prior to 2012.  *See* Earley Decl. Ex. 14 (referring to a "schedule" that Mr. Reeve prepared prior to 2012 calculating the total amount of underpayments owed).

**Statement 33.** Garrison directed the Fund Managers to revise the Funds' journal entries to try to conceal the fact that the money was initially characterized as "prepayments" for transactions yet to close, rather than as "underpayments" for transactions that had already closed, and the Fund Managers acknowledged that these revisions were wrong. Winer Decl. Ex. 30 at 21952-21952a (Feb. 1, 2013 text message exchange between Fund Managers' director of accounting (Reeve) and Funds' outside auditor in which Reeve admits that he changed journal entry ("JE") descriptions "at Harold's [Garrison's] order"); *id.* Ex. 31 at 189:6-192:19 (Garrison testimony in which he acknowledges directing Reeve to "correct the books").

**DEFENDANTS' RESPONSE TO STATEMENT 33.**

Defendants deny the allegations in Statement 33 because Plaintiffs' citations to the record do not support the allegations therein.  The evidence demonstrates that the Fund Manager believed that the fees were properly taken as prepaid fees on anticipated transactions during the course of the year, consistent with the FMA and sanctioned in prior years by the Boards and the auditors; that at the same time, the Fund Manager believed that it was entitled to receive roughly $5.8 million that was due as payment on historically underpaid financing fees; and that on or around December 18, 2012, Mr. Garrison made a final determination that the fees should be treated and accounted for as underpaid financing fees rather than prepayments.  Garrison Dep. Tr. 85:7-23 (Earley Decl. Ex. 6).  *See also* Defs.' Statement of Additional Material Facts ¶¶ 40-47 (citing additional evidence in the record).  Mr. Garrison directed the HDG accounting team to

do whatever was necessary to make sure the accounting records accurately reflected his final determination that the payments were for underpaid financing fees, even if this meant correcting the general ledger.  Garrison Dep. Tr. 189:6 – 192:19  (Earley Decl. Ex. 6).

**Statement 34.** Garrison provided Ian Nelson, the Funds' auditor, with yet another explanation for the Payments on January 3, 2013. Garrison advised Nelson that the Payments were taken as "defensive action" because he thought the Fund Manager would be terminated, and he was "reserving for fees" that he thought would be owed upon termination. Winer Decl. Ex. 8 at 54:5-55:13, 132:13-133:17 (auditor testimony about meeting with Garrison in which Garrison said he took money from the Funds as a "defensive action" in case the Funds were to terminate the Fund Managers); *id.* Ex. 32 at 21925 (auditor's notes from meeting with Garrison in which Garrison explains he took money as "defensive action").

**DEFENDANTS' RESPONSE TO STATEMENT 34.**

Defendants deny the allegations in paragraph 34. *See* Garrison Dep. Tr. 278:12 – 281:17 (Earley Decl. Ex. 6) (stating that Mr. Garrison always intended to meet with the Funds' auditors at year-end to discuss how to deal properly with accounting for fees).

**Statement 35.** Throughout 2012, Garrison acted in three roles: as the CEO of the Fund Managers, as a director of the Funds, and as the person who controlled related companies and a personal trust which he intended to benefit from the Payments. Winer Decl. Ex. 33 (organizational chart showing subsidiaries of "Harold D. Garrison Revocable Trust"); Defs. Answ. ¶ 10 (admitting that Garrison is Chairman and CEO of the Fund Managers).

**DEFENDANTS' RESPONSE TO STATEMENT 35.**

Defendants admit the allegations in paragraph 35, except deny that Mr. Garrison controlled the undefined related companies and deny that he intended to or did personally benefit in any way from the payments at issue in this case.  *See* Reeve Decl. ¶ 6 (stating that the Revocable Trust put more money into the HDG Mansur family of companies than it received from them in 2012).

**Statement 36.** Garrison knew of and substantially participated in the Fund Managers' disloyalty, imprudence, and self-dealing by directing that the Payments be made from the Funds' assets whenever cash was needed for his businesses, by fraudulently manipulating the Funds' accounting records, by concealing material information from the Board regarding these Payments, and by providing misleading information to the Boards to cover up the fraud and breach of fiduciary duty. Winer Exs. 18-20 (quarterly reports that failed to disclose payments to Fund Managers); *id.* Ex. 21 (minutes from board meeting where Garrison failed to disclose payments to Fund Managers); *id.* Exs. 47, 49 (Garrison letters to Funds misrepresenting that payments had been taken as underpaid financing fees); *id.* Ex. 17 (email showing Garrison knew Fund Managers had taken fees in 2012 with respect to transactions that had "zero probability of closing" in 2012); *id.* Ex. 30 (text message indicating that Garrison had instructed subordinate to change journal entries); *id.* Ex. 11 (email showing Garrison knew money had been taken from Funds as prepayment of fees expected to be earned, and not as underpayment of fees already earned); *id.* Exs. 12-15, 34 (emails in which Garrison discusses use of prepaid fees to pay Fund Managers' payroll and other expenses); *id.* Ex. 16 at 150:10-153:4 (Reeve testimony that Garrison told him to change journal entries).

