UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------

GPIF-I EQUITY CO., LTD. and
GPIF-I FINANCE CO., LTD.,

        Plaintiffs,

HDG MANSUR INVESTMENT SERVICES, INC.,
HDGM ADVISORY SERVICES, LLC, and
HAROLD D. GARRISON

        Defendants.

---------------------------------------------------------------------

**Case No. 13 Civ 547 (CM)**

## PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS

Pursuant to Rule 56.1 of this Court's Local and Civil Rules, Plaintiffs GPIF-I Equity Co., Ltd. ("Equity Co.") and GPIF-I Finance Co., Ltd. ("Finance Co." and, together with Equity Co., the "Funds"), respectfully submit the following response to Defendants' Statement of Additional Material Facts [Dkt. No. 107].

## PARAGRAPH 39

At the beginning of 2012, as in all prior years, the Fund Manager submitted a budget to Plaintiffs which Plaintiffs reviewed in great detail prior to approving it. Garrison Dep. Tr. 82:11 – 83:10 (Earley Decl. Ex. 6); Nov. 21 Reeve Dep. Tr. 104:21 – 105:14 (Earley Decl. Ex. 7). The 2012 budget projected that the Fund Manager would receive over $7 million in financing and disposition fees during 2012 from transactions expected to close during the year. *See* Approved 2012 Budget (Earley Decl. Ex. 15); Stipulated Facts ¶ 21 (Earley Decl. Ex. 2).

## THE FUND'S RESPONSE TO PARAGRAPH 39

The Funds admit that in early 2012, the Fund Manager submitted a budget to the Funds' Investment Committee projecting that the Fund Manager would receive fees in 2012 for certain

transactions when the transactions closed.  Those fees were estimated to total more than $7 million.  The budget was based on assumptions that those identified transactions would close during the year.  In fact, certain of the transactions on which the budgeted fees were based did not close in 2012 (and still have not closed).  Jan. 13, 2014 Declaration of Deborah Hazell ("Hazell Decl.") ¶ 9 [Dkt. No. 99].  The Funds deny the remaining allegations in Paragraph 39.

**PARAGRAPH 40**

Throughout 2012, the Fund Manager authorized the Funds to pay the Fund Manager fees in various amounts totaling $5,818,682 during the year.  Garrison Dep. Tr. 82:11 – 83:10 (Earley Decl. Ex. 6); Nov. 21 Reeve Dep. Tr. 104:21 – 105:14 (Earley Decl. Ex. 7).  As in prior years, the Fund Manager's accounting team understood these payments to be prepayments on transactions that were budgeted to close in 2012.  Reeve Decl. ¶ 3; Nov. 21 Reeve Dep. Tr. 40:9-23 (Earley Decl. Ex. 7).

**THE FUNDS' RESPONSE TO PARAGRAPH 40**

The Funds admit that the Fund Manager paid itself fees in excess of $5,818,682 during the year.  The Funds also admit that the Fund Manager initially accounted for these payments based on Garrison's instructions to attribute the payments to particular transactions that the Fund Manager expected to close in 2012, but deny that the Fund Manager's accounting team ever legitimately understood these payments to be prepayments on transactions that were budgeted to close in 2012. Jan. 13, 2014 Declaration of Jeremy Winer ("Winer Decl.") Exs. 14, 17 [Dkt. No. 98].  In fact, the payments in the first two quarters of 2012 were made well before any of the transactions could have been reasonably expected to close.  *Id.* Ex. 14.  By the third quarter of 2012, officers and employees of the Fund Manager knew and admitted that the Fund Manager was taking money well in excess of any amount possibly due for transactions in 2012, and that most of those transactions were not reasonably expected to close in any event.  *Id.* Ex. 9.  Garrison initially believed that the

payments should have been accounted for as "work in progress," not as "prepayments," and later instructed the accounting team in 2012 to change the accounting from "prepayments" to "underpayments," which they did without objection. *Id.* Exs. 30, 31.  The Fund Manager reported to the Board in 2012 that the payments were all "underpayments" for past transactions, and never mentioned that they were prepayments for transactions expected to close in 2012.  *Id.* Ex. 26.

