# EXHIBIT 2

Page 1

1              CONFIDENTIAL
2           UNITED STATES DISTRICT COURT
3           SOUTHERN DISTRICT OF NEW YORK
4   GPIF-I EQUITY CO., LTD., and   )
5   GPIF-I FINANCE CO.,            )
6              Plaintiffs,         )
7              vs.                 ) No. 13 CIV 547
8   HDG MANSUR INVESTMENT          ) (CM)
9   SERVICES, INC., HDGM ADVISORY  )
10  SERVICES, LLC, AND HAROLD D.   )
11  GARRISON,                      )
12             Defendants.         )
13
14           The deposition of IAN NELSON, called for
15  examination, taken pursuant to the Federal Rules of
16  Civil Procedure of the United States District Courts
17  pertaining to the taking of depositions, taken before
18  Lynn A. McCauley, CSR No. 84-003268, RPR, a Certified
19  Shorthand Reporter of the State of Illinois, at One
20  North Franklin Street, Suite 3000, Chicago, Illinois,
21  on December 12, 2013, at 9:13 a.m.
22
23
24
25

Page 22

1        CONFIDENTIAL
2            MR. MARK:  Objection, but you can answer.
3    BY THE WITNESS:
4        A.   They did characterize the $5.8 million in
5    payments as prepaid fees.  They did not assert the
6    transactions to me that those payments were for.
7    BY MR. EARLEY:
8        Q.   Okay.
9        A.   In fact, the rationale provided to the
10   Board had nothing to do with prepaid payments.
11       Q.   Are you aware if the Fund Manager ever
12   was paid fees for transactions prior to closing?
13       A.   Yes.
14       Q.   Okay.  When?
15       A.   I believe it was the last time the ING
16   debt, the ING portfolio -- are you familiar with
17   that -- was refinanced, and it was -- I may not get
18   the year right, but I think it was the end of 2009.
19   And the transaction spilled over into 2010.  They had
20   paid themselves in advance.
21              There were -- we asked a lot of
22   questions as to why then they paid themselves in
23   advance.  And, in fact, that transaction closed
24   before we completed the audit work.
25       Q.   And you're referring to the ING

1                    CONFIDENTIAL
2   portfolio.
3       A.   Yes.
4       Q.   I believe it was a refinancing of the ING
5   portfolio?
6       A.   Yes.
7       Q.   You said you asked a lot of questions at
8   that time, with respect to why the fees were paid in
9   advance.
10      A.   Yes.
11      Q.   Is that correct?
12           Who did you ask questions to?
13      A.   I asked questions to Mansur.  I asked
14  questions to the Board as to whether they were aware
15  and okay with those payments.
16      Q.   Who did you ask -- withdrawn.
17           Was there anyone specifically at the
18  Fund Manager that you discussed the truth about the
19  ING payments?
20      A.   It would have been Brian Reeve.  It would
21  have been the CFO at the time.  And the CFO changed a
22  few times.  So I think it was Robert at the time.
23      Q.   Do you recall any of the specifics of
24  your conversation with Mr. Reeve?
25      A.   I mean, the specifics, no.  Generally,

Page 24

1      CONFIDENTIAL
2      the conversation would have been, is it appropriate
3      to pay the fee to the Fund Manager in advance of the
4      transaction closing?
5           Q.   Did you ask Mr. Reeve if he thought it
6      was appropriate to pay the fee in advance of the
7      transaction closing?
8           A.   Again, I don't specifically remember, but
9      that most likely was part of our conversation.
10          Q.   Did you determine at any time in 2009
11     that it was appropriate to pay the fee prior to the
12     transaction closing?
13          A.   I agreed that it was reasonable to do so
14     in connection with the audit, based on the
15     conversations with Mansur and the Board.
16               And their rationale was that all the
17     work associated with completing the refinancing had
18     been completed.  So they, in effect, had put the
19     effort in and had a signed term sheet.  And, in fact,
20     the deal did close in early January is my
21     recollection.
22          Q.   In relation to the payment of the fees
23     relating to the ING refinancing prior to its closing,
24     did you review the Fund Management Agreement?
25          A.   Yes.

Page 35

1                   CONFIDENTIAL
2   refinancing was going to take place.
3        Q.   And why did you do that?
4        A.   Because it's unusual for a Fund Manager
5   to receive payment on a fee in advance of a
6   transaction closing, just on its surface.
7        Q.   And the language in this contract, did
8   you think it was different -- withdrawn.
9             So did you come to a conclusion that
10  the financing fee was justified, because of the
11  review you did of the e-mails and term sheets related
12  to the progress on the ING financing in 2009?
13       MR. MARK:   Objection to -- to
14  characterization of justified, but you can answer.
15  BY THE WITNESS:
16       A.   I mean, it was recorded as a prepaid fee,
17  if I recall correctly.  And Mansur had paid
18  themselves, if I recall that as well.
19             So did I object to that recording of
20  a payment they had made?
21       Q.   Yes.
22       A.   No.  Based on the effort put in.  And,
23  essentially, it had to close in order for them to
24  earn it.
25       Q.   If you look on the first page of the

```
                                              Page 36
 1                    CONFIDENTIAL
 2    memo --
 3         A.   Uh-huh.
 4         Q.   -- you see it quotes a portion of Section
 5    5.5 from the Fund Management Agreement.  And, again,
 6    it has that language in full on and prior to the time
 7    of completion of the relevant financing.
 8              Do you see that?
 9         A.   Which paragraph?
10         Q.   It's Section 5.5 and financing fee.
11         A.   Uh-huh.  Yep.
12         Q.   Is that an unusual provision for a Fund
13    Management Agreement?
14         MR. MARK:  Objection.
15         MR. PLATT:  Objection.
16         MR. MARK:  You're not here as an expert.
17    BY MR. EARLEY:
18         Q.   You can answer if you understand the
19    question.
20         A.   What's that?
21         Q.   You can answer.
22         MR. MARK:  You can answer if you can.
23    BY THE WITNESS:
24         A.   It's unusual in my experience.
25
```

Page 193

1         CONFIDENTIAL
2       Q.   And you also said that the Board was
3   comfortable with respect to the prepayments that
4   occurred back in 2009.
5            How did you know that the Board was
6   comfortable with respect to those prepayments?
7       A.   They were aware of the fact that they
8   were done and had been presented with the information
9   that they were done, understood the facts, and were
10  okay with it.
11      Q.   How was the Board aware of the
12  prepayments and comfortable?
13      A.   Through -- again, through discussions
14  that we had pre-issuance of financial statements.
15      Q.   And you also testified that the closing
16  of the transaction had already occurred by the time
17  that PwC was asked to review the prepayments; is that
18  right?
19      A.   Yeah.  The closing -- well, the closing
20  of the transaction occurred prior to us issuing the
21  financial statements.
22      Q.   So is it fair to say that in PwC's
23  review, it concluded in 2010 that the prepayments
24  that had occurred were unusual, but were made in
25  circumstances where the Board was comfortable and