**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------------ x
GPIF-I EQUITY CO., LTD. and                    :
GPIF-I FINANCE CO., LTD.,                      :
                                               :
        Plaintiffs-Counterclaim Defendants,    :
v.                                             :    13 Civ 547 (CM)
                                               :
HDG MANSUR INVESTMENT SERVICES, INC.,          :
HDGM ADVISORY SERVICES, LLC, and               :
HAROLD D. GARRISON                             :
                                               :
        Defendants-Counterclaim Plaintiffs.    :
------------------------------------------------------------------ x
```

# PLAINTIFFS' PROPOSED FINDINGS OF FACT

## PROPOSED FINDINGS IN SUPPORT OF PLAINTIFFS' CLAIMS

**Background**

1. Plaintiffs GPIF-I Equity Co., Ltd. and GPIF-I Finance Co., Ltd. (the "Funds") are real estate investment funds that invest on behalf of shareholders in a diversified portfolio of real estate properties. Stipulated Facts ¶ 1.

2. Shareholders purchased *hissas,* which entitled the holders to a share of voting stock in the Funds. Ex. 205.

3. HDG Mansur Investment Services, Inc. ("HDG Mansur Investment") and HDGM Advisory Services, LLC ("HDGM Advisory") (the "Fund Managers") acted as the managers and agents of the Funds. Garrison 11/15/13 Dep. at 32-33; Exs. 1-2, §§ 3, 4.

4. HDGM Advisory succeeded HDG Mansur Investment as the Funds' manager on March 30, 2012. Stipulated Facts ¶ 9; Ex. 168.

5. HDGM Advisory registered with the SEC under the Investment Advisers Act on March 31, 2012. Ex. 168.

6. HDGM Advisory registered with the SEC "solely as a result of the Fund Manager's business with respect to the GPIF" and consistent with newly-implemented registration requirements. Ex. 168.

7. Garrison was the CEO of the Fund Managers, and directed and controlled their day-to-day operations. Hazell Statement.

8. Garrison was a director of the Funds in 2012. Stipulated Facts ¶¶ 3-4.

9. The Fund Managers reported to the Boards of Directors for the Funds (the "Funds' Boards") chaired, in 2012, by Garrison. Hazell Statement.

10. The defendants admit in their Answer that they owed common law fiduciary duties to the Funds.  Answer at ¶¶ 2, 40, 43; Exs. 47, 49; Garrison 11/15/13 Dep. at 37.

11. The Fund Managers provided fund management and investment advisory services to the Funds, and exercised discretionary authority over the assets and management of the Funds.  Hazell Statement; Exs. 1-2, §§ 3, 4; Answer at ¶¶ 2, 40, 43; Garrison 11/15/13 Dep. at 51, 54.

12. The Fund Managers determined the Funds' NAV and the price of the hissas, or investment shares, in accordance with the Private Placement Memorandum.  Ex. 205 at GPIF_0008990-91, 0009004; *see also* Exs. 1-2 ¶ 4.3.9.

13. The Funds placed their trust and confidence in the Fund Managers to preserve and add value to the Fund assets (including the assets of the underlying property entities' accounts).  Hazell Statement.

**The Fund Managers' Self-Dealing**

14. Beginning on February 8, 2012, and continuing until November 28, 2012, the Fund Managers paid themselves $5,818,682 from the Funds' assets  (the "Payments").  Stipulated Facts ¶ 14.

15. Garrison directed the Fund Managers to take the Funds' money over the course of 2012 whenever they needed cash or to prop up related companies he owned and controlled.  *See e.g.*, Exs. 164, 172, 173, 179, 184.  Nelson Dep. at 54-55, 124, 131-32.

16. Garrison and the Fund Managers grabbed cash wherever they could find it in the Funds' underlying property entity accounts, without any notice to, or approval of,

the Funds' Boards.  *See e.g.*, Exs. 164, 172, 173, 179, 184; Garrison Dep. 11/15/13 at 52, 53, 221 and 267-269; Reeve 11/21/13 Dep. at 47-48, 108-111, 144-45 & 148.

