UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
GPIF-I EQUITY CO., LTD. and
GPIF-I FINANCE CO., LTD.,

        Plaintiffs-Counterclaim Defendants,

v.                                                               Case No. 13 Civ 547 (CM)

HDG MANSUR INVESTMENT SERVICES, INC.,
HDGM ADVISORY SERVICES, LLC, and
HAROLD D. GARRISON

        Defendants-Counterclaim Plaintiffs.
------------------------------------------------------------------- x

## STATEMENT OF DEBORAH HAZELL

       I, Deborah Hazell, hereby submit the following statement of facts in support of the claims of plaintiffs GPIF-I Equity Co., Ltd. and GPIF-I Finance Co., Ltd. (the "Funds") at trial:

       1.     I am a member of the Board of Directors of each of the Funds which are referred to collectively as "HSBC Amanah Global Properties Income Fund." I have been a director of the Funds since July 19, 2011, and am currently the Chair of the Boards.

       2.     The Funds' objective is to generate returns for its shareholders through *Shariah*-compliant investments in real estate properties through joint venture entities (referred to in my testimony as the "underlying property entities"). The underlying property entities are separate corporate entities with separate cash accounts. The Funds' assets include, among other things, their ownership interests in the underlying property entities, and the cash deposited in the separate accounts of those entities.

       3.     Most of the Funds' shareholders are individuals who invested in the Funds. The Funds brought this lawsuit to recover their shareholders' money that was wrongfully taken by the defendants.

       4.     Defendants HDG Mansur Investment Services, Inc. ("HDG Mansur Investments") and HDGM Advisory Services, LLC ("HDGM Advisory" and collectively, the "Fund Managers") acted as the managers and agents of the GPIF-I Equity Co., Ltd. and the GPIF-I Finance Co., Ltd. (the "Funds") in 2012. Defendant Garrison was the CEO of the Fund Managers and directed and controlled their day-to-day operations. Garrison was also a director of the Funds, and Chair of the Boards in 2012.

       5.     HDGM Advisory succeeded HDG Mansur Investments as the Funds' manager and agent on March 30, 2012. A copy of the Assignment and Assumption Agreement, which changes the Fund Manager, is marked as Exhibit 168. HDGM Advisory was registered with the

SEC as an Investment Advisor. Tom Kmiecik, the CFO for the Fund Managers, was registered as the Chief Compliance Officer.

### The Fund Managers' Self-Dealing

6.  The Fund Managers provided fund management and investment advisory services to the Funds, and exercised discretionary authority over the assets and management of the Funds. Exs. 1-2 §§ 3, 4. The Funds placed their trust and confidence in the Fund Managers to protect the assets of the Funds, which included the assets of the underlying property entities' accounts owned by the Funds. In return for their services, the Fund Managers received a variety of different fees in 2012, including, but not limited to: Fund Administration Fees that totaled $1,282,303, expense reimbursements that totaled $666,731 and certain transaction fees.

7.  Beginning on January 12, 2012, and continuing until November 28, 2012, the Fund Managers took *additional* money totaling $6,457,533 from the Funds' assets without notice to, or approval of, the Funds' Board of Directors (the "Funds' Boards"). *See* Ex. 17. The document marked as Exhibit 15 is a schedule prepared by HDGM Advisory in January 2013 that it represented to be the money taken during 2012. The Boards were unaware that this money was being taken until December 18, 2012, when they discovered that Garrison and the Fund Managers had concealed this information from the Boards.

8.  The Funds ultimately sought the return of only $5,818,682 (the "Payments") in this case because $638,851 of the money taken was credited to the Fund Managers when the NL Niederbipp sale transaction closed in December 2012. *See* Stip. Facts ¶ 14; *see also* Ex. 110.

9.  When the Funds' Boards learned of these Payments, they asked the Funds' auditors to conduct a review of the Payments. The auditors at PriceWaterhouseCoopers ("PWC") conducted that review in January 2013. Based on that review, and the auditors' oral reports, the Funds' Boards reached several conclusions regarding these Payments: the Fund Managers took the Funds' money wherever they could find it in the accounts of the Funds' underlying property entities; the Fund Managers took the money to advance their own business interests and those of Garrison ahead of those of the Funds; and the Fund Managers took the Funds' money without notice to, or approval of, the Funds' Boards.