**DEFENDANTS' RESPONSE TO STATEMENT 36.**

Defendants deny the allegations in Statement 36.  The evidence demonstrates that the Fund Manager believed that the fees were properly taken as prepaid fees on anticipated transactions during the course of the year, consistent with the FMA and sanctioned in prior years by the Boards and the auditors, and the Fund Manager's accounting of the prepaid fees was proper; that at the same time, the Fund Manager believed that it was entitled to receive roughly $5.8 million that was due as payment on historically underpaid financing fees; and that on or around December 18, 2012, Mr. Garrison made a final determination that the fees should be treated and accounted for as underpaid financing fees rather than prepayments.  Nov. 15 Garrison Dep. Tr. 85:7-23 (Earley Decl. Ex. 6).  *See also* Defs.' Statement of Additional Material Facts ¶¶ 40-47 (citing additional evidence in the record).  Mr. Garrison directed the HDG accounting team to do whatever was necessary to make sure the accounting records accurately reflected his final determination that the payments were for underpaid financing fees, even if this meant correcting the general ledger.  Garrison Dep. Tr. 189:6-190:15 (Earley Decl. Ex. 6).   Mr. Garrison played no role in determining how the payments at issue in this case were accounted for until December 2012.  See Reeve Decl. ¶ 2.

**Statement 37.**  Garrison used the Payments to prop up other affiliated companies that he owned, and to enrich himself and a trust that he set up for his and his wife's benefit. Winer Decl. Ex. 35 (Promissory Note from Fund Managers to Garrison trust for $1,186,524); *id.* Ex. 36 (demand from Garrison trust that promissory note be paid); *id.* Ex. 37 (transfer by Fund Managers of interest in GPIF co-investment vehicle to Garrison trust); *id.* Ex. 38 (Fund Managers' grant of security interests to Garrison trust).

**DEFENDANTS' RESPONSE TO STATEMENT 37.**

Defendants deny the allegations in paragraph 37.  Defendants object because Plaintiffs'

citations to the record do not support the allegations in paragraph 37.  *See* Dec. 6 Reeve Dep. Tr.

56:21 – 57:12; 77:7 – 78:8 (Earley Decl. Ex. 21) (stating that the transfer to the Revocable Trust

was not for cash); Reeve Decl. ¶ 6 (stating that the Revocable Trust put more money into the

HDG Mansur family of companies ($857,000) than it received from them in 2012 ($103,000)).

**Statement 38.** The Fund Managers' and Garrison's misconduct caused damages to the Funds, in

addition to the $5,818,682 that Defendants claimed in this litigation were due to them as underpaid

"financing fees," of $2,688,925, which consists of: (a) $1,385,604 in direct fund expenses that the

Fund Managers took from the Funds, and had agreed to repay but never did so after on the

termination; (b) $83,321 for the fourth quarter 2012 Fund Administrative Fee "true-up" that the

Fund Manager owed to the Funds but was never paid because the Fund Manager and Garrison

refused to comply with the Fund Manager's fiduciary duties and continued to try to cover up their

fraud; (c) $380,000 in increased PwC audit costs to uncover the breaches of fiduciary duty and

fraud that Garrison and the Fund Manager refused to acknowledge and tried to cover up; (d)

$765,000 in increased D&O insurance costs for the Funds after the insurers learned of the Fund

Managers' misconduct; and (e) $75,000 in increased transition costs because Garrison and the Fund

Manager refused to acknowledge the breaches of fiduciary duty and fraud and had tried to cover

them up. Hazell Decl. ¶ 11; Winer Decl. Ex. 39 at 178597 (identifying receivable due from the

Fund Managers for direct fund expenses); *id.* Ex. 40 (Oct. 23, 2011 email in which Garrison admits

that Fund Managers "incorrectly calculated" direct fund expenses going back to 2009).