## PARAGRAPH 41

Prepayment on budgeted disposition and refinancing fees was specifically permitted by Sections 5.5 and 5.6 of the FMA which allowed fees to be paid "on or prior to" the closing of certain transactions to ensure they had the cash flow to meet their overhead and operational expenses.  FMA (Winer Decl. Exs. 1-2); Nov. 21 Reeve Dep. Tr. 103:7-23 (Earley Decl. Ex. 7); Garrison Dep. Tr. 192:6 – 193:20 (Earley Decl. Ex. 6).  Prepaid fees were tracked by the Fund Manager's accounting team internally against the budget.  Earley Decl. Ex 16; Nov. 21 Reeve Dep. Tr. 103:7-23 (Earley Decl. Ex.7).

## THE FUNDS' RESPONSE TO PARAGRAPH 41

The Funds admit that paragraphs 5.5 and 5.6 of the FMA provide that the financing and disposition fees are payable "on and prior to" the financing or disposition, but that those provisions go on to say that the Fund Manager shall be entitled to receive its fee "at the time of [financing or disposition]."  To the extent that there was any ambiguity in this language, the Funds' boards of directors told the Fund Manager not to take fees without board review and approval.  *See* Hazell Decl. ¶ 4.  As a result, the Funds deny that the Fund Manager was permitted to prepay itself fees with respect to transactions that had not closed.  In any event, the Fund Manager never made legitimate prepayments on transactions that were budgeted to close in 2012.  The payments in the first two quarters of 2012 were made well before any of the transactions could have been reasonably expected to close.  Winer Decl. Ex. 14.  By the third quarter of 2012, officers and

employees of the Fund Manager knew and admitted that the Fund Manager was taking money well in excess of any amount possibly due for transactions in 2012, and that most of those transactions were not reasonably expected to close in any event. *Id.* Ex. 9. Garrison initially believed that the payments should have been accounted for as "work in progress," not as "prepayments," and later instructed the accounting team in 2012 to change the accounting from "prepayments" to "underpayments," which they did without objection. *Id.* Exs. 30, 31. The Fund Manager reported to the Board in 2012 that the payments were all "underpayments" for past transactions, and never mentioned that they were prepayments for transactions expected to close in 2012. *Id.* Ex. 26. The Funds admit that prepaid fees were tracked against the budget, and that by the 3rd quarter of 2012 the Fund Manager had overpaid itself against transactions expected to close during 2012. *Id.* Ex. 9. The Funds are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 41.

## PARAGRAPH 42

The auditor and Board of the Funds knew about this practice of prepayments from prior years. Nelson Dep. Tr. 22:11-24; 193:2-14 (Earley Decl. Ex. 3). As an example, in 2009, pursuant to Section 5.5 of the FMA, the Fund Manager authorized the prepayment of fees totaling $1,946,000 on a refinancing transaction budged to close in 2009 that did not end up closing until March 2010. At year-end 2009, the Fund Manager disclosed the prepayments to the Fund's auditor, PricewaterhouseCoopers ("PwC"). PwC then discussed the prepayments in detail with the Fund Manager and the Board and ultimately confirmed that both PwC and the Board were comfortable with the prepayments. The Fund Manager memorialized the rationale under the FMA for the prepayments in a memo to PwC in 2010. *See* Earley Decl. Ex. 17; Nelson Dep. Tr. 44:7 – 45:13 (Earley Decl. Ex. 3); Stipulated Facts ¶ 19 (Earley Decl. Ex. 2). Likewise, at year-end 2010,

PwC and the Board approved prepayments in 2010 on a transaction that did not close until 2011, and again the HDG Entities sent PwC a memorandum memorializing the existence of and rationale for the prepayments under the FMA.  *See* Earley Decl. Ex. 18.

## THE FUNDS' RESPONSE TO PARAGRAPH 42

The Funds deny that the Funds' auditor and Boards knew about or authorized a practice by the Fund Manager of prepaying themselves fees in years prior to 2012, and further deny that the Fund Manager made full disclosures to the Funds' auditor or Boards concerning such a practice. The Funds admit that the Fund Manager prepared memoranda dated April 1, 2010 and February 25, 2011 memorializing the payment of financing fees during 2009 and 2010 for transactions that had actually closed.  The Funds deny that the full Boards were ever advised of the prepayments or approved them.  Hazell Decl. ¶¶ 4-6.