17. The Fund Managers and Garrison took the Payments even though they knew the amounts were material to the Funds: they knew that the Funds' Boards were trying to keep as much cash as possible and to control costs; they knew the Boards were concerned about other fees that they had taken; and they knew that Board members disputed any suggestion of "underpayments."  Hazell Statement; Stipulated Facts ¶ 23.

18. The Fund Managers continued to take the Funds' assets even after their CFO, Tom Kmiecik refused to approve them, and performed an internal analysis showing that the Fund Managers had *overpaid* themselves by more than $1 million.  Exs. 171, 187.

19. The Fund Managers refused to return the money, or to hold it in escrow, when their theft was revealed and this dispute arose.  Ex. 50.

**The Fund Managers' and Garrison's Misrepresentations**

20. The defendants submitted quarterly Fund Management Reports to the Funds' Boards in April, July, and November 2012.  Exs. 18, 19, 20; Reeve 11/21/13 Dep. at 178-79.

21. Garrison was responsible for the substance of the Fund Management Reports, and their presentation to the Funds' Boards.  Hazell Statement.

22. The Fund Management Reports contained Related Party Payment Schedules that were supposed to include payments made to the Fund Managers.  Exs. 18, 19, 20.

23. The Fund Managers and Garrison affirmatively misrepresented in the Related Party Payment Schedules for the first and second quarters of 2012 that the Fund Managers were *not taking* any money for financing fees or disposition fees. Ex. 18 at HDG-GPIF0156735, Ex. 19 at HDG-GPIF0160391.

24. The Fund Managers and Garrison affirmatively misrepresented in the Related Party Payment Schedule for the third quarter of 2012 that the Fund Manager was taking relatively small amounts of money for financing fees and disposition fees. Ex. 20 at HDG-GPIF0164308.

25. The Fund Managers were taking the Payments totaling millions of dollars over the first three quarters of 2012. Ex. 17; Hazell Statement; Reeve 11/21/13 Dep. at 82-83, 87-88 & 95.

26. The Fund Management Reports contained Inter-Company Loan Schedules that were supposed to include loans and payments on the loans (the cash transfers) among the underlying property entity accounts for the Funds. Exs. 18, 19, 20.

27. The Fund Managers and Garrison affirmatively misrepresented in the Inter-Company Loan Schedules that relatively small loans or cash transfers were being made in 2012 among the Funds' underlying property entity accounts. Ex. 18 at HDG-GPIF0156736, Ex. 19 at HDG-GPIF0160392, Ex. 20 at HDG-GPIF0164309.

28. The Fund Managers were making loans (or payments on them) each quarter of 2012 to facilitate the millions of dollars of Payments. Stipulated Facts ¶¶ 14-15.

29. At the November 2012 Board meeting, the Fund Manager stated that there were no "material movements" in Inter-Company Loan activity (*i.e.*, only around

$69,000) when in fact there were more than $2.6 million of those loans or payments on them during that quarter alone. Ex. 38; Stipulated Facts ¶¶ 14-15.

30. The Fund Managers and Garrison knew their statements were false, and that they were concealed the true facts, because Garrison had personally directed that the undisclosed Payments be made. *See e.g.*, Exs. 164, 172, 173, 179, 184. Nelson Dep. at 54-55, 124, 131-32.

**The Fund Managers' and Garrison's Material Omissions**

31. The Fund Managers and Garrison concealed the Payments and loans, and their self-dealing, during their communications to Ms. Hazell and other Fund Board members regarding fees and expenses, despite their common law fiduciary obligations to make full disclosures. Exs. 38, 169, 180; Hazell Statement; Garrison Dep. 11/15/13 at 175-176.

32. Garrison concealed this information even though he was a director of the Funds with an independent common law duty to disclose, and even though he sat through and participated in all the Board meetings. Hazell Statement.