10. The Fund Managers took the Payments despite knowing that the Funds' Boards were implementing a disposition plan in 2012 and, under that plan, it was very important to continue our tight control of costs and keep as much cash available as possible for the ongoing management of the Funds. Garrison attended the meetings at which the Boards discussed the critical need to continue our cost controls and keep as much cash as possible to maintain property assets that would preserve and add value to the Funds' shareholders. The Fund Managers also took the Payments even though they knew that the Funds' Boards were very concerned about fees the Fund Managers had paid themselves in the past and as a result had requested transparency and greater detail behind any fee calculations. The Boards had confronted Garrison about approximately $1.3 million in "direct fund expenses" to which they were not entitled and $810,893 in capital appreciation performance fees that the Fund Managers had previously taken and the Board disputed. *See* Ex. 162.

### The Fund Managers' Misstatements To The Funds' Boards Regarding The Payments

11. The Fund Managers and Garrison concealed the Payments in 2012 from me and other members of the Funds' Boards.

12. In particular, the Fund Managers submitted quarterly Fund Management Reports to the Funds' Boards for the first three quarters in 2012 (the "Fund Management Reports"). The documents marked as Exhibits 18, 19, and 20 are copies of those three Fund Management Reports. Garrison was ultimately responsible for the substance of these Reports, and the presentation of information in these Reports at the Board meetings.

13. The quarterly reports contained Related Party Payment Schedules and Inter-Company Loan Schedules. The Related Party Payment Schedules included line items for financing fees, disposition fees, and other fees and payments from the Funds' assets to the Fund Manager. The Inter-Company Loan Schedules included line items for transfers of money from the account of one underlying property entity to the account of another underlying property entity.

14. The purpose of the Related Party Payment Schedules was to inform the Funds' Boards of all payments that the Fund Manager was making to itself under the Fund Management Agreements (the "FMAs"). The Related Party Payment Schedules were a means by which the Boards ensured that all payments were proper. The Boards had requested the Inter-Company Loan Schedules to be sure they were aware of all cash that was being transferred from the account of one underlying property entity to another, regardless of whether there were formal loan documents for those transfers.

15. The Related Party Payment Schedules in the Fund Management Reports did not include the $5.8 million in Payments that the Fund Managers were taking for themselves from the Funds. Instead, the Related Party Payment Schedules misrepresented to the Boards that the Fund Managers had *not* received any financing fees, and had only received very small amounts in disposition fees through the third quarter of 2012. In fact, the Fund Managers were paying themselves millions of dollars from the underlying property entity accounts in 2012 at the same time they were making these misrepresentations.

16. In particular, the Fund Management Reports made the following misrepresentations:

- In the first quarter Report, dated April 18, 2012, the Fund Manager and Garrison reported that the Fund Manager had paid itself $0 in disposition and financing fees. Ex. 18 at HDG-GPIF0156735. In fact, the Fund Manager later admitted it had paid itself almost $1.4 million in the first quarter. Stip. Facts ¶ 14.

    The Fund Manager and Garrison also reported that the Fund Manager had made inter-company loans or cash transfers totaling $217,224 during the first quarter. Ex. 18 at HDG-GPIF0156736. In fact, the Fund Manager later admitted it had made inter-

company loans and cash transfers (in connection with the Payments) that totaled $779,082 in that quarter. Stip. Facts ¶¶ 14-15.

- In the second quarter Report, dated July 25, 2012, the Fund Manager and Garrison reported that the Fund Manager had paid itself $0 in disposition and financing fees. Ex. 19 at HDG-GPIF0160391. In fact, the Fund Manager later admitted it had paid itself $1.8 million in that quarter. Stip. Facts ¶ 14.

  The Fund Manager and Garrison also reported that the Fund Manager had made inter-company loans or cash transfers totaling $392,062 during that quarter. Ex. 19, p. HDG-GPIF0160392. In fact, the Fund Manager later admitted it had made inter-company loans and cash transfers (in connection with the Payments) that totaled $1,353,000. Stip. Facts ¶¶ 14-15.

- In the third quarter Report, dated October 31, 2012, the Fund Manager and Garrison reported that the Fund Manager had paid itself $174,600 in disposition and financing fees. Ex. 20 at HDG-GPIF0164308. In fact, the Fund Manager later admitted it had paid itself more than $2.6 million. Stip. Facts ¶ 14.