**DEFENDANTS' RESPONSE TO STATEMENT 38.**

Defendants deny the Statement in paragraph 38 because there is no evidence in the record to support that any of these alleged damages were the but-for or proximate cause of Defendants' alleged misconduct.  In addition, the recoverability of the stated damages is a legal issue involving issues of proximate cause not appropriate for a statement of facts.  In addition, Plaintiffs first entered into negotiations with the HDG Entities to recover Direct Fund Expenses in 2011.  Hazell Dep. Tr. 95:25 – 97:6 (Earley Decl. Ex. 1.)  In addition, there is no evidence in the record that the Funds are owed the claimed amount for a "true-up" of the Q4 2012 Fund Administration Fee.  In addition, Ian Nelson cited the pragmatic difficulties caused by the transition between fund managers as a contributing reason for PwC's increased audit fees.  Nelson Dep. Tr. 205:24 – 207:12 (Earley Decl. Ex. 3).   The Fund Administration Fee was paid at the beginning of every quarter pursuant to Exhibit A of the FMA. (Winer Decl. Exs. 1-2).

## DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS

39.    At the beginning of 2012, as in all prior years, the Fund Manager submitted a budget to Plaintiffs which Plaintiffs reviewed in great detail prior to approving it.  Garrison Dep. Tr. 82:11 – 83:10 (Earley Decl. Ex. 6); Nov. 21 Reeve Dep. Tr. 104:21 – 105:14 (Earley Decl. Ex. 7).  The 2012 budget projected that the Fund Manager would receive over $7 million in financing and disposition fees during 2012 from transactions expected to close during the year.  *See* Approved 2012 Budget (Earley Decl. Ex. 15); Stipulated Facts ¶ 21 (Earley Decl. Ex. 2).

40.    Throughout 2012, the Fund Manager authorized the Funds to pay the Fund Manager fees in various amounts totaling $5,818,682 during the year.  Garrison Dep. Tr. 82:11 – 83:10 (Earley Decl. Ex. 6); Nov. 21 Reeve Dep. Tr. 104:21 – 105:14 (Earley Decl. Ex. 7).  As in prior years, the Fund Manager's accounting team understood these payments to be prepayments on

18

transactions that were budgeted to close in 2012.  Reeve Decl. ¶ 3; Nov. 21 Reeve Dep. Tr. 40:9-23 (Earley Decl. Ex. 7).

41.     Prepayment on budgeted disposition and refinancing fees was specifically permitted by Sections 5.5 and 5.6 of the FMA which allowed fees to be paid "on or prior to" the closing of certain transactions to ensure they had the cash flow to meet their overhead and operational expenses.  FMA (Winer Decl. Exs. 1-2); Nov. 21 Reeve Dep. Tr. 103:7-23 (Earley Decl. Ex. 7); Garrison Dep. Tr. 192:6 – 193:20 (Earley Decl. Ex. 6).  Prepaid fees were tracked by the Fund Manager's accounting team internally against the budget.  Earley Decl. Ex 16; Nov. 21 Reeve Dep. Tr. 103:7-23 (Earley Decl. Ex.7).

42.     The auditor and Board of the Funds knew about this practice of prepayments from prior years.  Nelson Dep. Tr. 22:11-24; 193:2-14 (Earley Decl. Ex. 3).  As an example, in 2009, pursuant to Section 5.5 of the FMA, the Fund Manager authorized the prepayment of fees totaling $1,946,000 on a refinancing transaction budged to close in 2009 that did not end up closing until March 2010.  At year-end 2009, the Fund Manager disclosed the prepayments to the Fund's auditor, PricewaterhouseCoopers ("PwC").  PwC then discussed the prepayments in detail with the Fund Manager and the Board and ultimately confirmed that both PwC and the Board were comfortable with the prepayments.  The Fund Manager memorialized the rationale under the FMA for the prepayments in a memo to PwC in 2010.  *See* Earley Decl. Ex. 17; Nelson Dep. Tr. 44:7 – 45:13 (Earley Decl. Ex. 3); Stipulated Facts ¶ 19 (Earley Decl. Ex. 2).  Likewise, at year-end 2010, PwC and the Board approved prepayments in 2010 on a transaction that did not close until 2011, and again the HDG Entities sent PwC a memorandum memorializing the existence of and rationale for the prepayments under the FMA.  *See* Earley Decl. Ex. 18.

43.     The Funds' lawyers and auditors advised the Fund Manager dating back at least to 2009 that it was in the Funds' best interest to make regular cash transfers between the Funds' project companies for the payment of fees and other expenses to avert negative tax consequences and avoid potential third-party cash grabs.  Nelson Dep. Tr. 48:9-19 (Earley Decl. Ex. 3).  Further, the Funds' lead auditor, Ian Nelson of PwC, has testified that intercompany cash transfers did not have the ability to hide or conceal the payment of fees.  Nelson Dep. Tr. 100:11-20; 191:20 – 192:7 (Earley Decl. Ex. 3).