## PARAGRAPH 43

The Funds' lawyers and auditors advised the Fund Manager dating back at least to 2009 that it was in the Funds' best interest to make regular cash transfers between the Funds' project companies for the payment of fees and other expenses to avert negative tax consequences and avoid potential third-party cash grabs.  Nelson Dep. Tr. 48:9-19 (Earley Decl. Ex. 3).  Further, the Funds' lead auditor, Ian Nelson of PwC, has testified that intercompany cash transfers did not have the ability to hide or conceal the payment of fees.  Nelson Dep. Tr. 100:11-20; 191:20 – 192:7 (Earley Decl. Ex. 3).

## THE FUNDS' RESPONSE TO PARAGRAPH 43

The Funds are without sufficient knowledge or information to form a belief as to whether any of the Funds' lawyers or auditors advised the Fund Manager that it was in the Funds' best interest to make regular cash transfers between the Funds' project companies for the payment of

fees and other expenses to avert negative tax consequences and avoid potential third-party cash grabs.  The Funds deny the remaining allegations of Paragraph 43.

**PARAGRAPH 44**

The prepayments made in 2012, however, did not involve intercompany loans, but rather cash transfers.  These cash transfers were specifically made with respect to many of the payments in 2012 because excess cash was housed at one of the properties, PP IX Indianapolis ("PP IX") due to the fact that this property did not have any issues with a lender looking to trap cash.  Whenever a particular property whose cash PP IX was storing needed to pay a fee, PP IX would send back the properties' own cash.  Nelson Dep. Tr. 188:17 – 189:24 (Earley Decl. Ex. 3); Nov. 21 Reeve Dep. Tr. 51:13 – 52:7 (Earley Decl. Ex. 7).

**THE FUNDS' RESPONSE TO PARAGRAPH 44**

The Funds deny the allegation that the Funds' prepayment of fees in 2012 did not involve intercompany loans, and are without sufficient knowledge or information to form a belief as to the remaining allegations of Paragraph 44.  The Funds further deny that this is an issue of material fact.  Regardless of whether Brian Reeve at the Fund Manager now chooses to refer retroactively to the "intercompany loans" as "cash transfers," the fact remains that the Funds' Boards were misled regarding the flow of money among the underlying property entity accounts, and were never advised of any distinction between intercompany loans and cash transfers.  Winer Decl. Exs. 18-20; Hazell Decl. ¶¶ 5-6.

**PARAGRAPH 45**

As in prior years, the HDG Entities' accounting team treated the 2012 payments as a prepaid expense (i.e., an asset) with a credit to cash (i.e., a liability) on the Funds' general ledger and trial balances, and the trial balances were shared with the Funds monthly.  It is undisputed this

6

was the proper way from an accounting perspective to account for the prepaid fees.  Stipulated

Facts ¶ 18 (Earley Decl. Ex. 2); Nelson Dep. Tr. 66:2 – 14 (Earley Decl. Ex. 3).

**THE FUNDS' RESPONSE TO PARAGRAPH 45**

The Funds admit that the Fund Manager initially accounted for the payments as prepaid

expenses with a credit to cash, based on defendant Garrison's instructions to attribute the payments

to particular transactions expected to close in 2012.  Winer Decl. Ex. 16.  The Funds deny that the

Fund Manager's accounting team ever legitimately understood these payments to be prepayments

on transactions that were budgeted to close in 2012.  In fact, the payments in the first two quarters

of 2012 were made well before any of the transactions could have been reasonably expected to

close.  *Id.* Ex. 14.  By the third quarter of 2012, officers and employees of the Fund Manager knew

and admitted that the Fund Manager was taking money well in excess of any amount possibly due

for transactions in 2012, and that most of those transactions were not reasonably expected to close

in any event.  *Id.* Ex. 9.  Garrison initially believed that the payments should have been accounted

for as "work in progress," not as "prepayments," and later instructed the accounting team in 2012

to change the accounting from "prepayments" to "underpayments," which they did without

objection.  *Id.* Exs. 30, 31.  The Fund Manager reported to the Board in 2012 that the payments

were all "underpayments" for past transactions, and never mentioned that they were prepayments

for transactions expected to close in 2012.  *Id.* Ex. 26.  The Funds deny the remaining allegations

of Paragraph 45.