33. The Fund Managers' and Garrison's false statements and omissions created the misleading impression that the Related Party Payments and Inter-Company Loans were far lower, and that Funds' financial position was materially better, than they actually were. Hazell Statement.

34. Based on the Funds' year-end valuation, the $5,818,682 taken by defendants amounted to 13% of the Funds' NAV. Ex. 110 at GPIF_0178581.

35. The audited NAV as of December 31, 2012, was $44.5 million. Ex. 110.

**The Funds' Reliance and the Defendants' Deceit**

36. The Funds' Boards considered information regarding the Related Party Payments and Inter-Company Loans to be material to their ability to carefully monitor the Funds and the Fund Manager's performance, and to implement a disposition plan for the Funds that required them to limit expenses and keep as much cash as possible. Hazell Statement.

37. The Funds' Boards relied on the information provided by the Fund Managers and Garrison regarding the Related Party Payments and Inter-Company Loans because the Fund Managers and Garrison had fiduciary duties to provide full and accurate information, and had control over that information. Hazell Statement.

38. If the facts regarding the Related Party Payments and Inter-Company Loans had been accurately disclosed, the Funds' Boards would have terminated the Fund Manager, prevented any additional payments, and taken immediate steps to recover any prior payments. Hazell Statement.

39. Disclosure of the true facts regarding the Related Party Payments and Inter-Company Loans by the Fund Managers and Garrison would have prevented or greatly reduced the harm that the Funds have suffered. Hazell Statement.

40. The Fund Managers and Garrison misrepresented and concealed the material facts from the Funds' Boards for several reasons:

    a. The Fund Managers and Garrison knew from their communications in 2012 with the Funds' Boards that the Boards would not have permitted the Payments and the intercompany loans or cash transfers to facilitate the Payments, and would have required the return of any Payments already made. Ex 66; Hazell Statement; Stipulated Facts ¶ 23.

   b. Garrison's numerous companies were in serious financial distress, and he needed the money to prop them up. Exs. 51, 170, 174; Garrison 11/15/13 Dep. at 229-230.

   c. Garrison used the Payments to enrich himself and his trust at the expense of the Funds. Exs. 115, 117, 188.

41. Garrison enriched himself and his trust at the expense of the Funds by paying himself $468,180, and advancing more than $2 million to "affiliates," from HDG Mansur Investment in 2012. Exs. 54 at HDG-GPIF0431952, 79.

42. Garrison enriched himself at the expense of the Funds by distributing $3 million from HDG Mansur Investment to HDG Capital (a company owned by Garrison) during 2012, instead of putting that money in escrow for the Funds and its shareholders. Ex. 54 at HDG-GPIF0431948, 431954, 431956.

43. Garrison enriched himself at the expense of the Funds when:

   a. In August 2012, Garrison executed a note on behalf of HDG Capital Group in the amount of $1,186,524 in favor of his personal trust, which he secured the Fund Managers' assets. Ex. 117; Reeve 12/06/13 Dep. at 66-70.

   b. HDG Capital defaulted on the note in less than a week, and Garrison's personal trust exercised its rights to repossess the assets of the Fund Managers. Exs. 117, 188.

   c. These transactions transferred the Payments out of the reach of the Funds.

44. There is extensive evidence that Defendants' employees knew that the Payments were improper throughout 2012:

   a. The Fund Managers' CFO at the time, Tom Kmiecik, refused to "play the game" and would not sign off on the Payments, even though Brian Reeve (the Fund Manager's Director of Accounting) complained that Kmiecik "benefits [from the Payments] by getting a paycheck." Ex. 171.

   b. By September 2012, Reeve advised Garrison that the Fund Manager had overpaid itself by more than $1 million. Ex. 187.

    c. When Kmiecik confronted Garrison with concerns about the Payments, Garrison induced his and Reeve's continued silence by promising to repay the Payments, and to "take the hit" for misappropriating the money. Ex. 66.