  The Fund Manager and Garrison also reported that the Fund Manager had made inter-company loans or cash transfers totaling $69,882 during that quarter. Ex. 20 at HDG-GPIF0164309. In fact, the Fund Manager later admitted it had made inter-company loans and cash transfers (in connection with the Payments) that totaled $2,642,100. Stip. Facts ¶¶ 14-15.

17.    In short, the Fund Managers and Garrison made false statements to the Boards on numerous occasions in the Fund Management Reports. Those false statements created the misleading impression that the Related Party Fee amounts and Intercompany Loan amounts were far lower than they actually were for those quarters in 2012. *Id.*; *see also* Ex. 38 at 178547. The false Fund Management Reports and the defendants' concealment of the true facts also created the misleading impression that the Funds' expenses were lower, and its financial position was materially better. The Fund Managers and Garrison provided these false statements even though they knew that that they had made the Payments and the intercompany loans, and that the information was false and misleading.

### Defendant Garrison's Failure To Disclose The Payments

18.    As far as I am aware, the Fund Managers did not report the Payments, or the intercompany loans or cash transfers accompanying these Payments, in any other communications to the Funds or the Funds' Boards. Defendant Garrison had frequent communications with me during 2012 regarding the Funds and the Fund Managers' fees. He never mentioned taking any Payments, much less millions of dollars of Payments, or any inter-company loans or cash transfers facilitating those Payments.

19.    I have reviewed the Board minutes for our 2012 meetings, which are marked as Exhibits 38, 39, 169, and 180. I have seen no reference to the Payments. Garrison attended each of the Board meetings as the CEO of the Fund Managers and as a director of the Funds, and was

there when the Related Party Payments and intercompany loans were presented. He never mentioned the Payments during those presentations. Moreover, despite frequent discussions at the Board meetings regarding the Funds' expenses and the need to keep as much cash as possible, he never reported these Payments or the intercompany loans or cash transfers. The Payments certainly should have been disclosed because, based on the Funds' year-end valuation, the $5,818,682 taken from the Funds' assets amounted to 13% of the Funds' NAV. Ex. 110 at 178581.

### The Funds' Boards Relied On Defendants' Material Misstatements

20. The Funds' Boards considered this information regarding Related Party Payments and intercompany loans to be important in order to carefully monitor the Funds. They reviewed this information with Garrison at every Board meeting. Garrison knew that this information was important to the Boards based on his participation in the Board meetings.

21. As a member of the Funds' Boards, I relied on the Fund Managers' and Garrison's misstatements and concealment regarding the Payments and the accompanying cash transfers and intercompany loans. Other Board members relied on the misstatements as well, based on my discussions with them. We relied on these misstatements and concealment of information because the Fund Managers and Garrison had fiduciary duties to provide us with full and accurate information, and they had control over the information regarding the Payments and the loans.

22. Based on the defendants' misstatements and concealment, the Funds' Boards permitted the substantial compensation that the Fund Manager was receiving in the form of Fund Administration Fees and other fees. If the facts regarding the Payments and loans had been accurately disclosed, the Funds' Boards would have terminated the Fund Manager, prevented any additional payments, and taken immediate steps to recover any prior payments. That would have greatly reduced the harm that the Funds have since suffered.

23. The Fund Managers and Garrison knew or should have known from their communications in 2012 with the Funds' Boards and Board members that the Boards would not have permitted the Payments and intercompany loans or cash transfers to occur, and would have required the return of any Payments already made.

24. Garrison did mention to me a few times that he thought the Fund Manager was entitled to receive money for "underpaid" financing fees in prior years. However, he never made a formal request to the Funds' Boards for this money, he never made any effort to support his claim, and he never advised that he was actually taking any money from the Funds based on that claim.

25. It is true that the FMAs do not provide for Board approval of all payments by the Fund Managers. But the FMAs also do not provide for such payments to be made in defiance of the Boards' clear efforts to protect the Funds' assets and carefully monitor expenses. By managing the shareholders' money and exercising broad discretion with respect to that money, the Fund Managers had a responsibility to act with the utmost honesty, to put the interests of the Funds ahead of their own, and to avoid harming the Funds or depleting their assets. The Fund

Managers violated that responsibility by taking the Payments in 2012 for their own selfish interests, concealing the Payments from the Funds' Boards, and even misrepresenting to the Funds' Boards in the Fund Management Reports that the Payments were not being made. It is hard to imagine a more serious breach of trust or fiduciary duty.