44.     The prepayments made in 2012, however, did not involve intercompany loans, but rather cash transfers.  These cash transfers were specifically made with respect to many of the payments in 2012 because excess cash was housed at one of the properties, PP IX Indianapolis ("PP IX") due to the fact that this property did not have any issues with a lender looking to trap cash.  Whenever a particular property whose cash PP IX was storing needed to pay a fee, PP IX would send back the properties' own cash. Nelson Dep. Tr. 188:17 – 189:24 (Earley Decl. Ex. 3); Nov. 21 Reeve Dep. Tr. 51:13 – 52:7 (Earley Decl. Ex. 7).

45.     As in prior years, the HDG Entities' accounting team treated the 2012 payments as a prepaid expense (i.e., an asset) with a credit to cash (i.e., a liability) on the Funds' general ledger and trial balances, and the trial balances were shared with the Funds monthly.  It is undisputed this was the proper way from an accounting perspective to account for the prepaid fees.  Stipulated Facts ¶ 18 (Earley Decl. Ex. 2); Nelson Dep. Tr. 66:2 – 14 (Earley Decl. Ex. 3).

46.     In December 2012, Deborah Hazell inquired about whether the HDG Entities had made prepayments.  *See* Earley Decl. Ex. 19.  At that time Mr. Garrison believed that the HDG Entities had the right to receive prepayments during 2012 under the FMA and he also continued to believe that the HDG Entities were owed approximately $5.8 million in underpaid financing

fees.  Nov. 15 Garrison Dep. Tr. 85:7 – 23 (Earley Decl. 6). Mr. Garrison decided to treat the payments as underpaid financing fees and informed Ms. Hazell that the money reflected underpaid financing fees.  Earley Decl. Ex. 13 (letter from Garrison to Hazell re: Request for Information regarding Fees).

47.     Several non-HDG-affiliated members of the GPIF Investment Committee internally agreed that the HDG Entities' interpretation of "financing fees" had merit based on the language of the contract.  *See* Earley Decl. Ex. 20 (email chain between Glover and DeZego dated January 7, 2013).

48.     Defendants virtually never communicated with investors and needed approval from the Fund's investment committee for many activities beyond day-to-day operations of the Funds, including the Board's approval for budgets and business plans.  Hazell Dep. Tr. 51:10-20; 52:6-23 (Earley Decl. Ex. 1); FMA § 3 (Winer Decl. Exs. 1-2).

49.     Mr. Garrison and his wife are the primary beneficiaries of the Harold D. Garrison Revocable Trust.  Reeve Decl. ¶ 4. The bank statements for every entity that Mr. Garrison owns under the Revocable Trust, which have been produced in this matter, show that any money coming out of the Fund Manager account was more offset by the same amount of money being paid into the HDG family of companies by the Revocable Trust. Reeve Decl. ¶ 6.

50.     Mr. Garrison came to the belief as early as Q4-2011 that the Fund Manager was underpaid on financing fees.  Nov. 15 Garrison Dep. Tr. 126:20-127:14 (Earley Decl. Ex. 6); Earley Decl. Ex. 14 (email referencing a schedule Brian did "last year" on underpaid financing fees).

51.     The FMA specifically granted the Investment Committee the authority to: "(a) coordinate the principles of operation of the Fund" and to "(b) make policy determinations and establish,

approve, modify and implement policy guidelines with respect to the operation of the Fund

(including with respect to diversification, credit rating, portfolio allocation, target investment and

other factors pertaining to the making and disposition of Fund investments)."  FMA (Winer Decl.

Exs. 1-2.)

52.     On or shortly after December 18, 2012, Plaintiffs decided to terminate the HDG Entities

as Fund Manager and removed their ability to do anything substantive relating to the Funds.

Earley Decl. Ex. 19.

53.     Aaron Caperton was one of the HDG Entities' employees throughout 2012 who handled

the day-to-day mechanics of the Funds' accounting.  Hazell Dep. Tr. 73:6-25 (Earley Decl. Ex.

1).


Dated: New York, New York
        January 27, 2014

                                    Respectfully submitted,

                                    MINTZ LEVIN COHEN FERRIS
                                    GLOVSKY AND POPEO, P.C.


                                     _/s/ Francis J. Earley_____
                                    Francis J. Earley
                                    John S. McMahon III
                                    MINTZ LEVIN COHEN FERRIS
                                    GLOVSKY AND POPEO, P.C.
                                    Chrysler Center
                                    666 Third Avenue
                                    New York, New York 10017
                                    (212) 935-3000
                                    (212) 983-3115 (Fax)
                                    *Attorneys for Defendants*

26605428