**PARAGRAPH 46**

In December 2012, Deborah Hazell inquired about whether the HDG Entities had made

prepayments.  *See* Earley Decl. Ex. 19.  At that time Mr. Garrison believed that the HDG Entities

had the right to receive prepayments during 2012 under the FMA and he also continued to believe

that the HDG Entities were owed approximately $5.8 million in underpaid financing fees.  Nov. 15

Garrison Dep. Tr. 85:7 – 23 (Earley Decl. 6).  Mr. Garrison decided to treat the payments as underpaid financing fees and informed Ms. Hazell that the money reflected underpaid financing fees.  Earley Decl. Ex. 13 (letter from Garrison to Hazell re: Request for Information regarding Fees).

## THE FUNDS' RESPONSE TO PARAGRAPH 46

The Funds admit that in December 2012, Ms. Hazell inquired as to whether the Fund Manager had made prepayments and further admit that Mr. Garrison told Ms. Hazell that the Fund Manager had paid itself $5,818,682 as payment of Financing Fees that had previously been "underbilled."  Winer Decl. Ex. 26.  The Funds deny that Mr. Garrison had any legitimate belief that the HDG Entities had the right to prepay themselves throughout 2012 or that the Fund Manager was owed approximately $5.8 million in underpaid financing fees.  *Id.* Exs. 8, 32.  Garrison never advised the Boards that the Fund Manager had a right to receive prepayments during 2012 under the FMA, even though he was asked that question in Ms. Hazell's letter, and even though he was asked at the December 27, 2012 Board meetings to give a full explanation of the Fund Manager's reasons for taking the money.  Garrison also expressly disavowed taking the money as prepayments by changing the accounting records, and represented to this Court that the money had been taken throughout 2012 as underpayments, without ever mentioning any right to take prepayments.  *Id.* Exs. 26, 28; Jan. 29, 2013 Garrison Decl. ¶¶ 18-23 [Dkt. No. 7]; Feb. 15, 2013 Garrison Decl. ¶¶ 23-31 [Dkt. No. 23].  The Funds are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 46.

## PARAGRAPH 47

Several non-HDG-affiliated members of the GPIF Investment Committee internally agreed that the HDG Entities' interpretation of "financing fees" had merit based on the language of

the contract.  *See* Earley Decl. Ex. 20 (email chain between Glover and DeZego dated January 7, 2013).

## THE FUNDS' RESPONSE TO PARAGRAPH 47

The Funds deny the allegations in Paragraph 47 and respectfully refer the Court to the cited document, in which, *inter alia*, GPIF Investment Committee member Edward Glover states:  "[I]f I were a judge and saw that a fee was already being charged on the purchase price as well as the third party financing I would find it pretty difficult to accept that a fee should also be paid on internal equity."  *See also* Aug. 1, 2013 Decision at *9 ("It makes no sense at all that [the Fund Managers] would be paid a 'financing fee' calculated off a base that includes the Plaintiff Funds' equity in the Property Investments, which [the Fund Managers] neither raised nor arranged") [Dkt. No. 34].

## PARAGRAPH 48

Defendants virtually never communicated with investors and needed approval from the Fund's investment committee for many activities beyond day-to-day operations of the Funds, including the Board's approval for budgets and business plans.  Hazell Dep. Tr. 51:10-20; 52:6-23 (Earley Decl. Ex. 1); FMA § 3 (Winer Decl. Exs. 1-2).

## THE FUNDS' RESPONSE TO PARAGRAPH 48

The Funds admit that the Fund Manager needed the Board's approval for budgets and business plans and admit that the Fund Manager needed approval from the Funds' investment committee for various other activities.  The Funds further state that the Fund Manager had, and exercised, broad authority and discretion over the Funds' assets.  Defs. Br. in Opp. to Preliminary Injunction at 1-2, 6 [Dkt. No. 8].  The Funds are without sufficient knowledge or information to form a belief as to the truth of the remaining allegations of Paragraph 48.