    d. Aaron Caperton, the Fund Manager's representative responsible for accounting for the Payments, wrote that the Funds' audit "will be a nightmare" and that Reeve had told PwC not to come for an interim audit in September because "[h]e doesn't want them catching" the Payments. Ex. 186.

    e. Caperton recognized in another email that "once the audit starts[,] forget it. Ian [Nelson at PwC] is skeptical about everything . . . . It's going to get U-G-L-Y in a hurry!" Ex. 190 at HDG-SEC0599357.

45. By December 2012, two other Fund Manager representatives got nervous about the fraud, and one revealed the Payments to Hazell on December 18, 2012, without Garrison's knowledge. Hazell Statement; Garrison 11/15/13 Dep. at 232-238.

46. When confronted with information about the Payments, Garrison and HDGM Advisory refused to return the money taken by the Fund Managers. Ex. 50.

47. After being confronted about the Payments, Garrison and HDGM Advisory engaged in further concealment and misrepresentations in an effort to cover up their theft.

    a. Garrison failed to provide an explanation for the Payments until he settled on the "underpayments" story that was the "flimsiest of pretexts." Exs. 46-47; Garrison 11/15/13 Dep. at 163, 176; Mem. Order (Dec. 20, 2013) Dkt. #85 at 8.

    b. To support his "underpayment" story, Garrison directed Brian Reeve to revise the Funds' journal entries to report "underpayments." Stipulated Facts ¶ 28; Garrison 11/15/13 Dep. 191, 243, 252, 254.

    c. Reeve later acknowledged that the fact the journal entries were changed "isn't good," and that he made the revisions personally in

      an effort to "keep Aaron [Caperton] clean." Ex. 121 at PwC-HDG-021952-52a.

d. Caperton also admitted that Garrison's "underpayment" rationale was "BS", and that in January 2013 he gave PWC supporting information regarding the payments because "I'm not going down in that fire." Ex. 196.

e. When asked for an explanation at the December 27, 2012 Board meetings, Garrison continued to insist that his theft was to recover for "underpayments." Ex. 39; Stipulated Facts ¶ 26.

f. HDGM Advisory prepared a misleading schedule for the Funds' Boards purporting to show that the Payments were "underpayments" for prior transactions. Exs. 15, 17, 196; Stipulated Facts ¶ 28; Nelson Dep. at 65, 163-77; Reeve 11/21/13 Dep. at 38-40 & 44.

g. Garrison revealed to Ian Nelson at PwC that the Payments were taken as a "defensive action" because he thought the Fund Manager would be terminated, and he was "reserving for fees" that he thought were owed. Nelson Dep. at 54-55, 132-33.

h. Garrison misrepresented the facts to the Court, stating in his declarations that: (1) the underpayments were presented to the Funds' Boards, when in fact they were not, *compare* Ex. 12, ¶ 22 with Ex. 38 and Garrison Dep. at 150, 156-58; (2) the "underpayments" were taken "incrementally" during 2012, when in fact he didn't decide to characterize the payments as "underpayments" until the end of December 2012, *compare* Ex. 12, ¶ 23 with Garrison Dep. at 163, 171-173; (3) the Fund Manager began taking the payments based on a KPMG report completed in April 2012, when in fact the payments started in January 2012, *compare* Ex. 12 (¶¶ 21-23) and Garrison 11/15/13 Dep. at 137-38 with Ex 15, 17.

**The Funds Terminated the Fund Managers for Cause**

48. The Funds terminated HDGM Advisory as the Fund Manager on December 27, 2012, effective January 2, 2013. Stipulated Facts ¶¶ 27-31.

49. After review of the Fund Managers' conduct by the auditor and the Funds' Boards, the Boards determined that the "for cause" provision of the contract was

satisfied, and notified HDGM Advisory of the decision.  Exs. 101, 102; Hazell Testimony.