26. I understand that the Fund Managers claim that the intercompany loans were not intercompany loans at all but simply a project company using a separate bank account to house its own cash, even though they recorded the transactions as intercompany loans or repayments of such loans. Regardless of how the Fund Managers characterize the movement of money among the underlying property entities, they were supposed to disclose such transfers to the Funds' Boards throughout 2012 and they did not do so.

### The Fund Managers' and Garrison's Efforts To Cover Up The Self-Dealing

27. On December 18, 2012, I received a phone call from Jeff Haroldson, who worked with HDGM Advisory. He was acting without defendant Garrison's knowledge. Haroldson advised that the Fund Managers had been taking the Payments throughout 2012 without the review or approval of the Funds' Boards. Haroldson further advised that others who worked with the Fund Manager were concerned about these Payments as well.

28. I immediately wrote to Garrison on behalf of myself and other members of the Boards. I asked whether the Fund Managers had taken fees without Board review and approval, and the reason for the Payments. I also stated that any payments had to be returned immediately, and a detailed report of any such payments had to be provided. My letter to Garrison on December 18, 2012 is marked as Exhibit 46.

29. On December 19, 2012, Garrison responded that all fees received by the Fund Managers had been paid in accordance with the Fund Management Agreements. He did not agree to return the fees taken, or advise why the fees were taken. A copy of Garrison's December 19, 2012 letter is marked as Exhibit 47. Indeed, he did not even acknowledge that the fees referred to in my letter had ever been taken.

30. On December 20, 2012, I wrote to Garrison and Thomas Kmiecik asking again for an explanation as to why the fees had been taken, as that question had not been answered in Garrison's December 19 letter. It was Garrison's practice during the time I knew him to avoid answering difficult questions, and I knew that I would have to press him for an explanation. A copy of my December 20, 2012 letter to Garrison is marked as Exhibit 48.

31. On December 20, 2012, Garrison responded that the Fund Managers had in fact received $5,818,682 as financing fees that had been underbilled and underpaid on financings in prior years. Ex. 49.

32. The Funds' Boards immediately provided notice of special board meetings to be held on December 27, 2012 to discuss the Payments. The Boards' meetings were held during the holiday period because we thought that the Payments, and the Fund Managers' refusal to return the Payments, were a serious problem that had to be addressed immediately.

33. At the Boards' meetings on December 27, 2012, Garrison was invited to explain to the Boards why the Fund Managers had taken the Payments totaling $5,818,682, and why the Fund Managers thought they were entitled to keep the money despite the Boards' concern. A copy of the minutes of that meeting is marked as Exhibit 39. Garrison advised the Funds' Boards that the money had been taken during the year as "underpayments" for financing transactions in prior years. Garrison further stated that the Fund Manager did not want to be in a position to fight in court for its fees in the event it was terminated, and that the Fund Manager was potentially at major risk to recover the amounts that it thought it was owed.

34. In response to my question as to why the Fund Managers took the Payments totaling $5,818,682 without Board review or approval, Garrison responded that he thought those instructions only related to new fees, and not to underpayments of past fees. Garrison did not dispute that the Fund Managers had received clear instructions not to take fees without the approval of the Funds' Boards. Garrison also did not dispute that the Fund Managers had hidden the Payments from the Funds' Boards. In response to my request that the Fund Manager provide a breakdown of the $5,818,682 that had been taken, Garrison advised that he did not have that information available, and therefore could not validate the amount of underpayments.

35. At the end of the December 27, 2012 meetings of the Funds' Boards, I reiterated my concern that the Fund Managers had taken fees despite the clear instructions that prior notice and approval was necessary. Other Board members joined in my concern. Garrison did not dispute that those clear instructions had been given, and that the $5,818,662 had been taken without Board approval. The Funds terminated HDGM Advisory as Fund Manager without prejudice as to whether the termination was consensual or for cause, as that was still to be determined. Thereafter, the Fund Manager only transitioned the Funds' records. It was not authorized to, nor did it, perform any work for the Funds.

36. On January 7, 2013, Garrison confirmed that the Fund Managers would not return the $5,818,682 to the Funds, or place that disputed money in escrow. Garrison advised that since the Fund Manager believed it was entitled to receive the money, it would keep the money regardless of what was in the best interests of the Funds. A copy of Garrison's January 7, 2013 letter is marked as Exhibit 50.

37. In January 2013, the Fund Manager provided the schedules of the Payments marked as Exhibits 15 and 17. These schedules supposedly showed how that money was taken as "underpayments" for prior transactions. Those schedules show that the Fund Managers took the money at different times, from different underlying property entities' accounts, and in different amounts that were unrelated to the transactions that were supposedly "underpaid."