**PARAGRAPH 49**

Mr. Garrison and his wife are the primary beneficiaries of the Harold D. Garrison Revocable Trust.  Reeve Decl. ¶ 4.  The bank statements for every entity that Mr. Garrison owns under the Revocable Trust, which have been produced in this matter, show that any money coming out of the Fund Manager account was more offset by the same amount of money being paid into the HDG family of companies by the Revocable Trust.  Reeve Decl. ¶ 6.

**THE FUNDS' RESPONSE TO PARAGRAPH 49**

The Defendants refused to provide discovery on the transfers of money or other assets or rights among the various entities controlled by Garrison and the Garrison trust.  Thus, the Funds are without sufficient knowledge or information to form a belief as to the truth of the allegations of Paragraph 49.  The Defendants did produce one set of documents that create the inference of a fraudulent conveyance for the benefit of Garrison's trust at the expense of the HDG Mansur Investment Services.  Winer Decl. Exs. 35-38.

**PARAGRAPH 50**

Mr. Garrison came to the belief as early as Q4-2011 that the Fund Manager was underpaid on financing fees.  Nov. 15 Garrison Dep. Tr. 126:20-127:14 (Earley Decl. Ex. 6); Earley Decl. Ex. 14 (email referencing a schedule Brian did "last year" on underpaid financing fees).

**THE FUNDS' RESPONSE TO PARAGRAPH 50**

Based on the evidence set forth in the responses above and in the Funds' Counterstatement of Material Facts (Dkt. No. 100), and on the Court's decision that the Fund Manager engaged in "massive theft under the flimsiest of pretexts," the Funds deny that Garrison had a legitimate belief that the Fund Manager was underpaid on financing fees.

**PARAGRAPH 51**

The FMA specifically granted the Investment Committee the authority to: "(a) coordinate the principles of operation of the Fund" and to "(b) make policy determinations and establish, approve, modify and implement policy guidelines with respect to the operation of the Fund (including with respect to diversification, credit rating, portfolio allocation, target investment and other factors pertaining to the making and disposition of Fund investments)." FMA (Winer Decl. Exs. 1-2.)

**THE FUNDS' RESPONSE TO PARAGRAPH 51**

The Funds admit that the quoted language appears in the FMA and respectfully refer the Court to the FMA for its contents.

**PARAGRAPH 52**

On or shortly after December 18, 2012, Plaintiffs decided to terminate the HDG Entities as Fund Manager and removed their ability to do anything substantive relating to the Funds.  Earley Decl. Ex. 19.

**THE FUNDS' RESPONSE TO PARAGRAPH 52**

The Funds admit that the Funds' Boards decided to terminate the Fund Manager on December 27 2012, effective on January 2, 2013.  The Funds deny the remaining allegations of Paragraph 52, and further state that the Funds requested that the Fund Manager return $5,818,682 that the Fund Manager had misappropriated from the Funds or place the money in escrow, but that the Fund Manager refused the Funds' request.  Winer Decl. Ex. 28.

**PARAGRAPH 53**

Aaron Caperton was one of the HDG Entities' employees throughout 2012 who handled the day-to-day mechanics of the Funds' accounting.  Hazell Dep. Tr. 73:6-25 (Earley Decl. Ex. 1).

**THE FUNDS' RESPONSE TO PARAGRAPH 53**

The Funds admit that Aaron Caperton was an employee of the Fund Manager in 2012 and admit that Mr. Caperton performed various accounting functions for the Fund Manager. The Funds are without sufficient knowledge or information to form a belief as to the remaining allegations of Paragraph 53.

Dated: New York, New York
February 7, 2014

Respectfully submitted,

WILMER CUTLER PICKERING
  HALE AND DORR LLP

/s/ Charles C. Platt
Charles C. Platt
Jeremy S. Winer
Stephanie D. Shuler
Fiona J. Kaye
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888

*Attorneys for Plaintiffs GPIF-I Equity Co., Ltd. And*
*GPIF-I Finance Co., Ltd.*