50. Before the termination, the Funds asked defendants to put the $5,818,682 in dispute in escrow to protect those assets.  Ex. 50.

51. Defendants disregarded the interests of the Funds, and refused to comply with the request to put the $5,818,682 in dispute in escrow.  Ex. 50.

**The Defendants' Misconduct Resulted in, and Caused, Losses to the Funds**

52. The breach of fiduciary duty and fraud of the Fund Managers and Garrison resulted in, and caused, damages of $5,818,682, the total amount of the Payments.

53. The Fund Managers' and Garrison's conduct also resulted in, and caused, additional damages in the amount of $2,688,925, which consist of:

   a. $1,385,604 in Direct Fund Expenses that the Fund Managers took from the Funds, and had agreed to repay prior to termination but never did.  Ex. 110 at GPIF_0178597; Hazell Statement; Ex. 162.

   b. $83,321 for the fourth quarter 2012 Fund Administrative Fee "true-up" that the Fund Managers owed to the Funds but never paid.  Hazell Statement.

   c. $380,000 in increased PwC audit costs to uncover the breaches of fiduciary duty and fraud that Garrison and the Fund Managers refused to acknowledge and tried to cover up.  Ex. 161; Hazell Statement.

   d. $765,000 in increased D&O insurance costs for the Funds after the insurers learned of the Fund Managers' misconduct.  Hazell Statement.

   e. $75,000 in increased transition costs because Garrison and the Fund Managers refused to acknowledge the breaches of fiduciary duty and fraud and had tried to cover them up.  Hazell Statement.

**The Fund Managers' Disloyalty Forfeited Any Recovery Under the Contract.**

54. During the period of the Fund Managers' disloyalty, from February 8, 2012 to the time that they stopped performing any services for the Funds, the Funds paid the Fund Managers $2,854,189, consisting of:

    a. Fund Administration Fees of $1,121,697, representing a prorated portion of the Q1 2012 fee together with the fees paid over the rest of 2012.

    b. Capital Appreciation Performance Fees of $449,167 paid in connection with the CT Topeka and NL Niederbipp transactions, which closed after February 8, 2012.

    c. Disposition Fees of $636,071 paid in connection with the CT Topeka, HS Austin, and NL Niederbipp transactions, which closed after February 8, 2012.

    d. Legal fees reimbursed to the Fund Managers of $290,694, representing a prorated portion of the annual legal fee reimbursement.

    e. Leasing fees of $58,052 paid in connection with the Langen Lease, which closed after February 8, 2012.

**The Funds Are Entitled To Attorneys' Fees And Disbursements.**

55. Section 9.9 of the FMA provides:

    **Costs of Litigation**. If either Party shall institute an action or proceeding against the other Party relating to this Agreement or any other Transaction Document to which it is a party, the unsuccessful Party in such action or proceeding shall reimburse the successful Party for its disbursements incurred in connection therewith and for its reasonable attorneys' fees actually incurred.
    Exs. 1-2.

56. The Funds are the successful party in this litigation, as the Court has already granted summary judgment on the contract claim to return the $5,818,162 that defendants stole from the Funds. Dec. and Order Granting Plaintiffs' Motion for Partial Summary Judgment (08/01/13), Dkt. 34.

## ADDITIONAL PROPOSED FINDINGS
## IN DEFENSE OF DEFENDANTS' COUNTERCLAIM

**The Funds Terminated the Fund Managers for Cause**

57. The FMAs provide for a termination for cause, in relevant part, upon the occurrence of:

(i) the commission of an act constituting a breach of fiduciary duty owed by the Fund Manager to the Fund Companies or gross negligence or willful misconduct by the Fund Manager in the performance of its duties hereunder or under any other Transaction Document, (ii) the commission of an act constituting fraud or dishonesty by the Fund Manager in the performance of its obligations under this Agreement or any Transaction Document . . . . Ex. 1 & 2 at ¶ 6.2(b).