38. The conduct of the Fund Managers' representatives essentially confirmed to me that they knew what had occurred was wrong. When I talked to him in January 2013, Tom Kmiecik, the CFO and CCO of HDGM Advisory, was very obstructive, and would not answer any questions. Brian Reeve, the Director of Accounting for HDG Mansur Capital Group, LLC, expressed concern about his conduct and asked me whether he was going to get into trouble.

39. In mid-January 2013, I received information from PwC, which had been reviewing the Payments on behalf of the Funds. PwC advised that the Payments had been taken

7

throughout 2012 and that descriptions in the general ledger journal entries had been changed in December 2012. Those changes apparently occurred after my December 18, 2012 letter to HDGM Advisory had been received, to support their story that there had been an underpayment of fees. This further deception and the clear attempt to continue to mislead the Funds' Boards, coupled with the conduct described above, led the Boards to ultimately determine at the Funds' February 5, 2013 meetings that the termination of HDGM Advisory as the Fund Manager was for cause. A copy of the February 12, 2013 letter advising HDGM Advisory of this determination is marked as Exhibit 101. The termination was for cause under the FMAs because of HDGM Advisory's breach of fiduciary duty, willful misconduct, gross negligence, dishonesty and fraud.

40. Garrison resigned from the Boards on February 13, 2013. Mr. Fred Crawford, the other Board member affiliated with HDG Mansur Capital Group, LLC, resigned on February 14, 2013. They tried to stay on the Boards, and only resigned when the other directors were about to have them removed.

### Losses To The Funds That Resulted From The Defendants' Misconduct

41. The conduct of the Fund Managers and Garrison caused substantial damages to the Funds in addition to the $5,818,682 that was taken. Other Board members and I have been forced to spend hundreds of hours trying to discover what happened, which has been hindered by the Fund Managers' and Garrison's refusal to provide truthful information. We have also been forced to spend hundreds of hours trying to recover the Payments through this litigation. Finally, other Board members and I have been forced to spend hundreds of hours trying to keep the Funds' disposition plan on track despite the severe disruption caused by the defendants' self-dealing and deceit.

42. The Funds are not seeking to recover for all this time and effort that was a direct result of the misconduct by Fund Managers and Garrison, which has a significant value but could be difficult to quantify. However, the Funds are seeking to recover their actual out-of-pocket expenses that were the direct result of the breach of fiduciary duty by the Fund Managers, and the fraud by the Fund Managers and Garrison personally. Those out-of-pocket damages, which are in addition to the $5,818,162 in Payments that was taken, total $2,688,925. Those additional damages consisted of:

(a) $1,385,604 in direct fund expenses that the Fund Managers took from the Funds, and had agreed to repay prior to termination, but never in fact repaid, *see* Exs. 110 at 178597, 162, 167;

(b) $83,321 for the fourth quarter 2012 Fund Administrative Fee "true-up" that the Fund Managers owed to the Funds but was never paid because the Fund Manager and Garrison refused to live up to their responsibilities to the Funds;

(c) $380,000 in increased PwC audit costs to uncover the conduct that Garrison and the Fund Managers refused to acknowledge, *see* Ex. 161;

(d) $765,000 in increased D&O insurance costs for the Funds after the insurers learned of the Fund Managers' misconduct; and

8

(e) $75,000 in increased transition costs because Garrison and the Fund Managers refused to acknowledge their conduct.

43.   In addition, the Funds are entitled to forfeiture and restitution of fees paid to the Fund Managers after February 8, 2012, the date the Fund Managers took the first of the Payments, in the amount of $2,854,189. This amount consists of the following:

- Fund Administration Fees of $1,121,697, representing a prorated portion of the Q1 2012 fee together with the fees paid over the rest of 2012.

- Capital Appreciation Performance Fees of $449,167 paid in connection with the CT Topeka and NL Niederbipp transactions, which closed after February 8, 2012.

- Disposition Fees of $636,071 paid in connection with the CT Topeka, HS Austin, and NL Niederbipp transactions, which closed after February 8, 2012.

- Legal fees reimbursed to the Fund Managers of $290,694, representing a prorated portion of the annual legal fee reimbursement.

- Leasing fees of $58,052 paid in connection with the Langen Lease, which closed after February 8, 2012.

_____
Deborah Hazell