58. The termination was for cause under the Fund Management Agreements ("FMAs") because of the Fund Manager's breach of fiduciary duty, dishonesty and fraud. Exs. 101, 102; Hazell Statement.

**Defendants' Termination Fees**

59. The termination fee for cause under the terms of the FMAs is $1,040,202, which consists of the following components:

   a. AW Plano disposition fee of $369,000, Stip. Facts ¶ 36.
   b. TR Solihull disposition fee of $56,277, Stip. Facts ¶ 36.
   c. EG Hemel disposition fee of $41,655, Stip. Facts ¶ 36.
   d. IB Farnborough disposition fee of $72,704, Stip. Facts ¶ 36.
   e. SP Bruchsal disposition fee of $21,722, Stip. Facts ¶ 36.
   f. Legal fees of $29,792, Stip. Fact ¶ 37.
   g. Expenses totaling $14,513, Stip. Fact ¶ 38.
   h. Sponsor Co-Investment Payment of $140,940.

60. The Sponsor Co-Investment Payment of $140,940 is based on the Funds' audited NAV as of December 31, 2012, which was adopted and approved by the Funds' Boards. Ex. 110; Hazell Statement in Defense of Counterclaim.

61. The audited NAV as of December 31, 2012, was used to calculate the value of the *hissas*, or shares held by investors in the Funds, as well as the interest of HSBC Capital (USA) Inc., as of that date.  Hazell Statement in Defense of Counterclaim.

62. When the Funds terminated HDGM Advisory as the Fund Manager, and retained CBRE to act as Investment Manager, the Funds' Boards asked CBRE to value the Funds' properties as of December 31, 2012.  Hazell Statement in Defense of Counterclaim.

63. After CBRE's review, CBRE provided the Funds' Boards with significantly reduced valuations that were based on more measured assumptions.  Hazell Statement in Defense of Counterclaim.

64. The CBRE valuations were reviewed by PwC as part of the audit, and provided the basis for the audited NAV that was approved by the Boards after a full review of all of the CBRE assumptions and conclusions.  Statement in Defense of Counterclaim.

**Defendants' Claim to Leasing Fees**

65. The FMAs do not cover the provision of leasing services by the Fund Manager to the Funds or the underlying property entities, or provide for the Fund Manager to receive fees for leasing services from the Funds or the underlying property entities.  Hazell Statement in Defense of Counterclaim; Exs. 1-2.

66. The Fund Managers did not have any agreements with the Funds or the underlying property entities to receive any commissions, fees or other compensation in connection with the provision of leasing services for SA Andover, MB Maryland Heights, SB Richardson "A" and "B," and AP Nassau Bay properties (the "Properties").  Hazell Statement in Defense of Counterclaim.

67. The Fund Managers represented to at least one tenant (regarding the MB Maryland Heights lease) that there were no commission agreements.  Ex. 287.

68. The Investment Committee did not approve the leasing compensation; the Investment Committee resolutions are clear that their "approval" was for conflict of interest purposes only.  Exs. 291, 293.

69. The Fund Managers were terminated as of January 2, 2013, before the MB Maryland Heights, SB Richardson "A" and "B," and AP Nassau Bay leases closed.  Ex. 103.

70. CBRE, the new Investment Manager, performed material work on the MB Maryland Heights, SB Richardson "A" and "B," and AP Nassau Bay leases. Hazell Statement in Defense of Counterclaim.


Dated:  New York, New York
        May 21, 2014

                                            WILMER CUTLER PICKERING
                                               HALE AND DORR LLP

                                            By:   /s/ Charles C. Platt
                                            Charles C. Platt
                                            Stephanie D. Shuler
                                            Fiona J. Kaye
                                            7 World Trade Center
                                            250 Greenwich St.
                                            New York, New York 10007

                                            *Attorneys for Plaintiffs GPIF-I Equity Co., Ltd.
                                            And GPIF-I Finance Co., Ltd.*